UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X

WESTCHESTER DAY SCHOOL,                          :
                                                            02 Civ. 6291 (WCC)
                        Plaintiff,               :

        - against -                              :        **OPINION
                                                         <u>AND ORDER</u>**
VILLAGE OF MAMARONECK, THE BOARD OF              :
APPEALS OF THE VILLAGE OF MAMARONECK,
MAURO GABRIELE, GEORGE MGRDITCHIAN,             :
PETER JACKSON, BARRY WEPRIN and CLARK
NEURINGER, IN THEIR OFFICIAL CAPACITY           :
AS MEMBERS OF THE BOARD OF APPEALS OF
THE VILLAGE OF MAMARONECK, and ANTONIO          :
VOZZA, IN HIS OFFICIAL CAPACITY AS A
FORMER MEMBER OF THE BOARD OF APPEALS           :
OF THE VILLAGE OF MAMARONECK,
                                                 :
                        Defendants.
                                                 :
- - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                                MORRISON & FOERSTER, LLP
                                1290 Avenue of the Americas
                                New York, New York  10104

JACK C. AUSPITZ, ESQ.
JOEL C. HAIMS, ESQ.
KYLE W.K. MOONEY , ESQ.                          - and -

        Of Counsel

                                BERNSTEIN, LIEBHARD & LIFSHITZ,
                                  LLP
                                10 East 40th Street, 22nd Floor
                                New York, New York  10016

STANLEY D. BERNSTEIN, ESQ.

        Of Counsel                      **Attorneys for Plaintiff**

*Copies  Mailed  to  Counsel  of  Record*

**A P P E A R A N C E S :   (continued)**


                                        THACHER PROFFITT & WOOD LLP
                                        50 Main Street, 5th Floor
                                        White Plains, New York 10606

KEVIN J. PLUNKETT, ESQ.
DARIUS P. CHAFIZADEH, ESQ.

        Of Counsel                              - and -

                                        THE LAW OFFICE OF JOSEPH C. MESSINA
                                        424 Mamaroneck Avenue
                                        Mamaroneck, New York 10543

JOSEPH C. MESSINA, ESQ.
LISA M. FANTINO, ESQ.

        Of Counsel                      **Attorneys for Defendants**


                                        MICHAEL J. GARCIA
                                        UNITED STATES ATTORNEY FOR THE
                                        SOUTHERN DISTRICT OF NEW YORK
                                        **Attorneys for *Amicus Curiae***
                                          **United States of America**
                                        86 Chambers Street, 3rd Floor
                                        New York, NY  10007

SARAH E. LIGHT, ESQ.
  Asst. United States Attorney

**CONNER, Senior D.J.:**

Plaintiff Westchester Day School ("WDS" or the "School") brings this action against defendants the Village of Mamaroneck (the "Village"), the Zoning Board of Appeals of the Village of Mamaroneck (the "ZBA"), Mauro Gabriele, George Mgrditchian, Barry Weprin and Clark Neuringer, in their official capacities as members of the ZBA, and Antonio Vozza, in his official capacity as a former member of the ZBA, (collectively, the "defendants"). Plaintiff seeks relief under: (1) the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), alleging, *inter alia*, that defendants substantially burdened WDS's religious exercise by denying its application for a special permit to construct a new school building and to renovate and improve other existing buildings on the WDS campus; and (2) the All Writs Act, 28 U.S.C. § 1651, alleging, *inter alia*, that the ZBA's denial of WDS's application was arbitrary and capricious and not supported by the evidence in the record.[1] This Court conducted a noncontinuous, seven-day bench trial beginning November 14, 2005 and concluding November 29, 2005. For the reasons that follow, we enter judgment in favor of plaintiff.[2] Pursuant to Fed. R. Civ. P. 52(a), the following opinion sets forth the Court's Findings of Facts and Conclusions of Law.

---

[1] Plaintiff's free exercise claim, brought under 42 U.S.C. § 1983, was dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief could be granted by Opinion and Order of this Court dated July 27, 2005.

[2] Consequently, the Court denies defendants' motion to dismiss the Amended Complaint made on the record at trial and reiterated in defendants' post-trial brief. (Tr. 2 *et seq.*, and renewed at Tr. 1412; Defs. Post-Trial Br. at 1.)

1

**BACKGROUND**

I.    **Procedural History**

WDS commenced its action on August 7, 2002, following a vote by the ZBA six days earlier

that purported to rescind a Negative Declaration issued by it on February 7, 2002 in connection with

a special permit application filed by WDS on October 10, 2001 (the "Application").   Specifically,

the Application requested that the ZBA modify WDS's existing special permit to allow construction

of a new 44,000 square foot school building ("Gordon Hall") as well as make related improvements

to its campus (collectively, the "Project").   In its initial Complaint, WDS asserted claims under:

(1) RLUIPA, 42 U.S.C. § 2000cc *et seq.*; (2) N.Y. Village Law § 7-712-a(12); (3) N.Y. C.R.R. §

617.7(f); and (4) 42 U.S.C. § 1983.   On September 18, 2002, defendants moved to dismiss the

Complaint pursuant to FED. R. CIV. P. 12(b)(6) and WDS cross-moved for partial summary judgment

under Rule 56.   By Opinion and Order dated December 4, 2002 (the "December 2002 Order"), this

Court granted WDS's motion for partial summary judgment, holding that the Negative Declaration

was not properly rescinded as a matter of State law and therefore remained in full force and effect.

*See Westchester Day Sch. v. Vill. of Mamaroneck*, 236 F. Supp. 2d 349 (S.D.N.Y. 2002) (Conner,

J.) ("Westchester I").   This required the ZBA to continue WDS's Application to the special permit

hearing stage.

On May 13, 2003, the ZBA denied WDS's special permit modification and, on May 29,

2003, WDS filed an Amended Complaint challenging the ZBA's decision, asserting claims under

(1) RLUIPA; (2) 42 U.S.C. § 1983; and (3) the All Writs Act.   On June 23, 2003, defendants filed

an Answer and Affirmative Defenses.   No party demanded a jury trial.   WDS moved for partial

summary judgment and, by Opinion and Order dated September 5, 2003 (the "September 2003

2

Order"), this Court granted WDS's motion, holding that defendants violated RLUIPA. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 280 F. Supp. 2d 230 (S.D.N.Y. 2003) (Conner, J.) ("Westchester II"). In doing so, this Court annulled and set aside the May 13, 2003 determination of the ZBA, and ordered the immediate and unconditional issuance of WDS's special permit modification. *See id.* at 243-44. This Court also upheld the constitutionality of RLUIPA. *See id.* at 233-39.

Defendants appealed the September 2003 Order and, on September 27, 2004, the Second Circuit vacated and remanded the case for further proceedings (the "Second Circuit Opinion"). *See Westchester Day Sch. v. Vill. of Mamaroneck*, 386 F.3d 183 (2d Cir. 2004).

On November 5, 2004, defendants filed a First Amended Answer and Affirmative Defenses and moved for leave to file a jury demand or, in the alternative, for this Court to order a jury trial. By Opinion and Order dated April 1, 2005, this Court denied defendants' motion. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 363 F. Supp. 2d 667 (S.D.N.Y. 2005) (Conner, J.) ("Westchester III").

On March 24, 2005, defendants moved to dismiss the Amended Complaint and for summary judgment. By Opinion and Order dated July 27, 2005 ("July 2005 Order"), this Court denied defendants' motion with respect to WDS's claims under RLUIPA and the All Writs Act, but granted the motion with respect to WDS's claim under 42 U.S.C. § 1983. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 379 F. Supp. 2d 550 (S.D.N.Y. 2005) (Conner, J.) ("Westchester IV"). In addition, this Court again upheld the constitutionality of RLUIPA. *See id.* at 554.

## II.   **The Trial**

Trial of this action commenced on November 14, 2005, and lasted for seven days.  WDS presented eleven witnesses (including one expert witness) as part of its case-in-chief:  (1) Rabbi Joshua Einzig, Headmaster of WDS; (2) Rachel Goldman, Executive Director of WDS; (3) Caren Hammerman, Chairman of the Board of Trustees of WDS from 2000–04, President from 1997–2000 and parent of four WDS graduates; (4) Vicky Rubenovitch-Fish, Assistant Principal of WDS; (5) Michael Turek, a parent of two current WDS students and a member of the Orthodox Jewish community of New Rochelle, New York; (6) Dr. Marvin Schick, an expert on Jewish education; (7) Russell Davidson, an architect specializing in school design and partner of the firm Kaeyer, Garment & Davidson ("KGD"), architects to WDS; (8) J. Michael Divney, P.E., AICP, a licensed professional engineer, certified planner and partner of the firm Divney, Tung & Schwalbe ("DTS"), site planners and traffic consultants to WDS; (9) James Staudt, Esq., a partner of the law firm McCullough, Goldberg & Staudt, land use counsel to WDS; (10) Frank Fish, a partner of the firm Buckhurst Fish & Jacquemart, Inc. ("BFJ"), planning and traffic consultants to the ZBA; and (11) Dr. Michael Horodniceanu, a traffic consultant retained by opponents of the Project and upon whose opinion, as discussed below, the ZBA relied in denying the Application.  In rebuttal, WDS called David Kalman, President and Board member of Westchester Hebrew High School ("WHHS").

Defendants presented four witnesses:  (1) Mauro Gabriele, Chairman of the ZBA since December 2002; (2) Peter Jackson, a former ZBA member who returned to the ZBA in December 2002; (3) Georges Jacquemart, a partner of BFJ specializing in traffic planning; and (4) Christopher Tilley, a neighbor of WDS and an opponent of the Project.

Over the course of the trial, the Court admitted into evidence more than 125 exhibits,

4

including all of the transcripts of the ZBA hearings during which the Application was discussed.

The Court also admitted into evidence materials relating to WDS and its dual curriculum, such as

curriculum guides and class lists.[3]  In addition, the Court admitted into evidence expert reports from

Dr. Schick, Fish and Jacquemart.  Also before the Court are designated excerpts from the depositions

of ZBA members Mgrditchian, Neuringer and Weprin, none of whom testified at trial, as well as

Gabriele and Jackson.

The Findings of Fact and Conclusions of Law set forth below, pursuant to FED. R. CIV. P.

52(a), are based on the extensive record developed over the course of the bench trial during which,

as set forth above, plaintiff and defendants had a full and fair opportunity to present their cases to

the Court.

## FINDINGS OF FACT

### I.   WDS and the Orienta Point Neighborhood

1.   Since 1948, WDS has operated an Orthodox Jewish day school in the Orienta Point

neighborhood of the Village (the "Property").  (SAF ¶ 1; Tr. 169-70; Pl. Ex. 3(4).)[4]

---

[3] During trial and via letter to the Court dated November 21, 2005, defendants objected to the admissibility of these materials as irrelevant in light of the Second Circuit Opinion, which defendants interpret to hold that, as a matter of law, "classrooms, a cafeteria, tutoring rooms and similar rooms are secular in nature."  (Ltr. from K. Plunkett, Esq. to Hon. William C. Conner, dated Nov. 21, 2005, at 1.)  According to defendants, these materials, therefore, are irrelevant to any determination concerning the religious exercise element of RLUIPA.  We disagree (*see infra* Concl. of Law Section I.B., II.), and maintain the admissibility of these exhibits.

[4] Citations herein take the following form:  "SAF ¶ __" refers to the Statement of Agreed Facts submitted to the Court on November 8, 2005; "Tr. __" refers to the consecutively paginated trial transcript; "Pl. Ex.__" refers to plaintiff's exhibits; "Defs. Ex. __" refers to defendants' exhibits; and "_____ Dep. at __" refers to designated testimony from the depositions of the ZBA members, named defendants in this action.

2.      The Property is owned by Westchester Religious Institute ("WRI"), which allows WDS, among other entities (see infra ¶ 4), to use its property.  (SAF ¶ 6; Tr. 62, 150.)

**A.      Character of the WRI Property**

3.      The Property, located at 856 Orienta Avenue, Mamaroneck, New York 10543, east of Boston Post Road (U.S. Route 1) in the Village, is a 25.75-acre, largely undeveloped parcel bounded by Orienta Avenue, Skibo Lane, Walton Avenue, Bleeker Avenue and the Long Island Sound.  (SAF ¶¶ 1, 6; Pl. Ex. 116.)

4.      In addition to WDS, WHHS and a synagogue operate on the Property.  (SAF ¶ 9; Tr. 62.)

5.      WHHS and WDS are separate entities, maintain separate records and have separate Boards of Trustees, each of which oversees the operations of its respective institution.  (SAF ¶ 9; Tr. 62, 65.)

6.      The synagogue also is a separate entity, though it utilizes the *shul*, or chapel, in the WHHS building for prayer services when school is not in session.  (SAF ¶ 9; Tr. 35-36, 65.) Approximately 40 families form the synagogue's congregation, called Shaarei Tikva.  (Tr. 65; Pl. Ex. 78 at 6.)  The congregation holds services on Saturday morning, with approximately 10-25 members usually in attendance, but if ten men are present—Orthodox Jews require the presence of ten men to form a *minyan* before public prayer can begin—services are held Friday evening, Saturday afternoon and Sunday morning.  (Tr. 35-36.)  Services also are held on religious holidays when school is not in session.  (Tr. 36, 65; Pl. Ex. 78 at 6.)  As Orthodox Jews, members of the synagogue do not drive to services.  (Tr. 36; Pl. Ex. 78 at 6.)

6

7.      There are four principal buildings on the Property:  (1) the split level Wolfson Hall;
(2) the three-story Estate House (also referred to as the "Castle"); (3) the Carriage House; and (4)
the two-story high school building, built in 1979.  (SAF ¶ 8; Pl. Exs. 1, 2, 116.)

a.      Wolfson Hall was constructed in the 1960s (SAF ¶ 8), and has undergone no
subsequent renovation.  (Tr. 87.)  As of October 2001, when the Application was filed, Wolfson Hall
contained classrooms for one of the pre-kindergarten ("*ganon*") classes and for kindergarten through
grade three, as well as a lunchroom, a science lab for grades six through eight and offices.  (Tr. 87.)

b.      The Castle was built circa 1897 (SAF ¶ 8) as a summer home and, as of
October 2001, had undergone renovation only to convert the bedrooms into classrooms.[5]  (Tr. 88-89;
Pl. Ex. 65 at 7-8.)  The classrooms were irregularly shaped and small—some classrooms were well
under 400 square feet.  (Tr. 88-89, 175; Pl. Ex. 65 at 8; *infra* ¶¶ 61-62.)  The windows were unsafe,
there was no air conditioning and the electrical system was inadequate.  (Tr. 88-89, 175.)  In
addition, because the Castle was structurally unsound, WDS was forced to have erected wooden
columns to shore up the structure, and to have an engineer inspect the building four times per year.
(Tr. 89-92, 174-75, 278; Pl. Ex. 29.)  As of October 2001, the Castle contained classrooms for *ganon*
classes and grades six through eight, in addition to a computer room and administrative offices.  (Tr.
88, 175.)

c.      The Carriage House was built in 1892 to serve as a horse stable.  (SAF ¶ 8;
Tr. 86.)  In 1999, it was renovated to create five classrooms.  (Tr. 86; Pl. Ex. 85.)  As of May 13,
2003, this renovation was the only meaningful construction performed by WDS on the Property since

_____

[5] After a fire destroyed portions of the Castle in June 2003, WDS applied for and received
a building permit to renovate this building.  (SAF ¶ 36; Tr. at 101; *see infra* ¶ 230.)  At the time of
this Opinion and Order, renovations were nearing completion.

7

the construction of Wolfson Hall in the 1960s. (Pl. Ex. 65 at 5-6.) As of October 2001, the Carriage House contained a total of five classrooms used for grades four and five and a small teachers' room. (Tr. 86.)

8.     In addition to these buildings, pursuant to a special permit granted by the ZBA in 1986, WRI constructed a headmaster's residence on the portion of the Property fronting Orienta Avenue (858 Orienta Avenue). (SAF ¶ 10; Pl. Ex. 92.) After several years, WDS determined that use of the residence for this purpose was no longer necessary (Pl. Ex. 78 at 97-98), and, in March 1995, at WDS's request, the Village Tax Assessor changed the taxable status of the residence from tax-exempt to taxable; taxes subsequently have been paid to the Village. (SAF ¶ 10; Tr. 730-32, 916; Pl. Ex. 36.) The use of this residence does not, therefore, require a special permit, and the residence can be used for nonschool purposes. (Tr. 731-32.)

9.     Other uses of the Property, in addition to WDS, WHHS and Shaarei Tikva, include Westchester Summer Day, a summer recreational and Jewish educational program run by WDS. (SAF ¶ 5; Tr. 65-66.) Up to 500 children, ranging in age from three to fifteen, attend Westchester Summer Day. (SAF ¶ 5; Tr. 65-66.) Westchester Summer Day incorporates many Jewish aspects, including prayer, Jewish music and art and Hebrew tutoring. (Tr. 66.)

10.    The Property also is used on Sunday mornings and Tuesday evenings for approximately ten weeks during the spring months for little league softball games for children in kindergarten through sixth grade ("Sunday Sports League"). (Tr. 68.) The Sunday Sports League was established in order to allow Orthodox Jewish children the opportunity to take part in organized, competitive sports; these children cannot participate in the Village-run little league because those games are played on Saturdays, the *Sabbath* for those of the Orthodox Jewish faith. (Tr. 69-70.) The

8

Sunday Sports League is run by a volunteer parent of a WDS student, and the majority of the participants are WDS students. (Tr. 69.) The Sunday Sports League, and the other activities described above, were lawfully taking place on the Property before the ZBA unanimously renewed WDS's special permit on November 2, 2000. (Tr. 918; Pl. Ex. 3(4) at 1; Pl. Ex. 65 at 4-5; Pl. Ex. 78 at 5-6; Pl. Exs. 85-96.)

11.     On very rare occasions, perhaps once a year, a religious life-cycle event, such as a *Bar* or *Bat Mitzvah*, may be held on the Property when the school is not in session. (Tr. 108.)

12.     The Mamaroneck Police Department, local firehouses, the Orienta Point Association and other civic organizations have been permitted to hold their annual picnics on the Property. (Tr. 108-09, 824; Pl. Ex. 72 at 72-73.) These organizations have not been charged any rental fees for their use of the Property. (Tr. 108-09, 824; Pl. Ex. 72 at 72-73.)

### B.     Character of Orienta Point

13.     The Property is located in an area of the Village zoned as an R-20 District.[6] *See* VILL. CODE § 342-21(A); (Pl. Ex. 3(1) at 2; Pl. Ex. 4 at F-1).

14.     Several other large properties border WRI's tract. Adjacent to the Property is the Orienta Beach Club. (SAF ¶ 6; Tr. 890; Pl. Ex. 116.) Also, two blocks north of the Property, on the northeast corner of Orienta Point, are the Beach Point Club facilities.[7] (Tr. 890-91; Pl. Ex. 116.)

---

[6] Under the Code of the Village of Mamaroneck (the "Village Code"), private schools, such as WDS, are permitted to operate in R-20 Districts subject to granting of a special permit. *See* VILL. CODE § 342-21(A)(5).

[7] ZBA member and Beach Point Club member Jackson testified at trial that the Beach Point Club had built a new dining facility sometime during WDS's application process. (Tr. 1332.) The Affidavit of Larry Fraioli, Chairman of the Village of Mamaroneck Planning Board—submitted at the Court's request for information on other Village-approved construction projects occurring in the

9

In addition, the Hampshire Country Club, an eighteen-hole golf course, is located on Orienta Point; its entrance is to the west of the Property off of Orienta Avenue. (Tr. 494-95; Pl. Ex. 116.) Several boat yards also are situated on the north shore of Orienta Point. (Tr. 891; Pl. Ex. 116.) These boat yards accommodate hundreds of boats, some of which are transported to and from the boat yards on large trailers via the Orienta Point road network. (Tr. 891, 926; Pl. Ex. 116.) Trial testimony of Tilley, an Orienta Point resident and vocal opponent of the Project, and Jackson, a ZBA member who maintains a membership at the Beach Point Club, revealed that these uses generate significant traffic, especially on the weekends. (Tr. 1247, 1331-32.)

15.     Several schools in addition to WDS and WHHS operate in and around Orienta Point. The Liberty Montessori School is located on Orienta Point, on the southeast corner of the Boston Post Road/Orienta Avenue intersection. (Tr. 1182; Pl. Ex. 116.) Mamaroneck High School is on the west side of Boston Post Road, between the Boston Post Road/Orienta Avenue and Boston Post Road/Old Post Road intersections. (Tr. 357, 1203; Pl. Ex. 116.)

16.     The two main thoroughfares providing access to the Orienta Point neighborhood are Orienta Avenue and Rushmore Avenue. (Pl. Ex. 116.) Orienta Avenue intersects Boston Post Road and continues in a generally southeasterly direction towards the Long Island Sound. (*Id.*) Rushmore Avenue intersects Orienta Avenue just east of Boston Post Road and continues east to the Long Island Sound. (*Id.*)

17.     Orienta Avenue is a two-way, two-lane road with an average pavement width of

---

Orienta Point area at the time of WDS's Application—indicated that the Board granted: (1) the Beach Point Club's application for site plan approval of an 11,000 square foot addition on or about June 26, 2003, and (2) the Hampshire Country Club's application for two variances and site plan approval for an 11,000 square foot addition in or about April 2004 and July 2004, respectively. (Fraioli Aff. ¶¶ 3, 7, 9, 12-14.) Neither of these projects required a special permit.

approximately 20 feet.  (SAF ¶ 7; Pl. Ex. 3(8) at 2.)  A sidewalk extends along a substantial portion of Orienta Avenue, from Boston Post Road until just before Sylvan Lane.  (Tr. 492-93, 1244-45, 1330; Pl. Ex. 116.)  At that point, Orienta Avenue splits into two parts:  Orienta Avenue and a service road, the pair separated by a 15-foot wide grassy median.  (Tr. 1244-46, 1330-31; Pl. Ex. 116.)  The service road continues until just before the WDS driveway on Orienta Avenue.  (Pl. Ex. 116.)

18.     Rushmore Avenue also is a two-way, two-lane road with an average pavement width of approximately 20 feet.  (Pl. Ex. 3(8) at 2.)  A sidewalk extends along a substantial portion of Rushmore Avenue, from Orienta Avenue to the western boat yard on the north shore of Orienta Point.  (Pl. Ex. 116.)

19.     In addition to Orienta Avenue and Rushmore Avenue, Old Post Road provides a one-way egress from Orienta Point, intersecting Boston Post Road to the south of the Boston Post Road/Orienta Avenue intersection.  (*Id.*; Tr. 1203, 1249.)  Cove Road also provides vehicular ingress to and egress from the Orienta Point neighborhood.  (Tr. 1205, 1249; Pl. Ex. 116.)

20.     Vehicular ingress to the Property is provided from a one-way, inbound-only driveway located on Orienta Avenue.  (SAF ¶ 7; Pl. Ex. 116.)  The main entrance to the Property is approximately eight-tenths of a mile from Boston Post Road.  (SAF ¶ 6; Pl. Ex. 116.)  Vehicular egress from the Property is provided from a one-way, outbound-only driveway located on Walton Avenue.  (SAF ¶ 7; Pl. Ex. 116.)  Because Walton Avenue is unpaved between Bloomdale Avenue and Bleeker Avenue, traffic departing the Property generally turns north on Bloomdale Avenue and exits Orienta Point via Rushmore Avenue to Orienta Avenue.  (Tr. 238-39, 335-36; Pl. Ex. 3(8) at figs. 3, 4.)

**II.**   **Special Permit Law, Process and History**

21.     As already noted, the Village Code permits private schools to operate in R-20 Districts subject to granting of a special permit.  *See* VILL. CODE § 342-21(A)(5).  The special permit procedure is set forth in Article X of the Village Code.  *Id.* §§ 342-67 to -73.

22.     Section 342-68 of Article X provides as follows:  "The special uses for which conformance to additional standards is required by this chapter shall be deemed to be permitted uses in their respective districts, subject to the satisfaction of all requirements and standards prescribed by this chapter and the granting of a special permit for such uses."

23.     The conditions to be satisfied are set forth in § 342-71:

A.  That the location and size of the use, the nature and intensity of the operations and traffic involved in or conducted in connection with it, the size of the site in relation to it and the location of the site with respect to the type, arrangement and capacity of streets giving access to it and the hours of operation are such that the proposed use will be in harmony with the appropriate and orderly development of the district in which it is located.

B.   That the location, nature and height of the buildings, walls and fences and the nature and extent of the landscaping and screening on the site, as existing or proposed, are such that the use will not hinder or discourage the appropriate development and use of adjacent land and buildings.

C.   That operations in connection with the proposed use will not be objectionable by reason of noise, fumes, smoke, dust, vibration, glare, intensity or flashing of lights.

D.   That the parking areas to be provided will be of adequate capacity for the particular use, properly located and suitably screened from adjoining residential uses and that the entrance and exit drives shall be laid out so as to achieve maximum safety.

E.   That, where they are applicable, the standards and requirements established or approved by the Village Engineer have been satisfactorily met as evidenced by his certification and that all necessary approvals of any other governmental agency or board have been or will be obtained by the applicant.

12

24.    If the ZBA finds that "all appropriate conditions have been satisfactorily met, it shall grant [an application for a special permit] and approve the proposed special use, subject to such terms as are prescribed in this chapter or as the Board may impose; otherwise it shall deny the application." *Id.* § 342-72.

25.    WDS operates on the Property pursuant to a special permit granted by the ZBA in accordance with this procedure.  (SAF ¶ 11; Pl. Ex. 86.)  The special permit is subject to renewal every three years, at which time the ZBA may impose reasonable conditions to mitigate any negative impacts related to the use of the Property.  (SAF ¶ 11; Tr. 733-34, 1292; Pl. Ex. 86.)

26.    As 58-year residents of Orienta Point, WRI and WDS have lengthy histories before the ZBA.  In 1974 and 1976, WRI applied for and was granted special permits for the installation of two tennis courts and a handball court, respectively.  (Pl. Exs. 95, 96.)  WRI received a special permit in 1978 to construct an additional building on its campus to house WHHS (Pl. Ex. 94), with another special permit granted six years later to permit the addition of a second story to that structure.  (Pl. Ex. 93.)  WRI received permission for the construction of a headmaster's residence two years later.  (Pl. Ex. 92; *see supra* ¶ 8.)  That same year, WRI received a special permit, after the fact, for the construction of an aboveground swimming pool (Pl. Ex. 91); WDS applied for and received special permits for installation of swimming pools in 1991 and 1997.  (Pl. Exs. 84, 88, 89.)  WRI applied for and was granted a special permit to grade and plant an athletic field in 1987.  (Pl. Ex. 90.)  It received another special permit in 1991 to construct a partial, second-floor addition.  (Pl. Ex. 89.)  Lastly, the Carriage House renovation special permit was granted to WDS in 1999.  (*See supra* ¶ 7.c.)

27.    On November 2, 2000, immediately following the year in which student enrollment

13

peaked at WDS (and the Property, including WDS and WHHS), the ZBA unanimously renewed the special permit for a period of three years and merged into that special permit all prior special permits granted by the ZBA with respect to the Property. (SAF ¶ 11; Pl. Exs. 32, 34, 86.) In doing so, the ZBA made the following specific findings of fact:

1.    All conditions of the special permit have been complied with[;]

2.    No complaints have been made to the Building Department, Police Department, or any other department or agency of the Village in connection with the operation of the school[; and]

3.    No violations have been noticed or cited in connection with the operation of the school.

(Pl. Ex. 86 at 1.) The Village has not subsequently issued any violations against WDS. (Tr. 901.)

28.    According to Hammerman's statements to the ZBA at its November 1, 2001 hearing on the Application, WDS informed the ZBA at the time of its application for the Carriage House renovation in 1999 (*see supra* ¶ 7.c.), that that application represented only the first stage of part of a larger expansion project. (Pl. Ex. 65 at 6.) The Application at issue in this action constitutes that envisioned "grander project." (*Id.*)

III.    **WDS's Existing Facilities**

29.    There was substantial testimony at trial regarding the inadequacies of the WDS facilities.[8] Plaintiff alleges that these inadequacies render WDS unable to provide an adequate and effective dual curriculum Judaic and general studies education consistent with the mission and tenets

_____

[8] That the ZBA was aware of the inadequacy of WDS's existing facilities is not in dispute. (Tr. 836-37; Pl. Ex. 65 at 7-8.) For example, a February 20, 2002 letter from Hammerman produced from ZBA's files discusses several of the inadequacies of WDS's existing facilities. (Defs. Ex. TT at 2.)

of modern Orthodox Judaism.

30.    For example, Rabbi Einzig, the WDS headmaster, testified:

The facilities are not adequate.  I am familiar with the school[s] that I have been at before, and we had much more and much bigger space for our children, and we are—we do not have the correct amount of space right now.  It inhibits really the process of true education.

(Tr. 32.)

31.    Hammerman likewise testified that "[t]here is a deprivation of space and adequate facilities for the teachers to be able to instruct their students in the Judaic studies curriculum."  (Tr. 224.)  Although she acknowledged on cross-examination that "[a]ll beliefs can be practiced," Hammerman qualified it by noting that the lack of space prevented the teachers from doing their jobs "adequately."  (*Id.*)

32.    Goldman, WDS's Executive Director, testified that "[the facilities] were inadequate then [1999/2000], they are inadequate today."  (Tr. 129.)  This conclusion was shared by WDS's architect.  Davidson, who has specialized in school design for over 20 years, stated "the facilities currently in use [at WDS] are inadequate even for the current student body."  (Defs. Ex. O at KGD 27; Tr. 1008, 1011, 1020.)

33.    As a result, WDS has received complaints from parents about the inadequacy of its facilities.  (Tr. 138; *see also* Tr. 94 (noting parental displeasure at large student-to-class ratio (*see infra* ¶ 34.a.)); Tr. 795-96 (indicating parents sending children to other competitive-area schools with more adequate facilities).)

34.    WDS's existing facilities are inadequate in several critical respects including, at least, the following:

      a.    WDS lacks sufficient classroom space to accommodate its dual curriculum Judaic and general studies education.  (Tr. 93-94, 112, 172.)  The lack of classroom space has forced WDS to increase class sizes to the detriment of the students' education; Judaic studies are traditionally and more effectively taught in smaller class sizes.  (Tr. 93-94, 394-98, 409-10, 419, 428.)  The impact of the lack of classroom space is exacerbated by the fact that WDS's dual curriculum requires that it have significantly more classroom space than schools that do not have a dual curriculum.  (Tr. 166, 394-95, 409, 419, 427.)  The need for extra space arises from, *inter alia*, the greater number of subjects taught and the number of faculty required to teach those subjects.  (Tr. 394-98, 409-10, 419, 428.)  WDS has been forced to decommission both its library and art room in order to use them as classroom space.  (Tr. 180.)

      b.    WDS does not have adequate space for a learning center or for small-group instructional rooms to provide, for both Judaic and general studies, (1) remedial instruction to children with special needs; (2) "challenge" instruction to more gifted students; and (3) differentiated instruction, *i.e.*, teaching children based on how each child best learns, whether, for example, through auditory, visual or kinesthetic means.   (Tr. 30-32, 82, 93, 172-73, 459-61, 795.) Hammerman testified that WDS has been forced to use closets as educational spaces:

> I was in the school on a frequent basis, and I saw that what had been used as closets for books or closets for supplies were now being turned into educational spaces, which were suboptimal spaces.  They had no windows, they were small, and they had education going on in there, because there were no other spaces available to be used.

(Tr. 179-80.)   Rubenovitch-Fish, WDS's Assistant Principal, testified that the small-group instructional rooms are in fact "[c]losets," and

> [t]he former bookroom is where one of our teachers pulls some of the challenge

> students in one of the buildings.  And the other one, she just goes into the classroom, because we don't have even a closet. There was a bookroom where they put the air-conditioner so we can breathe, and it's far from conducive to learning.

(Tr. 461.)  Rubenovitch-Fish further testified that WDS has even been forced to engage in small-group instruction in the hallways:

> We have enormous needs of learning center children, and we mentioned the challenge teacher, and we have nowhere for these children to go.  And sometimes Mrs. Katzeff just pulls up five or six chairs into the hallway with her challenge group, and people are coming and going.  And fortunately they can focus and attend, they are children of greater ability, but it's, it's far from ideal.  It's a very difficult situation to teach like that.

(Tr. 459-60.)  The learning center and small-group instructional rooms are particularly important at a dual curriculum school such as WDS due to the fact that, among other things, numerous children require remedial or challenge education in Judaic studies but there is less classroom time available each day to devote to instruction and remedial education in each of the Judaic and general studies subjects.  (Tr. 394, 396-98, 409-10, 419, 428, 455-56.)

       c.      WDS does not have a large room to use for, *inter alia*, religious instruction, group prayer and Jewish performances and assemblies.  (Tr. 33, 93, 172.) Rabbi Einzig emphasized the lack of adequate space for WDS to hold "weekly assemblies where we will be able to speak about the weekly portion in the Torah, we call it, *Parshat Shavua* . . . ."  (Tr. 34; *see also* Tr. 52.) For larger gatherings, WDS is forced to use the lunchroom, which itself cannot accommodate even half of the School's enrolled students.  (Tr. 33, 93.)[9] Moreover, when the lunchroom is required for a special activity that normally would be held in an assembly room, such as a book fair, students are forced to eat in their classrooms.  (Tr. 94-95.)  The lack of an assembly room also means that the

---

[9] The size of the lunchroom requires that students eat lunch in three shifts, the earliest lunch shift ending at 11:15 a.m., approximately five hours before dismissal.  (Tr. 95-96.)

younger students have nowhere to recreate during inclement weather.  (Tr. 96.)

        d.     WDS does not have a library—for either English or Judaic studies.[10]  (Tr. 93-94, 180.)  WDS was forced to decommission its library and use the space for classroom instruction.  (*See supra* ¶ 34.a.)

        e.     WDS lacks an art room.  (Tr. 93-94, 172, 457-58.)  The art room was moved to a makeshift space in Wolfson Hall before being converted to classroom space.  (Tr. 180; Defs. Ex. TT at 2.)  Ever since, WDS has wheeled art supplies from classroom to classroom.  (Tr. 180.)  Hammerman testified:

> [T]he materials are cumbersome.  When children make things, they need a place to hang them out to dry.  There is no place for them to do that.  It takes up an awful lot of time to wheel the things in and out.  The art teacher has to come into the classroom, which displaces the regular classroom teacher, *et cetera*.  It's just not a good situation.

(Tr. 180-81.)

        f.     WDS has no music room.  (Tr. 100, 172, 457-58.)  The lack of any music room precludes WDS from, *inter alia*, incorporating instruments into its music program.  (Tr. 458.)  Rubenovitch-Fish, an educator for over 30 years, testified:

> I have never been in a school where we didn't have a music room where the children can go—soundproofing or no soundproofing—a separate room so they could do beyond just vocal music, so they can get into instrumentation.
>
> Music largely involves movement as well.  There is no way of doing that.  We simply have the vocal, the singing.  That's the only piece of our music program that we can do in the confines of our rooms.

(*Id.*)

---

[10] Renovations to the Castle included space for a *beit midrash*, or library/study center devoted exclusively to Jewish scholarship.  (SAF ¶ 37; *see infra* ¶ 230.)

18

g.    WDS's existing facilities do not allow for age-appropriate grouping of students. (Tr. 1015.) Davidson explained:

> One of the issues . . . of the day school was that they were not able to cluster facilities for each age level together. They were spread out and that created obvious functional and educational impediments to offering their programs. Ideally, in any school environment, you want to group age levels together.

(Tr. 1015; *see also* Defs. Ex. O at KGD 27.) For example, while some of the *ganon* classrooms are located in the Castle, other *ganon* classrooms are located in Wolfson Hall.[11] (Tr. 87-88, 175-76.) WDS's inability to cluster students into age-appropriate groups results in, among other things, the lack of appropriate social separation between the younger and older students, which makes it more difficult to maintain order and discipline. (Tr. 98-99, 176, 1015.) More importantly, the time required for the students to travel between buildings for their different classes and activities results in the loss of valuable instruction time (Tr. 100-01, 213), a concern of crucial significance where the School must teach both Judaic and general studies. (Tr. 455-57.) Instruction time is therefore at a premium at WDS relative to non-dual curriculum schools.[12] (*Id.*) Rubenovitch-Fish explained that in order to cover both its Judaic studies curriculum and meet the New York State standards for general studies curriculum, WDS "compact[s]":

> [I]n order to fit into one whole day, we have a long day. We start at 8:00 in the

___

[11] WDS has been forced to locate kindergarten students in classrooms in Wolfson Hall where they do not have access to adequate bathroom facilities. (Tr. 459, 795.)

[12] The school year at WDS runs from September through June. (SAF ¶ 3.) School hours are Monday through Thursday 8:05 a.m. to 4 p.m. for grades six through eight, and 8:45 a.m. to 4 p.m. for *ganon* through grade 5, except for some *ganon* students who are dismissed at either 1 p.m. or 3 p.m. (Tr. 103-04, 106; Pl. Ex. 13 at 2-3.) All students are dismissed at 1:40 p.m. on Friday, except for some *ganon* students who are dismissed at 1 p.m. (Tr. 106; Pl. Ex. 13 at 2-3.) The purpose of early dismissal on Friday is to allow students and teachers adequate time to prepare for the *Sabbath*, which begins at sundown Friday. (Tr. 106.)

morning and go till 4:00.  But we have to compact so that it flows smoothly and seamlessly throughout the day.

. . . .

Time is our enemy.  We have to fit an awful lot into—to cover the same material that the other schools in Westchester County cover.

(Tr. 455-56.)

        h.     WDS also lacks facilities for speech therapy, occupational therapy and psychological counseling.  (Tr. 82, 93, 462-63.)  Rubenovitch-Fish explained that some of these services are "squeezed" into her office, which serves as a "combined office, bookroom, storeroom [and] conference room"; it is "not the best environment for something where they need to do either any form of assessment, or speech pathology needs great acoustics and sounds to be heard."  (Tr. 462.)  More importantly, because her office is located one floor below bathrooms, it proves a poor learning environment for students with sensory sensitivity.  (Tr. 462-63.)

        i.     WDS lacks computer and science labs that can properly accommodate all of its students.  (Tr. 96, 172.)  The small computer room in Wolfson Hall is able to service only students in kindergarten through grade three.  (Tr. 96.)  The single science lab can accommodate only those students in grades six through eight.  (Tr. 461-62.)  Moreover, the science lab is not located within a reasonable distance of those middle school students who actually use the lab.  (Tr. 96-97, 172.)

        35.    Rabbi Einzig testified that the students' education "is being compromised in the facility that we are now abiding in" (Tr. 47), and that the existing facilities "inhibit[] the process of true education."  (Tr. 32.)  Hammerman testified: "I know that the teachers of Judaic studies are hampered with the facilities they have, and they cannot adequately teach the religion in the facilities

that they have . . . . The teachers cannot adequately teach what they need to teach to accomplish the mission of the school." (Tr. 264-65; *see also* Tr. 224.) Goldman echoed these thoughts: "[T]he facilit[ies are] inadequate. It hinders us from performing what we believe is our duty to teach Jewish values, Torah values, properly in this school." (Tr. 131) Rubenovitch-Fish testified that WDS "do[es]n't have enough room to do anything properly." (Tr. 457.) Dr. Schick, an expert in Jewish education[13], also opined that modern Orthodox Jewish day schools are hindered in their ability to teach Judaic studies when, as here, they lack adequate facilities. (Tr. 397-98 (commenting on need for "a significant number of classrooms" and that lack of proper facilities will dissuade attendance).)

36.    The inadequacy of WDS's existing facilities also significantly interferes with and has had a chilling effect on its ability to attract and retain students.[14] (Tr. 99-100, 1020.) The evidence showed that there is a competitive interstate market for Jewish day schools in Westchester County, as part of an even larger interstate market for private education generally. (Tr. 405-06; *see also* 795-96.) In fact, Jewish day schools are growing in population across both New York State and the United States. (Tr. 398-400; Pl. Ex. 107 at 1, 25.) The modern Orthodox Jewish community in

---

[13] Dr. Schick has written several hundred articles on Jewish education and has visited approximately 400 Jewish day schools across the country, which constitutes approximately half of all such institutions. (Tr. 377-78, 380; Pl. Ex. 62 at 1.) Dr. Schick attended a yeshiva called the Rabbi Jacob Joseph School ("RJJ"), beginning in elementary school and continuing through seminary. (Tr. 377; Pl. Ex. 62 at 1.) He received his ordination as a rabbi there in 1957. (Tr. 377; Pl. Ex. 62 at 1.) Dr. Schick has been president of RJJ for the last 33 years. (Tr. 379.) Dr. Schick also serves as senior advisor to the Avi Chai Foundation, which "manages a $50 million fund established to provide interest-free loans of up to one million dollars to promote the construction of Jewish day schools." (Tr. 378; Pl. Ex. 62 at 2.) Dr. Schick helped to establish, and became the first president of, the National Jewish Commission on Law and Public Affairs. (Pl. Ex. 62 at 2.) This organization "has represented the . . . Jewish community on legal and legislative matters, including issues relating to day school education." (*Id.*)

[14] Both WDS students and teachers come from within the state of New York and from without the state of New York (*i.e.*, Stamford, Connecticut). (Tr. 83-84.)

Westchester also is growing.  (Tr. 260; 796.)

37.    Despite the growth of the modern Orthodox Jewish community in Westchester, enrollment at WDS has been declining since 1999.  (Pl. Ex. 32.)  Total student enrollment at WDS for the academic years 1994 through 2005 is as follows:

| | | |
|---|---|---|
| 1994 – 395 | 1998 – 482 | 2002 – 475 |
| 1995 – 403 | 1999 – 502 | 2003 – 463 |
| 1996 – 413 | 2000 – 486 | 2004 – 429 |
| 1997 – 458 | 2001 – 461 | 2005 – 414 |

(SAF ¶ 4; Pl. Ex. 32.)

38.    The decline in enrollment at WDS since 2001 has been caused, at least in part, by defendants' actions, which have precluded WDS from remedying the inadequacies of its facilities and constructing facilities available at other Orthodox Jewish day schools.  (Tr. 99-100, 176-78, 405-06, 1020.)  There is no evidence suggesting WDS can staunch this downward trend without constructing facilities more adequately geared toward providing its dual curriculum.  Obviously, this continued loss of students (and faculty) will undercut the objectives of the mission and ultimately imperil the School's viability.

39.    In addition, WDS has shown that the inadequacy of its existing facilities has interfered with its ability to recruit qualified teachers for both Judaic and general studies.  (Tr. 99-100.)

## IV.    The WDS Judaic and General Studies Curriculum

40.    WDS is a co-educational school providing a dual curriculum of Judaic and general

studies.[15]  (SAF ¶ 2; Tr. 21, 28, 70, 169-70.)  WDS is an elementary/middle school with *ganon*,

kindergarten and grades one through eight.  (SAF ¶ 2; Tr. 21, 169-70.)

41.     WDS's mission is to provide its students with an adequate and effective dual

curriculum education and for its students to become observant practicing members of the Orthodox

Jewish community, proud of and knowledgeable about their heritage both as Jews and as Americans.

(Tr. 54, 70-71, 169-70, 414; Pl. Ex. 14.)  WDS's by-laws provide, in relevant part, as follows:

> The objects and purposes of the School shall be to establish, maintain and conduct
> a school or schools with curriculum, teaching personnel, and methods to afford
> students attending the school:  non-secular education including but not limited to
> such subjects as biblical studies, Hebrew language and literature, and Jewish history
> and religion, and conducted as an orthodox Yeshiva with a view to propagating and
> inculcating the viewpoint of traditional and established Judaism; and secular
> education which shall seek to adopt and employ an enriched and progressive
> curriculum, which shall conform to the highest standards of modern American
> education.

(Pl. Ex. 14 at 1.)

42.     The dual curriculum at WDS integrates both Judaic and general studies such that

religious education and practice permeates the students' education in all grades.  (*E.g.*, Tr. 21, 43-44,

122, 191; Defs. Ex. G at 3.)  For example, Rabbi Einzig testified:

> Every part of [the students'] day is spent studying religion … [f]rom when the
> students come in the morning until they leave, they are totally absorbed with their
> religious education . . . —religion permeates throughout the school day.
>
> . . . .

---

[15] WDS is an accredited institution licensed by the State of New York and the prestigious
Middle States Association of Colleges and Schools ("Middle States").  (Tr. 132; Defs. Ex. TT at 2.)
Goldman testified that the original Middle States' accreditation, bestowed in 1995, found that
WDS's facilities "lack[ed] certain things and there should be improvement."  (Tr. 132.)  We find
convincing Goldman's doubt over whether WDS will be reaccredited by Middle States without
having made facilities improvements.  (Tr. 132-33.)

> Not only is religion prayers, but religion incorporates all of the studies of the doctrines of the religion. So students will learn their—for example, studying social studies or science or math, there will be religious and Judaic concepts that come into play in their education.

(Tr. 21-22.) He added: "[R]eligion plays a part in our daily whole, and throughout the day we are involved in general things and holy things, and they go back and forth." (Tr. 51.)

43. In *ganon* and kindergarten, there is no division between Judaic and general studies. (Tr. 55, 75-76, 435-36, 443.) Rather, the program is totally integrated and the children receive simultaneous instruction in both Judaic and general studies. (Tr. 75-76, 435-36.) The entire program in *ganon* and kindergarten revolves around Jewish holidays, Jewish festivals, the Torah and the Hebrew language. (Tr. 436-37, 440-41; Pl. Exs. 7, 9.) Goldman explained that, as concerned the *ganon* and kindergarten program:

> There is no division [between Judaic and general studies]. It's totally integrated.
>
> In other words, in the morning, if they're going to discuss the weather outside, the weather is going to be discussed both with Hebrew words and English words. They are also going to be talking about creation, and they will probably bring forth things from the Bible on God's creation and how it affects the weather.
>
> When they learn about numbers in the nursery and the kindergarten, they will be learning it both in the Hebrew and in the English, and usually it will be integrated in various stories from the Bible.
>
> So there is absolutely no division. It can be done at any time of the day, and there really is not a separate teacher for the Hebrew and for the English. It's the same person who does both.

(Tr. 76.) Rubenovitch-Fish offered similar testimony:

> We blend everything together as much as we can, we mesh it together. So that everything we do from the Torah, from our expectations and our Jewish customs and our holidays and our festivals, we incorporate into the teachings with the New York State program in mind, and that's how we blend it together.

(Tr. 443.)

44.    In grades one through eight, students spend roughly half of the school day on Judaic studies and half of the school day on general studies.  (Tr. 21, 72-73, 122-23.)  Judaic studies consists of Hebrew language, Bible, prophets, Talmud, Mishnah, Jewish history, law and ritual practice and Jewish culture.  (Tr. 28-29; Pl. Ex.10.)  In addition, like the younger students, students in grades one through eight also celebrate the Jewish holidays, practices and customs as part of the dual curriculum.  (Tr. 29, 33-34, 95, 445-48.)  At least half of the teachers at WDS are specifically assigned to Judaic studies.  (Tr. 468.)

45.    The general studies curriculum includes all of the subjects mandated by the State, and demanded by parents, such as math, social science, history, science and English.  (Tr. 28; Pl. Ex. 11.)  However, virtually all of the general studies courses are permeated with religious aspects and the entire faculty (including general studies teachers) cooperate on various Judaic and Jewish-themed activities.  (*E.g.*, Tr. 21-22, 445-55.)

46.    Religious instruction is integrated, to varying degrees, in general studies classes such as language arts, social studies, math and science, as well as music and art.  (*E.g.*, Tr. 45, 123, 445-50.)  For example, in the language arts program there is a focus on Jewish history and culture.  (Tr. 447-48.)

47.    Daily prayer also is an important and essential part of the curriculum for all students at WDS.  (Tr. 21-22, 26, 116.)  Students in *ganon* through fifth grade pray every morning in their classrooms.  (Tr. 78-79.)  The fourth and fifth grade students pray every morning and afternoon in their classrooms.  (Tr. 79.)  The sixth through eighth grade students also have daily morning and

afternoon prayer in their classrooms or in the *shul*.[16]  (*Id.*)  However, prayers are not limited to morning and afternoon services.  For example, every time a student has a meal or eats a snack, they recite prayers both before and after they eat.  (Tr. 21-22.)  All of these prayers are integrated into the school day and are recited whether the student is in a Judaic or general studies course.  (Tr. 23-24, 77.)

48.     WDS also "maintains fixed standards of observance of the laws of *kashrut*," Jewish dietary law, as required by their faith.  (Pl. Ex. 13 at 5; *see* Tr. 68.)  Thus, unlike public or secular private schools, WDS has two separate kitchens: one for meat and one for dairy.  (Tr. 67-68; Defs. Ex. TTT at A2.1, A2.10.)

49.     Students at WDS also adhere throughout the day to the dress code dictated by the Torah.  (Tr. 27; Pl. Ex. 13 at 3.)  Rabbi Einzig explained the basis underlying the dress code: "It dictates, it says in the Torah that—in the Bible—that one should dress modestly and to wear these garments [*kippots* and *tzizits*] to remember that God is above us and God is around us, so that is very much a part of our religion."  (Tr. 27.)

50.     The integration of Judaic and general studies at WDS is consistent with the expert testimony offered by Dr. Schick.  Dr. Schick testified as to the religious functions of Jewish day schools:

> The Jewish day school obviously has these two purposes, the general educational purpose and the general socialization purpose.  There are two other very important functions for Jewish day schools.
>
> Number one, the religious education function, which parallels the general education function, that is they impart certain knowledge in Jewish subjects; the idea being,

---

[16] WDS has an informal arrangement with WHHS whereby every other year WDS has access to the *shul* in the high school (subject to availability).  (Tr. 42-43, 80, 173.)

the hope being that this information will serve very well as these children reach adult life, and they will be participating members in the Jewish community.

The parallel function is a Jewish socialization function, which is to teach children certain modes of behavior which fit into the Jewish faith and carry out various traditions, such as going to synagogue, praying; not merely praying in the sense of being able to read, but to understand and have certain feelings about their community and the commitments to their community.

(Tr. 384.)

51.     Although the Court recognizes that there is no command in the Torah that Orthodox Jewish children attend an Orthodox Jewish day school, the Court finds that a religious education is mandated by modern Orthodox Judaism—there is a commandment to teach children the Torah. (*E.g.*, Tr. 262-63, 415, 793.)  As Dr. Schick explained:

[T]here is a very powerful religious obligation in Jewish life to teach children religious studies, as part of a prayer that is recited three times a day by many—by most Orthodox Jews, and so, the practical way of fulfilling that key central religious obligation is through the medium of a religious school.

(Tr. 415.)

52.     The vast majority of modern Orthodox Jewish parents satisfy this "key central religious obligation" by sending their children to Jewish day schools, such as WDS.  (Tr. 400-01, 415-16.)  Dr. Schick opined that for modern Orthodox Jews, enrolling their children in a dual curriculum Jewish day school is "virtually mandatory."  (Tr. 400-01.)  Rabbi Einzig confirmed this opinion (Tr. 50); Turek, a parent of two WDS students, echoed those sentiments (Tr. 793), as did Hammerman, a mother of four WDS graduates.  (Tr. 262-63, 269-70.)

53.     Tuition at WDS ranges between approximately $11,000 and $17,000 per student per year.  (Tr. 83.)  Hammerman testified that she pays this tuition to send her children to WDS, rather than a public school or secular private school, for the Jewish education and socialization that is

27

provided.  (Tr. 269-70.)  Turek stated that he sends his children to WDS because

> I as an orthodox Jew require the duality of the educational program that's offered
> there.  To me and my wife it is critically important that they have a strong
> grounding in Judaic studies.  Equally, I should add that there is an obligation which
> is clearly cited in the Torah, the Talmud, the old law, for a father to pass onto his
> son and daughter as the case may be the rich culture, traditions and values of the
> Jewish religion.

(Tr. 793.)  Based on these findings, it is clear that WDS would not exist without its religious

mission.

54.     The Court finds that WDS's existing facilities, in whole and in all of their constituent

parts, are used for religious education and practice—*i.e.*, devoted to religious purposes.  While it is

possible that a classroom may be used for a general studies course not infused with religion at a

particular time, the uses to which a particular classroom are put will change over time and at some

point will be devoted to religious purposes.  (Tr. 165-66, 186, 394.)

## V.     **The Expansion Project**

55.     In 1998, WDS retained architectural firm KGD to assist it in addressing the

inadequacies of its existing facilities in a manner that could accommodate its dual curriculum.  (Tr.

1007-08.)  KGD is an architectural, engineering and professional corporation established in 1994

from the predecessor firm of Kaeyer, Parker, Garment & Fleagle.  (Tr. 1004-05.)  KGD and its

predecessor have been practicing in the lower Hudson Valley with an emphasis on educational

architecture for more than 50 years.  (Tr. 1005.)  KGD has performed construction and renovation

work for all types of schools, including public schools, public special education schools, private

schools, private special education schools, community colleges, private colleges and graduate

schools.  (Tr. 1005-06.)  KGD worked with WDS to renovate the Carriage House for classroom use in 1999 (*see supra* ¶ 7.c.), and continued to work with WDS toward a more permanent solution that adequately would address its short term and long term needs.  (Tr. 1008-10.)

56.     As part of the planning process, WDS also retained DTS, a well-established land planning, engineering, project management and environmental consulting firm based in White Plains.  (Tr. 273, 655.)  DTS has been involved with more than 500 projects since it was founded in 1972, including many related to school construction.  (Tr. 274.)  DTS was retained to provide land planning, site engineering and environmental services.  (Tr. 273, 275, 475.)  DTS also was retained to assist WDS in seeking and obtaining any necessary approvals for the proposed land use, an area in which DTS has substantial experience and expertise.  (Tr. 275.)  DTS worked with KGD and also retained and coordinated the work of other professionals.  (Tr. 276, 475-76.)  WDS's contact at DTS was Michael Divney, a licensed professional engineer, certified planner and partner of DTS who has been with the firm since its founding more than 30 years ago.  (Tr. 273-74.)[17]

57.     WDS also retained James Staudt, Esq., a land use attorney at the firm McCullough, Goldberg & Staudt.  (Tr. 724-25.)

58.     Based on a comprehensive assessment of WDS's dual curriculum and educational needs, WDS and KGD determined the facilities required by WDS; which facilities could be incorporated into existing structures (*i.e.*, the Castle, Carriage House and Wolfson Hall); and which facilities would have to be incorporated into a new building.  (Tr. 1016-17.)  Russell Davidson,

---

[17] Divney received an engineering degree from the University of Notre Dame and a Masters of Urban Planning from New York University.  (Tr. 274.)  He is a member of the American Institute of Certified Planners, the National Society of Professional Engineers and the Urban Land Institute. (*Id.*)  Jacquemart testified that DTS was a reputable firm that did quality planning and engineering work.  (Tr. 1143.)

President and Managing Partner of KGD,[18] who has specialized in school design for more than 20

years (Tr.1004-05), explained the design process for WDS:

> [A]s a continuation of the initial planning study, we worked with the school to
> come up with a set of classrooms that were needed to serve the three different age
> level groupings and the dual language curriculum, as well as providing for the
> special subjects, art and music, the small group spaces that are needed to support
> the grade level classrooms, the common areas that were missing, like there was no
> library. And we came up with this list which we commonly call a facilities program
> and we started to see how—which spaces could be adequately accommodated in the
> existing buildings and came up with a conceptual approach for a new building to
> provide the balance of the spaces.

(Tr. 1009-10.)  Davidson further explained the unique considerations in the case of WDS:

> [I]t's not even appropriate to compare it to public schools, *per se*, because of its
> dual language curriculum, because of the age level groupings, because [of] the fact
> it contains a nursery school and worship spaces, as well as a religious library, things
> no other public schools contain.
>
> Frankly, we felt and still feel that without this expansion, the day school is going
> to, you know, will not be competitive in its environment and it will limit its abilities
> to draw students.

(Tr. 1020; *see also* Defs. Ex. DDDD at 1, 2.)

59.    Based on the comprehensive assessment performed with KGD, and in order to

remedy the inadequacies of its existing facilities, WDS decided to renovate Wolfson Hall and the

Castle and to construct a new building, Gordon Hall.  This decision was, in part, made in response

to competition from other area day schools.  (Tr. 34, 259, 793, 1020; Pl. Ex. 62 at 8.)  Gordon Hall

is to be approximately 44,000 square feet in size, containing 25 classrooms and a multi-purpose

---

[18] Davidson received his Masters in architecture from Rensselaer Polytechnic Institute.  (Tr.
1007.)   He is a member of the American Institute of Architects ("AIA") and the Council of
Educational Facilities Planners International.  (*Id.*)  Davidson also has been President of the Mid-
Hudson Chapter of the AIA and Treasurer of the State Association of Architects ("SAA").  (*Id.*)  He
currently is President-elect of the SAA.  (*Id.*)

room.  (SAF ¶ 16; Tr. 184, 225; *see generally* Pl. Ex. 3(4), (6); Pl. Ex. 4; Defs. Ex. TTT at A2.5-2.9.)  The proposed Gordon Hall will provide room for libraries, computer rooms, resource rooms, science labs, classrooms and other facilities, such as are provided in nonreligious private schools and public schools.  (Tr. 37, 41, 103, 172-73, 393-94, 427, 794; Pl. Exs. 3(4), 111.)  The Project calls for WDS to decommission all 13 classrooms in the Castle in order to use them for other required purposes, such as a learning center, library space, music and art rooms and rooms for speech therapy, occupational therapy and psychological counseling.  (SAF ¶ 17; Tr. 185; Pl. Ex. 3(4) at 2.)

60.    The proposed 44,000 gross square foot area of Gordon Hall was not based on a calculation of gross square footage per student.[19]  (Tr. 1017.)  As Davidson explained at trial, "Gross square feet per student is not a tool that is used to determine the size of school buildings.  It's only sometimes used as a benchmark after a program based design is complete to test your design to see if you're within certain reasonable ranges."  (*Id.*)  Davidson testified before the ZBA and at trial that WDS ended up with a figure of 169 GSF per student.  (Pl. Ex. 79 at 6; Tr. 1054-55.)  This number falls within a reasonable range.

61.    A 2001 AIA schedule of typical classroom sizes indicates gross square footage per student of 108 for elementary school students, 156 for middle school students and 175 for high school students.  (Pl. Ex. 64 at 28.)  In addition, an industry text on elementary and secondary school design finds that "[c]lassroom sizes typically range from 750 to 1,000 NSF."  (*Id.* at 29.)  The New York State minimum standard for an elementary school classroom is 770 NSF, based on an

---

[19] "Gross square feet (GSF) or gross building area, is the entire area of the plan of the school building, including interior and exterior walls, corridors, stairwells, mechanical rooms, and so on.  Net sq ft (NSF) refers to the net usable area of specific program elements."  (Pl. Ex. 64 at 28 (Stephen A. Kliment, *Building Type Basics for Elementary and Secondary School* (2001)).)

occupancy of 27 students.  (*Id.* at 28.)  However, this text points out that "[t]he quantity of specialized program areas is determined by the offerings at the school and varies from school to school." (*Id.* at 29.)

62.    Davidson testified that a majority of the classrooms in the existing buildings fell well below the New York State minimum standards, a problem that the Project was designed to address. (Tr. 1021-22; Pl. Ex. 26.)  The 169 GSF per student figure was consistent with three public schools—none of which have dual language programs—upon which Davidson's firm was working at the time of the Application.  (Pl. Ex. 79 at 6-7.)  Davidson also noted that the Harvey School, a private school located in a residential neighborhood in the Town of Bedford, New York, had added a 28,000 GSF art facility (with 1,000 NSF rooms) to its larger 100,000 GSF structure.  (*Id.* at 26, 28.) In addition, Davidson indicated his firm had done work on the New York State School for the Deaf, a private school in Greenburgh, New York, that has classroom sizes of 770 NSF to 900 NSF.  (*Id.* at 26.)

63.    Presently, the Carriage House is 12,252 square feet, the Castle is 21,302 square feet, Wolfson Hall is 30,492 square feet, WHHS is 34,993 square feet and the connector between the Castle and Wolfson Hall is 1,242 square feet.  (Pl. Ex. 120.)  Multiplying 169 GSF per student by a maximum potential WDS enrollment of 591 students yields 99,879 GSF.  (Tr. 1082.)  Subtracting 56,000 square feet, the approximate amount of existing space devoted exclusively to WDS use, *i.e.*, not including the full square footage of Wolfson Hall, leaves 44,000 square feet.  (*Id.*)

64.    Defendants argue that 65,000 square feet should be subtracted to reflect the use of space shared with WHHS in Wolfson Hall.  (Tr. 1082-85.)  The shared facilities include the gymnasium, the synagogue, the cafeteria and the science rooms.  (Tr. 1091.)  Davidson objected to

using that figure, however, because it represented an approximation that does not accurately reflect how the inclusion of shared space would affect the gross square footage per student.  (Tr. 1084.) Moreover, Davidson noted that

> in older buildings, especially in the northeast, there is much more gross square footage related to net square footage than in other areas because of the thickness of walls, because of the amount of insulation in buildings.  And particularly at the day school, the [C]arriage [H]ouse [and] the [C]astle building have a lot of unusable square footage included in the gross category because of the age of their construction, and also . . . because of the long connector . . . between Wolfson and the [C]astle building.

(Tr. 1018.)  This is consistent with the industry text, which states:  "Additions to existing schools tend to be less efficient; furthermore, the planning of the original school probably did not consider current teaching methodologies and technology."  (Pl. Ex. 64 at 20.)

65.    Although, with the addition of Gordon Hall, WDS could accommodate additional students, Gordon Hall was specifically designed to serve the needs of the existing student population. (Tr. at 240-41, 1101, 1049-52; Defs. Ex. TT at 3.)  Davidson testified that "[t]he proposed building addition was primarily a solution to the shortcomings of the educational facilities for the current enrollment."  (Tr. 1011.)

66.    The renovations to Wolfson Hall and the Castle will include making both buildings handicap accessible, creating a second science laboratory, retreading staircases, retiling bathroom floors, recarpeting rooms, rewiring for computer and network capability, and installing new doors, light fixtures and audio-visual equipment.  (SAF ¶ 17; Pl. Ex. 3(4) at 2-3.)

67.    The Project will rectify the inadequacies of WDS's existing facilities in several ways including, at least, the following:

a.    The construction of Gordon Hall will result in a net increase to WDS of 12

33

classrooms, to be used by students in *ganon* through grade two, grade four and grade five. (Tr. 185, 229; Pl. Ex. 111; Defs. Ex. TTT at A.2.1-2.2, A.2.5-2.8.) The classrooms in Gordon Hall will be used to teach Judaic and general studies, as well as for prayer services. (Tr. 52-53, 165.) Significantly, as noted above (*see supra* ¶ 43), in *ganon* and kindergarten there is no division between Judaic and general studies—they are taught in the classroom simultaneously. (Tr. 55, 75-76, 435-36, 443.) However, even where classrooms are used by elementary and middle school students for general studies, those general studies will integrate varying degrees of religious instruction. (*See supra* ¶¶ 44-47; Tr. 21-22, 29, 445-50.) In addition, while the classrooms may be used for general studies one year, the following year the same classrooms may be used for Judaic studies. (Tr. 165-66, 186, 393-94.)

b.      The Project will provide WDS with a learning center and small-group instructional rooms to be used for remedial, challenge and differentiated instruction in both Judaic and general studies. (Tr. 103; Pl. Ex. 111; Defs. Ex. TTT at A2.1-2.2.)

c.      A multi-purpose room will be constructed in Gordon Hall. (Tr. 37, 103, 225; Defs. Ex. TTT at A2.1, A2.6.) The multi-purpose room will be used for, *inter alia*, religious instruction, group prayer and Jewish performances and assemblies. (Tr. 33-34, 52, 117, 165-66, 174, 186.) It will also be available for the younger students to eat lunch, be used for school plays and allow the *ganon* and kindergarten students a place to recreate during inclement weather. (Tr. 33, 96, 116-17, 172.)

d.      The Project will provide WDS with an art room. (Tr. 103, 167, 184, 1010; Defs. Ex. TTT at A2.2, A2.8.)

e.      The Project also will provide WDS with a music room. (Tr. 103, 167, 184,

34

1010; Defs. Ex. TTT at A2.2, A2.8.)

   f. The Project enables WDS to properly cluster students in an age appropriate manner.  For example, Gordon Hall will contain classrooms for *ganon* through grade two (first floor) and grades four and five (second floor).  (Tr. 1016; Pl. Ex. 111; Defs. Ex. TTT at A2.1, A2.5-2.6.) Grade three will be in the Carriage House.  (Defs. Ex. TTT at A2.1, A2.5.)  The middle school students (grades six through eight), will be in Wolfson Hall.  (Defs. Ex. TTT at A2.1, A2.10.) Shared facilities, such as the learning center, *beit midrash* and music and art rooms will be centrally located in the renovated Castle.  (Defs. Ex. TTT at A2.1-2.2, A2.6, A2.8.)  The Project also calls for the administrative offices to be conveniently located in the Carriage House, Castle and Gordon Hall. (Tr. 217; Defs. Ex. TTT at A2.1-2.3, A2.5, A2.7-2.8.)

   g. The Project includes resource rooms that can be used for speech therapy, occupational therapy and psychological counseling.  (Tr. 184; Defs. Ex. TTT at A2.1-2.2, A2.5, A2.8.)

   h. The Project includes the addition of a computer lab and two science labs. (Defs. Ex. TTT at A2.1, A2.6, A2.10.)

  68. Based on these facts, as well as those discussed above, the Court finds that Gordon Hall and the other facilities renovated as part of the Project, in whole and in all of their constituent parts, will be used for religious education and practice—*i.e.*, devoted to religious purposes.  For example, that the multi-purpose room may at times be used for non-religious assemblies does not obviate the fact that it also will be used primarily and/or extensively for religious assemblies, which WDS otherwise could not hold.  Likewise, while it is possible that a classroom in Gordon Hall may be used for a general studies course not infused with religion at a particular time, the uses to which

a particular classroom are put will change over time. (Tr. 165-66, 186, 393-94.) Given that religion permeates the dual curriculum (*see supra* Section IV.), all of the classrooms would be expected at some point in time to be devoted to religious purposes. The Project is necessary to rectify the inadequacies in WDS's facilities and enable WDS to provide a Judaic and general studies education to its students consistent with its mission and the tenets of modern Orthodox Judaism.

69.     As part of the planning process, WDS considered various locations on the Property for Gordon Hall. (*E.g.*, Tr. 188-89, 371, 486, 1025.) For example, WDS considered building Gordon Hall between Wolfson Hall and the Castle. (Tr. 188, 372, 1025.) However, that area was determined not to be viable because it was wetland and part of the 100-year floodplain. (Tr. 372, 491, 1025.) WDS also considered locations on the other side of the Property's internal driveway. (Tr. 691.) Most of the baseball field, however, also is part of the 100-year floodplain. (Tr. 491.) In any event, locating Gordon Hall on the other side of the internal driveway would require students (including young children) to cross the driveway to access the existing buildings, which poses significant safety issues; it is, therefore, not a viable option. (Tr. 188-89, 212.)

70.     Ultimately, it was determined by WDS, in consultation with its experts, that the only logical and viable location for Gordon Hall was between the Castle and the Carriage House. (Tr. 212, 486-87, 1024-25.) The reasons for this are several:

a.     Given that the existing structures would constitute approximately 60% of the school's space after the construction of Gordon Hall, the most functional place for Gordon Hall was as close to these buildings as possible. (Tr. 1024-25.) This would facilitate the age-appropriate grouping of students, while ensuring that students of all grades could access the shared facilities in the Castle without leaving the building. (Tr. 1015-17, 1024-25, 1062-63; Pl. Ex. 28.)

36

b.     The creation of a single structure (with a single main entrance) facilitates both the security and safety of the students.  (Tr. 189, 1063; *see also* Pl. Exs. 1, 2, 28.)

c.     The location decreases travel time between classes, ensuring that maximum time can be devoted to the dual curriculum.  (Tr. 100; Pl. Ex. 28.)

d.     Erecting an independent building elsewhere on the Property, as opposed to connecting to the existing Carriage House and Castle buildings, likely would require more construction, *i.e.*, building(s) with greater overall square footage, to achieve the same functionality. (Tr. 1025.)

71.     Both the impact of Gordon Hall on the surrounding neighbors and the architecture of the adjoining Castle and Carriage House were taken into consideration during the design process. (*E.g.*, Tr. 191-92, 195, 333-34, 1016-17, 1024-25, 1033-34; Pl. Exs. 42, 55; Defs. Exs. O, TT.) Gordon Hall is designed as a dormered two-story building, where the second story will have a smaller footprint than the main level.  (SAF ¶ 16; Tr. 1027; Pl. Exs. 112, 113.)  The dormering and overall design creates the appearance that the "addition is broken down so it looks like several smaller buildings."  (Tr. 1027.)  The building bears a stone and brick exterior, a shingle roof and copper detailing in order to give an appearance that is in harmony with the buildings with which it will connect.  (SAF ¶ 16; Tr. 1024, 1026; Pl. Ex. 3(4) at 6; Pl. Exs. 112, 113; Defs. Ex. TTT at A3.1.)  At its closest point, Gordon Hall will be set back 25 feet from the nearest property line and 117 feet from the nearest house.  (SAF ¶ 16; Tr. 209, 268, 1030; Pl. Ex. 27.)  In addition, Gordon Hall will be screened from Skibo Lane by existing trees and vegetation as well as proposed trees, vegetation and solid fencing.  (Tr. 1028-29 ("[I]t's our belief that you will never be able to see the full building as depicted in [plaintiff's exhibit 114].");  Pl. Ex. 2; Pl. Ex. 3(4) at 6 & (9); Pl. Exs. 27,

37

37D-E, 37H, 42, 50, 55, 114, 117; Pl. Ex. 79 at 61 (stating that evergreen trees are ten to twelve feet

at planting and grow six to twelve inches per year to a mature height of 20 feet); Defs. Exs. EEEE,

FFFF.)

72.     In addition to the construction of Gordon Hall (and other renovations), the Project

contemplates striping the existing 96 parking spaces currently serving the Property in accordance

with the Village Code and adding up to 81 new parking spaces.  (Pl. Ex. 2; Pl. Ex. 3(4) at 7.)  The

additional parking will be screened from view by, *inter alia*, existing and proposed trees, vegetation

and a 5-foot high solid wood fence.  (Pl. Ex. 2; Pl. Ex. 3(4) at 7; Pl. Exs. 42, 50; Pl. Ex. 55 at 2, 5,

fig. 6 (parking area and quad area light fixtures diagraming limited light spillage).)

73.     The calculation of the parking was a two-step process.  First, WDS determined the

number of additional parking spaces required under the Village Code.  (Tr. 725-26); *see* VILL. CODE

§ 342-56.  Under section 342-55 of the Village Code,[20] WDS's existing buildings (constructed prior

to April 1, 1968) were not subject to requirements for off-street parking spaces.  *See* VILL. CODE §

342-55.  WDS was, however, responsible for ensuring sufficient parking spaces existed for the

additional classrooms being constructed—the Village Code required four parking spaces for each

additional classroom and one parking space for each additional employee.[21]  (Tr. 725-26); *see* VILL.

CODE § 342-56.  The Project was expected to cause a net increase of 12 classrooms and 22

employees, leading WDS to determine that 70 additional parking spaces would be required.  (Tr.

_____

[20] Section 342-55 states, in pertinent part: "Structures and land uses in existence on or for
which building permits shall have been approved prior to April 1, 1968, shall not be subject to the
requirements for off-street parking spaces set forth herein . . . ."

[21] Section 342-56 provides that for school use, "Off-street parking spaces shall be provided
as follows: . . . School — 4 for each classroom or 1 for each 5 seats within the assembly hall,
whichever is greater, plus 1 for each teacher and employee . . . ."

725-26); *see* VILL. CODE §§ 342-55, 342-56.

74.    This was the same methodology that WDS used, and long-time Village Building

Inspector Ernie Poccia specifically approved, when the Carriage House was renovated in 1999.  (Tr.

726-27, 738, 789, 1362.)  Staudt summarized his conversations with Poccia as follows:

> In this case, with respect to parking, the building inspector at that time was a man
> named Ernie Poccia and I met with him and I went through the different things
> including parking. . . .  [I] told him the ordinance is pretty clear.  The way it's done
> in Mamaroneck is the way its done virtually everywhere that I'm familiar with.
> You provide parking for the number of classrooms you're adding. . . .  I recall him
> saying like how many classrooms do you have now, how many classrooms are you
> going to have when you get done.  Okay.  You take the difference and you provide
> the parking.

(Tr. 727.)  The Westchester County Planning Board ("WCPB") and the ZBA's own consultants also

confirmed that only 70 additional parking spaces were required under section 342-56 of the Village

Code in a letter sent to the ZBA in October 2001.  (Pl. Ex. 39; *see infra* ¶¶ 100, 102.)

75.    Second, DTS determined, independent of the requirements under the Village Code,

that 81 additional parking spaces should be added due to projected demand.  (Tr. 726; Defs. Ex.

EEE.)  Thus, the Project called for the construction of 81 additional parking spaces.[22]  (Tr. 725-26.)

76.    The Project also contemplates improvements to traffic circulation and pedestrian

safety on the Property.  (Tr. 346-47; Pl. Ex. 42; Pl. Ex. 55 at 8.)  For example, the existing traffic

circle in front of the Castle will be enlarged, which will, among other things, enable buses to depart

from the Property at dismissal when loaded, without having to wait for the buses ahead to load and

---

[22] The WCPB later recommended that the ZBA "consider a reduction in the amount of
parking spaces required and encourage the applicant to reduce the number of spaces proposed."
(SAF ¶ 23; Pl. Ex. 39; *see infra* ¶ 100.)

depart as well.[23]  (Tr. 346-47; Pl. Exs. 2, 42; Pl. Ex. 55 at 8.)  This will make for a more efficient dismissal and will reduce any "caravanning" of buses leaving the Property.  (Tr. 346-47; Pl. Ex. 55 at 8; *see infra* n.61.)

77.    The construction and renovations relate solely to WDS; the Project does not include any changes or additions to WHHS (or the synagogue).  (Pl. Ex. 3(4) at 2; *see infra* ¶ 83.)

78.    The Project is compliant with applicable zoning regulations.[24]  (Tr. 737.)

79.    Even after the construction, only 7.6% of the Property will be covered with buildings, whereas zoning regulations allow for 35% coverage. (Tr. 1019); *see* VILL. CODE § 342-27, Schedule of Minimum Requirements (Part 1).

80.    Construction, assuming work commenced in 2002, was estimated to cost approximately $8.6 million for the erection of Gordon Hall (plus an additional $800,000 for air conditioning installation, for a total of $9.4 million) and over $3.2 million for the renovations to the Carriage House, the Castle and Wolfson Hall.  (Pl. Ex. 32; Tr. 1038.)

81.    Given construction inflation, for work commencing late 2006, construction of Gordon Hall is estimated to cost $12.4 million.  (Pl. Ex. 127; Tr. 1039.)

---

[23] WDS also explored other options for internal traffic circulation, ingress to and egress from the Property and certain improvements to the immediately surrounding roadway system.  (Tr. 372-73.)  However, none of them were determined to significantly improve traffic flow to and from the Property.  (*Id.*)

[24] During the Application process, defendants did not dispute that the Project was zoning compliant.  However, as discussed below, *infra* Section VIII.B., after requesting that WDS reduce the number of parking spaces and after the hearing was closed, the ZBA denied the Application based, in part, on the purported inadequacy of the proposed parking.  (Pl. Ex. 4 at F-9 to F-10.)

## VI.    The Application for Special Permit Modification

82.    In October 2001, WDS submitted to the ZBA the Application for a modification of its special permit to enable it to proceed with the Project.  (Pl. Ex. 3.)  The Application explains that the primary purpose of the Project is to replace outdated, inadequate classroom space with modernized, more functional facilities, and not to facilitate an increase in school population. (SAF ¶ 12; Tr. 241; Pl. Ex. 3(4) at 2.)

83.    Just prior to the submission of the Application, WDS contacted WHHS to inquire about possible high school expansion plans.  (Tr. 1056-58; Defs. Exs. WWW, XXX.)  Debbie Isaac, a WDS Board member, on behalf of WDS, contacted David Kalman, WHHS's President, who stated that WHHS had no such plans and that WHHS was not interested in being a part of the Application. (Tr. 1390-91, 1398.)  WDS was not aware of any WHHS expansion plans at the time it filed the Application, and it did not become aware of any such plans thereafter.  (Tr. 121, 770, 776, 1057-58.) Kalman confirmed at trial that there were no—and never have been—plans for the expansion of WHHS.  (Tr. 1390-95.)

84.    WDS prepared and submitted to the ZBA, with the assistance of DTS, *inter alia*, a full Environmental Assessment Form, supplemented by comprehensive analyses and extensive studies of all relevant potential environmental impacts of the Project, including, but not limited to, the impact of the Project on drainage, stormwater management, utilities, aesthetics and lighting.  (Tr. 274, 475-76; Pl. Ex. 3.)  WDS also submitted the WDS Traffic Assessment—a comprehensive empirical analysis performed by DTS of the potential impact of the Project on traffic in the surrounding area.  (Tr. 285-88; Pl. Ex. 3 (8).)  In all, the Application consisted of the following:  (1) Special Permit Modification Application; (2) Certification Required by New York State General

41

Municipal Law; (3) Consent of the Property Owner; (4) Memorandum in Support of Application for Special Permit Modification; (5) Special Permit Application Drawings, consisting of, among other things, the site plan, the site grading and utility plan, the landscape plan and comprehensive floor plans; (6) Full Environmental Assessment Form; (7) Drainage and Stormwater Management Report; (8) WDS Traffic Assessment; (9) Site Photographs; (10) Utility Report; (11) Letter Report Concerning Prehistoric and Historic Sensitivity; and (12) Survey of Existing Trees and Tree Symbols List.  (SAF ¶ 13; Tr. 281-89; Pl. Ex. 3.)  The Application did not request any zoning variances. (SAF ¶ 14; Pl. Ex. 3.)

85.    Prior to preparing the WDS Traffic Assessment, DTS consulted with BFJ, the ZBA's consultants and traffic experts, as to which intersections should be included in the study.[25]  (Tr. 313-14, 655-57.)  On BFJ's recommendation, DTS added two intersections to the 15 it already had identified.[26]  (Tr. 655-56.)  Thus, the WDS Traffic Assessment evaluated the impact of the Project on traffic at 17 intersections in and around WDS and Orienta Point.  (Tr. 286, 313; Pl. Ex. 3(8) at 5.)  The 17 intersections comprised a total of approximately 50 separate movements—*e.g.*, southbound through, southbound right-turn, etc.[27]  (Tr. 286; Pl. Ex. 3(8) at 13-16, tbls. 2, 3.)  The traffic at each of these movements was counted in fifteen-minute intervals from 7 a.m. to 9:30 a.m.

_____

[25] BFJ is a planning firm that has worked with the Village for more than 20 years and continues to work with the Village.  (Tr. 653-54.)  BFJ enjoys a reputation as a good professional traffic and planning firm and Jacquemart as an excellent traffic engineer.  (Tr. 584-85.)  It is not unusual for an applicant to speak with the ZBA's consultants before filing an application.  (Tr. 315.)

[26] BFJ did not suggest that the Boston Post Road/Delancey Avenue or Boston Post Road/Rockland Avenue intersections be included in the WDS Traffic Assessment.  (Tr. 656-57, 1143-44.)

[27] For ease of reference, individual movements or groups of movements at a particular intersection will be referred to herein simply as "movements."

and from 2:30 p.m. to 7 p.m.—a total of almost 3,000 separate movement intervals.  (Tr. 286.)

86.     Based on these traffic counts, and for each of the 17 intersections, DTS identified the "peak hour" (four consecutive 15-minute counts with the greatest volume) for the morning ("AM Peak Hour") and afternoon ("PM Peak Hour").  (*Id.*)  DTS then analyzed the impact of the Project on traffic for movements at the 17 intersections during both the AM Peak Hour and PM Peak Hour. (Tr. 287-88.)  The WDS Traffic Assessment compares traffic under a "No Build" scenario (assuming background growth alone) and a "Build" scenario (assuming background growth in addition to future enrollment of 125 additional students at WDS after completion of the Project).  (Pl. Ex. 3(8) at 13-16, tbls. 2, 3.)  DTS utilized a background growth factor of 2% per annum, which was based upon the New York State Department of Transportation (the "NYDOT") recommendation of a factor of 1.5–2% for that specific intersection.[28]  (Tr. 287, 292-93, 607.)  To be conservative, WDS's peak hour traffic was imposed on top of the peak hour for each of the individual intersections, regardless of whether or not the respective peak hours were actually the same, thus examining the potential traffic impact under a worst-case scenario.  (Tr. 291-92, 294-95.)

87.     The delay (in seconds) and Level of Service ("LOS") for each of the 17 intersections are set forth in the WDS Traffic Assessment.  (Pl. Ex. 3(8) at 13-16, tbls. 2, 3.)  LOS's range from "A" (representing the best level of service) through "F" (representing congestion).  (Tr. 544.)  LOS is not a measure of the relative safety of an intersection.  Rather, it is purely a function of delay—*i.e.*, the maximum amount of time that a motorist might have to wait at an intersection (including time spent at a red light) during the peak hour.  (Tr. 305-06, 354-55.)

_____

[28] The "background growth" rate is the expected year-to-year increase in traffic based on, *inter alia*, general economic and residential development, irrespective of the impact on traffic of the particular project at issue.  (Tr. 607-08.)

43

88.     The majority of the movements were projected to perform at an LOS of "A" during the AM Peak Hour and PM Peak Hour under the Build scenario—*i.e.*, assuming the Project went forward and enrollment was at projected capacity.  (Pl. Ex. 3(8) at 13-16, tbls. 2, 3.)

89.     The Project was predicted to significantly adversely affect the LOS of only one of one hundred movements (or one movement out of the 50 movements during the AM Peak Hour, and none out of the 50 movements during the PM Peak Hour).  (Pl. Ex. 3(8) at 13-16, tbls. 2, 3.)  The westbound movement at Rushmore Avenue and Bleeker Avenue (during the PM Peak Hour) was projected to go to an LOS of "A" (9.72 seconds delay) in the No Build scenario to an LOS of "B" (10.22 seconds delay) in the Build scenario.  (*Id.*)  It is not disputed, however, that both an LOS of "A" and an LOS of "B" are acceptable levels of service.  (Tr. 667; Pl. Ex. 68 at 25.)

90.     The sole intersection projected to have any movements with an LOS below "C" in either the No Build or Build scenario was the Boston Post Road/Orienta Avenue intersection.  (Pl. Ex. 3(8) at 13-14, tbl. 2.)  However, this intersection is projected to have one movement with an LOS of "E" regardless of whether or not the Project goes forward.  (*Id.*)  Moreover, the maximum impact of the Project on any movement at this intersection was projected—in the worst case scenario—to be only 4.7 seconds:  the westbound approach at the Boston Post Road/Orienta Avenue intersection in the AM Peak Hour is projected to be 74.8 seconds in the No Build scenario, as compared to 79.5 seconds in the Build scenario.  (*Id.*)  This movement reflects traffic exiting Orienta Point.  (Tr. 304, 611.)

91.     The Project was not predicted to significantly impact the LOS for any other intersection or any other movement.  (Pl. Ex. 3(8) at 13-16, tbls. 2, 3; Pl. Ex. 55 at 9 & tbl. 2.)

92.     The WDS Traffic Assessment concluded as follows:

44

> The proposed WDS project is projected to result in a net increase of 26 entering and 16 exiting vehicle trips in the weekday AM peak hour and 12 entering and 19 exiting vehicle trips in the weekday PM peak hour. The results of this assessment demonstrate that the seventeen study intersections currently operate at acceptable overall peak hour levels of service and will continue to operate as such under projected conditions with the proposed WDS project in 2003. The traffic volumes generated by the proposed project will not have significant effect on the operations of the study intersections.

(Pl. Ex. 3(8) at 17; *see also* Tr. 307-08, 321.)

## VII.    **The Public Hearing Process**

93.    When WDS submitted the Application, the following individuals (appointed by the Village Board of Trustees) served on the ZBA:  (1) Antonio Vozza (Chairman); (2) George Mgrditchian; (3) Barry Weprin; (4) Clark Neuringer; and (5) James Gaita.  (SAF ¶ 15.)

94.    In December 2002, Peter Jackson replaced Gaita as a member of the ZBA.  (*Id.*) Jackson, like Mgrditchian, previously had served on the ZBA when David Neufeld, a vocal opponent of the Project, served as Chairman.  (Tr. 1313; Jackson Dep. at 14-15; Mgrditchian Dep. at 13-14.) Also, in December 2002, Vozza, who had taken over for Neufeld as ZBA Chairman, asked his long-time friend and client, Mauro Gabriele, to take over for him as Chairman.  (SAF ¶ 15; Gabriele Dep. at 23, 25-31, 53, 107-08; Mgrditchian Dep. at 14.)

95.    Gabriele agreed, and became ZBA Chairman in December 2002.  (Gabriele Dep. at 23, 25-31, 53, 107-08.) Gabriele also was a friend of current ZBA member Mgrditchian.[29]  (Gabriele Dep. at 53, 55-56.) Indeed Gabriele, Mgrditchian and Vozza all were members of a local social club

---

[29] Notably, Mgrditchian testified at his deposition that he was not friends with Gabriele, nor did he belong to any community groups in which Gabriele also was a member; he corrected this response to indicate the opposite in an errata sheet.  (Mgrditchian Dep. at 26.)

and socialized with one another on a regular basis.  (Gabriele Dep. at 55-56.)  Mgrditchian and

Vozza were also business partners.  (Mgrditchian Dep. at 33-36.)

96.     The first series of public hearings on the Application was held by the ZBA on

November 1, 2001, December 6, 2001, January 3, 2002 and February 7, 2002.  (SAF ¶ 19; Pl.

Exs. 65-68.)  On December 6, 2001, the ZBA voted unanimously to designate itself as the "lead

agency" on the Project for State Environmental Quality Review Act ("SEQRA") purposes.  (SAF

¶ 20; Pl. Ex. 66 at 51-52.)

97.     Prior to and during the first series of public hearings, the ZBA requested and received

comments on the Application from Village staff members, agencies and consultants, including the

Fire Commissioner, the Coastal Zone Management Commission ("CZMC"), the WCPB and BFJ.

(SAF ¶ 21; Tr. 478-79; Pl. Exs. 39-41, 103, 105.)

98.     On October 18, 2001, the Fire Inspector advised the ZBA that the drawings submitted

by WDS "appeared to be in compliance with current code requirements."  (SAF ¶ 22; Pl. Ex. 105.)

99.     By consistency resolution dated January 16, 2002, the CZMC unanimously resolved

that the Project was consistent with the Village's Local Waterfront Revitalization Program.  (SAF

¶ 24; Tr. 821; Pl. Ex. 106.)  The CZMC did not request any changes to the plans.  (Pl. Ex. 106.)

100.     By letter dated October 31, 2001, the WCPB confirmed that only 70 parking spaces

were required under section 342-56 of the Village Code and, therefore, recommended that the ZBA

"consider a reduction in the amount of parking spaces required and encourage the applicant to reduce

the number of spaces proposed."  (SAF ¶ 23; Pl. Ex. 39.)

101.     The Application also was reviewed by Fish and Jacquemart of BFJ.  (Tr. 653-54.)

Jacquemart, BFJ's traffic expert, reviewed the WDS Traffic Assessment (including the Capacity

Analysis Worksheets), verified the methodology and concluded that the WDS Traffic Assessment was a "good analysis" that met all of the requirements of a traffic study.[30]  (Tr. 662, 1106, 1146, 1149; Pl. Ex. 67 at 14.)  Jacquemart did not have any disagreements with respect to the methodology employed by DTS.  (Tr. 1144-46.)  Indeed, neither Fish nor Jacquemart ever criticized the WDS Traffic Assessment until after the Application had been denied.  (Tr. 899-900.)

102.    By a memorandum dated December 31, 2001, BFJ provided the ZBA with comments on the Application.  (Pl. Ex. 41.)  Jacquemart drafted the "Traffic" section, which included all of his concerns with respect to the impact of the Project on traffic as well as the WDS Traffic Assessment itself.  (Pl. Ex. 41 at D661-62; Tr. 658, 1149-50.)  The memorandum did not express any concerns relating to the impact of the Project on traffic at the Boston Post Road/Orienta Avenue, Boston Post Road/Delancey Avenue or Boston Post Road/Rockland Avenue intersections.  (Pl. Ex. 41; Tr. 658-60.)  Nor did the memorandum raise any concerns with respect to the validity of the WDS Traffic Assessment.[31]  (Pl. Ex. 41.)  The memorandum also did not identify any concern over insufficient parking.  (*Id.* at D662.)  To the contrary, BFJ informed the ZBA that the Project called for too many parking spaces.  (*Id.*)  The memorandum also noted that Gordon Hall would directly impact the views from only four houses along Skibo Lane.  (*Id.*)

103.    Fish subsequently provided the ZBA with comments on the Application at public

---

[30] Jacquemart testified that he was provided adequate time to review the WDS Traffic Assessment.  (Tr. 1143.)

[31] The memorandum does note that the WDS trip generation rates were lower than those published by the Institute of Transportation Engineers ("ITE"), yet nevertheless confirms that WDS's numbers are acceptable.  (Pl. Ex. 41 at D661.)  As discussed below, Fish subsequently represented to the ZBA that "[t]here's no better way to calculate this than to use your own numbers."  (Pl. Ex. 67 at 28.)  Jacquemart again confirmed at trial that the trip rates used by WDS were appropriate.  (Tr. 1109.)

47

hearings.  Before speaking at the ZBA hearings, Fish consulted with Jacquemart.[32]  (Tr. 663, 666,

718, 1150.)  At the January 3, 2002 ZBA hearing, Fish stated on the record, among other things, the

following:

   a.  "[O]ur traffic engineer, George[s] Jacquemart, did not think it was necessary

for him to be here tonight.  I will repeat his concerns.  He is our traffic engineer, but basically he felt

that the analysis they had gone through is a good analysis; that it meets all the requirements of the

traffic analysis."  (Pl. Ex. 67 at 14; *see also* Tr. 1151.)

   b.  "Off-peak hours, to the advantage of the school, their operations are such that

they are not as overlapping particularly with the afternoon peak hour, 4:30 to 5:30.  They are not an

office building or they are not—they are more of an off-peak, sort of peak to themselves.  So we are

not—we wanted it pointed out to you.  [The Orienta Avenue/Boston Post Road intersection] will be

something that I think you normally would look at, the Planning Board would look at, but not

something that we felt needed mitigation."  (Pl. Ex. 67 at 16-17.)

   c.  "We have gone through their numbers.  We don't have any disagreement on

their numbers other than the first ones which I sort of glossed over.  That is that if they used the ITE

numbers, the generation numbers are higher than they have used.  Let me say why we don't have a

problem with that.  They have done their own numbers.  There is no better way to calculate this than

to use your own numbers."  (Pl. Ex. 67 at 28; *see also* Tr. 1152-53.)

   d.  "[I]t seems to us there are only four homes or four households that are directly

affected . . . by the massing of the new building. . . .  I think particularly it is the center two homes

---

  [32] Jacquemart confirmed at trial that he did not have any concerns about traffic that Fish
failed to convey to the ZBA.  (Tr. 1152; *but see infra* n.46.)

here that could be affected.  It is purely aesthetic.  It is how it is treated, the landscaping is treated

there, what trees, a detailed landscaping plan which again, it is up to you.  You may want to defer

that matter to the Planning Board.  We did not see that really as an environmental matter, not an EIS

matter."  (Pl. Ex. 67 at 21.)

104.    On January 17, 2002, DTS responded to BFJ's December 31, 2001 memorandum and

the issues raised by Fish at the January 3, 2002 ZBA hearing.  (Pl. Ex. 42.)  DTS addressed BFJ's

concerns with respect to landscaping, lighting, parking and internal traffic/circulation.  (*Id.*; Tr. at

325-29.)  With respect to internal traffic, WDS agreed to increase the turning radii of the traffic

circle, thus allowing buses that were ready to depart the site to pass by buses that remain parked.  (Pl.

Ex. 42; Tr. 326, 334, 346-47; *see supra* ¶ 76.)  WDS also, in response to BFJ's request, agreed to

remove the "excess [parking] spaces."  (Pl. Ex. 42; Tr. 329.)  DTS believed that their January 17,

2002 response addressed all of the issues raised by BFJ.  (Tr. 329.)

105.    On February 7, 2002, the ZBA voted unanimously on the Application under the

implementing regulations of SEQRA to issue a Negative Declaration.  (SAF ¶ 25; Pl. Ex. 68 at 51-

52; Pl. Ex. 97.)  The issuance of the Negative Declaration constitutes a finding by the ZBA that the

Project will not have any significant adverse environmental impact, that no Environmental Impact

Statement ("EIS") is required and that the special permit phase may continue.  (Pl. Ex. 97.)  The

Negative Declaration includes, among others, the following findings:

> Seventeen intersections were evaluated under weekday AM and PM peak traffic
> conditions.  The results of the assessment demonstrated that the seventeen study
> intersections currently operate at acceptable overall peak hour levels of service and
> will continue to operate as such under projected conditions. . . .
>
> . . . .

The environmental concern regarding parking is to be sure there are an adequate number of parking spaces for the existing and proposed uses, while at the same time preserving the existing mature trees on site and eliminating excess impervious surfaces. The Village Code requires 70 parking spaces to be added for the proposed project. The applicant has proposed 79 spaces. Applicant proposes to create a grass area for temporary overflow parking and to "bank" an unpaved area for 26 of the parking spaces in the event a demand for such spaces occurs.

As a result, the traffic volumes, circulation and proposed parking will not have a significant adverse effect on the environment.

(*Id.* at 2.)

106.    After the issuance of the Negative Declaration, there was a small but vocal outcry of community opposition to the Project led by, among others, former ZBA Chairman Neufeld and Orienta Point resident Christopher Tilley. (Pl. Exs. 61, 123.) Dozens of letters opposing the Project were sent to the ZBA, many from the Orienta Point Association as well as from the same, small group of residents. (Pl. Ex. 61 (containing both positive and negative letters).) In addition, residents expressed their concerns to ZBA members outside of the public hearings. (Tr. 1278, 1263-66.)

107.    Tilley stated at trial that he (and other Orienta Point residents) never received "legal notice" from WDS regarding its intended expansion. (Tr. 1201.) He testified that he first learned of the WDS proposal in February 2002, when he received a flyer from the Orienta Point Association concerning a meeting later that month at which WDS would present its proposal to the community members in attendance. (*Id.*)

108.    Tilley acknowledged that some of his neighbors received phone calls from Hammerman in November 2001. (Tr. 1202.) Hammerman testified that she made phone calls to "dozens" of area residents based on "a list of the neighbors to be noticed to come to the hearings," but only two residents took Hammerman up on her offer to meet and explain the Project. (Tr. 192.)

109.    Given the small, public outcry following the passage of the Negative Declaration, WDS representatives volunteered to meet with representatives of the neighborhood. (Tr. 194-95; Pl. Ex. 69 at 86.) Hammerman, on behalf of WDS, then sent a letter to area residents describing WDS and the Project. (Defs. Ex. TT; Tr. 195-96.) WDS and DTS also attended several meetings of the Orienta Point Association at which they presented the Project and fielded questions from the 50 or so resident attendees. (Tr. 195, 197.) In addition, WDS gave tours of the facility to a dozen or so residents. (Tr. 197.) Staudt stated that despite various attempts, some community members opposed to the Project, including Neufeld, refused to meet with WDS. (Pl. Ex. 70 at 71-72.)

110.    Certain residents of Orienta Point, including Neufeld, formed Save Orienta's Unique Neighborhood ("SOUND") to coordinate opposition to the Project.[33] (Tr. 1220, 1276-78.) SOUND, Neufeld, Tilley and other residents of the Village also commenced an Article 78 special proceeding in New York State Supreme Court against the ZBA, the ZBA members and WDS seeking annulment of the Negative Declaration.[34] (Tr. 1270-71; Pl. Ex. 4 at F-1.)

111.    On April 4, 2002, during a private executive session held prior to the ZBA hearing, Vozza (Neufeld's successor) distributed a memorandum recommending that the Negative Declaration be rescinded. (Pl. Ex. 46; Pl. Ex. 70 at 3.) Vozza had not previously discussed the

---

[33] Tilley told the ZBA at its March 13, 2003 hearing that 143 adults contributed to SOUND (Pl. Ex. 79 at 79). At trial, Tilley stated 125 residents voiced concerns over the Project, representing roughly 80 households. (Tr. 1260-61.) There are between 500 and 600 homes in Orienta Point. (Tr. 1205; Pl. Ex. 69 at 64.) The Court recognizes that a number of complaints voiced at the ZBA hearings were made by married couples, lending credence to one resident's assertion that only a "negligible percentage" of Orienta Point residents disfavored the Application. (Pl. Ex. 79 at 45; *see also* Pl. Ex. 69 at 64 (indicating 50 residents voiced concerns, or 5-10% of the community); Pl. Ex. 69 at 84).)

[34] The Article 78 defendants' motion to dismiss the petition was granted on July 25, 2002. (Pl. Ex. 4 at F-2.)

memorandum with the ZBA members, nor had the ZBA members had any discussions concerning rescission of the Negative Declaration.  (Mgrditchian Dep. at 49-50, 53; Neuringer Dep. at 50-52; Weprin Dep. at 46.)  Nevertheless, the ZBA voted that evening to hold a rehearing to review its issuance of the Negative Declaration.  (SAF ¶ 27; Pl. Ex. 70 at 76-77.)  The ZBA members were not aware of any other instance in which the ZBA had ever attempted to rescind a negative declaration. (Mgrditchian Dep. at 50-51; Neuringer Dep. at 49; Weprin Dep. at 52-53.)

112.    Additional public hearings were held on the Application on May 2, 2002, June 24, 2002 and August 1, 2002.[35]  (SAF ¶ 28; Pl. Exs. 71-73.)

113.    By letter dated June 17, 2002, from DTS to the ZBA, WDS memorialized commitments it had made in response to various concerns raised by the ZBA and the public.  (Pl. Ex. 50; Tr. 332.)  The letter addressed, *inter alia*, lighting, landscaping/screening, emergency access and internal traffic circulation.  (Pl. Ex. 50; Tr. 332-38.)  With respect to parking, DTS confirmed WDS's agreement to eliminate and reallocate the southernmost row of parking spaces in response to the ZBA's request.  (Pl. Ex. 50 at 1; Tr. 343.)  The letter also memorialized WDS's commitment to cap its enrollment: "The Westchester Day School agrees, as part of the application, to cap its enrollment at 591 students and to cap [Westchester Summer Day] at its current level of 500 students."[36]  (Pl. Ex. 50 at 4; Tr. 336-37.)  WDS believed that its June 17, 2002 letter adequately

---

[35] On April 30, 2002, K.W. Furey Engineering, P.C., the Village's consultants, advised the ZBA that "the engineering issues of site drainage, water supply and wastewater conveyance have been adequately addressed in the permit application," and that the Project will result in an "overall improvement" in stormwater and wastewater management.  (Pl. Ex. 103 at 4.)

[36] WDS advised the ZBA that WDS did not have the authority to cap the enrollment of WHHS; however, WDS and the ZBA discussed a campus enrollment cap, which would include WDS and WHHS.  (Pl. Exs. 53, 58.)  In its 55-year history, WDS has never been subject to any enrollment restrictions.

addressed all of the ZBA's concerns.  (Tr. 337-38.)

114.    However, on August 1, 2002, the ZBA voted 3-2 in favor of rescinding the Negative

Declaration under SEQRA (Vozza, Mgrditchian and Neuringer voting to rescind).[37]  (SAF ¶ 29; Pl.

Ex. 73 at 68-70.)  As this Court has previously ruled, the Negative Declaration was rescinded not

because of any new information relating to any significant adverse environmental impact of the

Project, but in response to the belated public outcry led by Neufeld and Tilley.  *See Westchester I*,

236 F. Supp. 2d at 359.   The effect of the ZBA's decision was the issuance of a "positive

declaration" requiring WDS—ten months after submitting the Application—to begin to undertake

environmental studies and to prepare a full EIS.  (Pl. Ex. 99.)

115.    WDS commenced this action on August 7, 2002.  On September 18, 2002, defendants

moved to dismiss and WDS cross-moved for partial summary judgment.  (SAF ¶ 30.)  On December

4, 2002, this Court granted WDS's motion for partial summary judgment, holding that the Negative

Declaration was not properly rescinded and remained in full force and effect.  (*Id.*); *see Westchester

I*, 236 F. Supp. 2d 349.

116.    Additional public hearings on the Application were held on September 5, 2002,

October 3, 2002, November 7, 2002, January 8, 2003, February 6, 2003 and March 13, 2003.  (SAF

¶ 31; Pl. Exs. 74-79.)  A small but vocal number of Orienta Point residents again raised complaints

about the Project.

117.    At least three Orienta Point residents voiced the opinion that WDS should sell its

property and move elsewhere.  (Pl. Ex. 79 at 58; Pl. Ex. 77 at 11, 43.)

───────────────

[37] The ZBA also voted under N.Y. VILL. LAW § 7-712-a(12), but that vote to rescind the
Negative Declaration was defeated 3-2.  (SAF ¶ 29; Pl. Ex. 73 at 68-70.)

118.    Others expressed concern over the reduction in property values the proposed expansion would cause.  (Pl. Ex. 61 at D763; Tr. 1214, 1221; *see* Pl. Exs. 77, 79.)  The Court finds that defendants have produced no credible evidence demonstrating the effect of the Project on property values.  The Affidavit of Jonathan A. Bernz, received into evidence at trial—originally submitted four years ago during SOUND's Article 78 proceeding—provides nothing more than a conclusory statement that "the proposed expansion will be devastating to the various aesthetic elements which create the economic values of the adjacent properties."  (Defs. Ex. CCCC at ¶ 6.)  At least one resident noted that a modernized structure would increase the aesthetic quality of the neighborhood and "send real estate prices up"  (Pl. Ex. 79 at 47), while another resident felt the School's presence enhanced the value of the neighborhood homes.  (Pl. Ex. 61 at D753.)

119.    Tilley also questioned whether WDS was a good neighbor.  For example, Tilley complained at trial about WDS's slow response in removing fallen trees as well as removing trees that appeared likely to fall, at least one of which fell, damaging his Jaguar.  (Tr. 1241, 1273-76.)

120.    On January 10, 2003, a conference was held before this Court, during which the Court directed the ZBA to give WDS a list of outstanding issues that were of concern to the ZBA and that might impede the approval of the Application.  (Tr. 826.)  On January 17, 2003, after each of the ZBA members had an opportunity to provide input, the ZBA sent such a list to WDS (the "Outstanding Issues List").[38]  (Pl. Ex. 54; Tr. 915.)  Among the issues identified by the ZBA were the following:

6.  Confirm whether the "green" parking to be held in reserve can be placed in a

---

[38] Although Gabriele suggested at trial that he lacked sufficient time to draft the Outstanding Issues List, he conceded that he never requested additional time from either WDS or the Court.  (Tr. 883.)

different location further to the north and interior to the site.

19.    Provide additional information on traffic volume for the intersections of Rockland Avenue and Boston Post Road and Delancey Avenue and Boston Post Road and the effect, if any, of increased enrollment.

(Pl. Ex. 54 at 3-4.)  Nobody from BFJ or the Village had suggested that the intersections identified in Item 19 be studied before the Application was submitted on October 10, 2001.  (Tr. 351; *see supra* ¶ 85.)  The ZBA did not indicate to WDS or this Court that there were any open issues other than those explicitly set forth on the Outstanding Issues List.  (Pl. Ex. 54.)

121.    On January 30, 2003, WDS responded to each of the items in the Outstanding Issues List.  (Pl. Ex. 55.)  In response to Item 6, WDS confirmed that the reserve parking had been "reallocated to both an area opposite the High School (12 spaces) and to an area on the north side of the entry drive (19 spaces)."  (Pl. Ex. 55 at 3.)  In response to Item 19, WDS submitted a traffic analysis of the Boston Post Road/Delancey Avenue and Boston Post Road/Rockland Avenue intersections (the "Supplemental Traffic Assessment").  (Pl. Ex. 55 at 9, tbls. 2, 3; Tr. 347-49, 1300.) The Supplemental Traffic Assessment concluded as follows:  "[T]he two study intersections have sufficient reserve capacity to accommodate the modest increase in peak hour traffic from the WDS project and acceptable traffic operations will continue to be provided under projected Build conditions."  (Pl. Ex. 55 at 9; Tr. 348-49.)  DTS believed that the January 30, 2003 letter adequately addressed all of the items included in the Outstanding Issues List.  (Tr. 349.)

122.    At a public hearing on February 6, 2003, the ZBA indicated that it would hold a special meeting to "wrap . . . up" the Application and that it wanted WDS to address four remaining issues at that special meeting by:  (1) providing renderings of Gordon Hall from Skibo Lane; (2) addressing the possibility of moving the new building slightly further back from the property line;

55

(3) discussing the possibility of reducing the overall square footage of Gordon Hall; and (4) clarifying the Project's potential likely effects on traffic in Orienta Point.[39]  (Pl. Ex. 78 at 90-100.) The ZBA did not mention any other issues, even those items identified in the Outstanding Issues List.  (*Id.*)  Nor did the ZBA inform WDS that the responses in its January 30, 2003 letter were in any way deficient.  (Pl. Ex. 78.)

123.    At the March 13, 2003 ZBA hearing, WDS provided the ZBA with requested renderings of Gordon Hall from Skibo Lane.  (Pl. Exs. 79, 112-114.)  WDS also provided a detailed presentation by its architect on a tentative proposal that reduced the size of Gordon Hall by 1,000 square feet, thereby eliminating two full classrooms—replaced by two smaller resource rooms—and moving the building further from the property line.  (Pl. Ex. 79 at 11-16.)  WDS advised the ZBA that it would secure approval to construct this smaller structure if the ZBA was more inclined to accept this modified proposal.  (Tr. 200-01, 208, 490, 689, 753; Defs. Ex. DDDD.)  WDS also proposed to add additional evergreen screening between the buildings and Skibo Lane.  (Pl. Ex. 79 at 61 (noting growth rate, initial size and size at maturity of trees); Defs. Ex. DDDD at 3.)  At the end of the evening, the ZBA closed the hearing and began its deliberations.  (Pl. Ex. 79 at 101-02.) The ZBA continued to deliberate on April 3, 2003, May 1, 2003 and May 13, 2003.  (SAF ¶ 33; Pl. Exs. 80-82.)

124.    Defendants do not dispute that the ZBA had the ability to approve the Application subject to conditions intended to mitigate adverse effects relating to public health, safety and welfare that might arise from the Project.  (Tr. 921, 1336; *see also* VILL. CODE § 342-72.)  As Gabriele

---

[39] In addition, the ZBA asked about the taxable status and lot division on which the headmaster's residence sits (*see supra* ¶ 8); it received an immediate answer from James Staudt, WDS's land use attorney, and did not request further information on this issue.  (Tr. 96-98.)

acknowledged at trial, the ZBA "can always impose conditions on resolutions."  (Tr. 921; *see* Tr.

1336-37 (Jackson acknowledged ZBA's ability to impose conditions).)

125.    In the months leading up to the May 13, 2003 vote, Staudt met with BFJ and Village

counsel to attempt to work out reasonable conditions that could be imposed on an approval of the

Application.  (Tr. 729.)

126.    In fact, during this time, the ZBA's consultants at BFJ repeatedly advised the ZBA

of conditions it could impose to mitigate any potential adverse effects.  (Pl. Exs. 53, 58, 102; Tr. 671,

674-80.)  For example, on January 7, 2003, Fish sent the ZBA a list of "potential modifications" that

"might now be considered by the ZBA as possible conditions to the granting of a special permit."

(Pl. Ex. 53; Tr. 671.)  Among the proposed conditions was an enrollment cap for the Property

(including both WHHS and WDS).  (Pl. Ex. 53 at 4.)  At the time Fish sent the memorandum to the

ZBA, he did not believe that there were any issues concerning the Application that could not be

mitigated by conditions.  (Tr. 674-75.)  Moreover, at the February 6, 2003 ZBA hearing, Fish

informed the ZBA that WDS already had addressed the issues identified in the list:

> MR. FISH:    I think in the memo we gave you we listed nine–sort of nine
> potential issues right now and I think they've addressed all nine issues.  I
> think probably on my sense is about seven of them there are some they've responded to
> our initial memos to the board.  And, again, two of them are enrollment cap for the
> total site including the high school.   They haven't agreed to that, it's my
> understanding.  Although the board is free to impose that in my view.  And
> secondly, the other one is they have not obviously made any changes that I have
> heard this evening on moving the building.  So of the nine potential issues or
> conditions, I think they've responded significantly to seven of them.  And the other
> two–the two I think remaining in my mind are the total enrollment cap and whether
> the building can be adjusted somewhat to set back from Skibo Lane.
>
> MR. MGRDITCHIAN:     Mr. Fish, I have to concur with that . . . .

(Pl. Ex. 78 at 51-52.)  At trial, Fish testified that he thought that issues concerning both the size of

the building and the set-back from Skibo Lane could be mitigated by the ZBA through conditions. (Tr. 674-75, 680-81.)

127.    On March 20, 2003, BFJ sent to ZBA Secretary Ann Malavet a draft resolution approving the WDS Application subject to certain conditions, including an enrollment cap for the Property and a "traffic management plan" providing for the establishment of a bus schedule. (Pl. Ex. 58; Tr. 677-80.)

128.    On April 3, 2003, BFJ sent the ZBA a memorandum specifically addressing the impact of an enrollment cap on traffic. (Pl. Ex. 102; Tr. 675-76.) The memorandum states that "the projected increase in traffic from the Day School is less than one year of background growth." (Pl. Ex. 102 at 2.) Nevertheless, after taking "a close look at the relationship between the student cap and traffic impacts," (*id.* at 1) the memorandum discusses the possibility of imposing an interim and final enrollment cap on the Property and concludes that "[t]his interim cap, combined with our previous recommendation of spacing the existing buses at least 1 minute apart, should be able to reasonably control traffic impacts." (*Id.* at 2.) This conclusion was based on an analysis performed by Jacquemart, BFJ's traffic expert and defendants' traffic expert at trial. (*Id.* at 1.)

129.    At the conclusion of the May 1, 2003 ZBA hearing, ZBA member Neuringer suggested that different resolutions relating to the WDS Application be circulated for review in advance of the next meeting:

> Considering what we have been struggling with on this, I don't think it would be at all inappropriate if there were more than one resolution to review. In other words, it doesn't have to come down to just one document. There could be one, two or three for review.

(Pl. Ex. 81 at 49-50.) Mgrditchian moved that additional resolutions and findings of fact be circulated for review before the next meeting. (*Id.* at 50.) Gabriele declared that it was "incumbent"

upon the ZBA to review the draft resolution (approving the Application) provided by BFJ on March 20, 2003 before its next meeting.[40]  (*Id.* at 49.)

130.    Nevertheless, the draft resolution provided by BFJ was not circulated to the ZBA members before the May 13, 2003 ZBA hearing.  (Jackson Dep. at 35, 54-55; Mgrditchian Dep. at 56-57; Neuringer Dep. at 69-70; Weprin Dep. at 56-57; Gabriele Dep. at 67-68.)  Nor were any other draft resolutions or findings of fact circulated.  (Jackson Dep. at 35, 54-55; Mgrditchian Dep. at 56-57; Neuringer Dep. at 69-70; Weprin Dep. at 56-57; Gabriele Dep. at 67-68.)  The ZBA members also did not discuss approving the WDS Application subject to conditions—or even what conditions might address their concerns.  (Jackson Dep. at 51; Mgrditchian Dep. at 65, 99-100; Neuringer Dep. at 86; Gabriele Dep. at 73, 75-76.)

131.    Instead, at the May 13, 2003 ZBA hearing, Gabriele presented a single resolution denying the WDS Application in its entirety (the "May 13 Resolution" or "Resolution").  (Neuringer Dep. at 70; Gabriele Dep. at 65.)  Gabriele stated on the record, among other things, the following:

> [F]irst and foremost, the primary professional report that was submitted to the board which is the traffic study, upon close scrutinization was found to have a number of inconsistencies and what could be regarded as inaccuracies.
>
> . . . .
>
> The essence of the proposed resolution that will lead to rejection of the application is essentially predicated upon the traffic which exists in the surrounding area, the intensity of use, and a lack of clarity as to what the long-term implications would

---

[40] The ZBA hearing transcript is not clear that Gabriele is referring to the draft resolution sent by BFJ on March 20, 2003.  However, as the record is devoid of evidence that BFJ provided any other draft resolutions to the ZBA, Gabriele's reference must be to that draft.  Because the ZBA members destroyed or discarded their files relating to the Application, the Court is unable to consider the possibility that Gabriele may have been referring to some other resolution.  *Cf. Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *Barsoum v. NYC Hous. Auth.*, 202 F.R.D. 396, 400 (S.D.N.Y. 2001).

be as far as aggravating a traffic situation which is already somewhat precarious in the neighborhood as has been demonstrated through public outcry as well as through a contradictory traffic study.

(Pl. Ex. 82 at 4-6.)

132.    That evening, the ZBA voted 3-2 to deny the Application.  (*Id.* at 7-9; SAF ¶ 34.) Gabriele, who drafted the resolution, voted to deny; he was joined by Mgrditchian and Jackson, both of whom previously served on the ZBA with vocal Project opponent Neufeld.  (Pl. Ex. 82 at 8; *see supra* ¶ 94.)  The Resolution was filed in the office of the Clerk of the Village on May 20, 2003. (SAF ¶ 35; Pl. Ex. 4.)  The May 13 Resolution specifies all of the ZBA's grounds for denying the Application.  (Tr. 880, 1319.)  The ZBA members did not take the Negative Declaration and the factual findings contained therein into consideration in voting on the May 13 Resolution.  (*E.g.*, Tr. 901-02, 1365.)

133.    After the vote denying the Application, and despite the existence of pending litigation, every member of the ZBA destroyed or discarded all of his documents relating to the Application, including handwritten notes.  (Mgrditchian Dep. at 15-19; Neuringer Dep. at 22-26, 86; Weprin Dep. at 13-15, 65-66; Gabriele Dep. at 40-43.)  Mgrditchian, for example, "shredded" all of his documents relating to WDS, including "numerous" handwritten notes, "[u]pon the closing and the decision on the Day School application."  (Mgrditchian Dep. at 17-18.)  Mgrditchian testified at his deposition that "[o]nce the application is closed and voted upon, there's no reason to keep an application any longer."  (*Id.* at 67.)  Likewise, Gabriele testified that "[a]fter the final resolution was voted on" (Gabriele Dep. at 40-42) he threw his documents relating to WDS—including handwritten notes— "directly in the garbage pail."  (Tr. 923.)  Similarly, Jackson put his WDS-related materials "out to the curb."  (Tr. 1310.)  The ZBA members were aware of this pending litigation when they disposed

or discarded their documents and handwritten notes.[41] (Tr. 924; Jackson Dep. at 13-14; Mgrditchian

Dep. at 20; Weprin Dep. at 9-10; Gabriele Dep. at 38-39.)

134.    The ZBA members considered the May 13 Resolution to constitute the "final

resolution" regarding the Application and believed the hearing process was "closed." (Gabriel Dep.

at 40-42; Mgrditchian at 15-19, 66-67.)  Indeed, each of the ZBA members who voted to deny the

Application agreed that if WDS were to file another application, it would have to begin the entire

application process all over again, including going through a new SEQRA review despite this

Court's previous Order reinstating the Negative Declaration.  (Tr. 921, 1367-68; Mgrditchian Dep.

at 66-67.)

135.    The Court is aware that the May 13 Resolution states that "[t]his denial exclusively

addresses the future expansion of the school and its accessory uses, both from a physical and

operational standpoint *as they relate to this application*."  (Pl. Ex. 4 at F-10 (emphasis added).)  The

Court also recognizes that WDS is in no way precluded from filing another application seeking

expansion.  However, this Court finds that the May 13, 2003 vote constituted the final say of the

ZBA with reference to the Application, thereby exhausting WDS's administrative remedies.  Indeed,

that the ZBA members themselves referred to the process as "closed," discarded their Application-

related materials and failed to comment on WDS's 43,000 square foot proposal (*see supra* ¶ 123)

belies any contention the ZBA would have entertained, or that WDS could have submitted,

additional information or a modified Application.  (Mgrditchian Dep. at 15-19; Gabriele Dep. at 40-

42.)

---

[41] This Court denied plaintiff's motion for sanctions against defendants for spoliation of evidence.

61

136.    Based on these facts, the Court finds that the May 13 Resolution constitutes a complete, final and definitive determination by the ZBA with respect to the Application and any and all self-imposed or requested concessions made in furtherance of the Application.  The Court further finds that the denial of the Application at the least will result in long delay of WDS's efforts to remedy the gross inadequacies of its facilities, and substantially increase construction costs.  Thus, the denial of the Application significantly interferes with WDS's ability to accomplish its educational mission, and significantly impacts WDS's retention and recruitment of students and teachers.

137.    Based on the extensive record developed at trial, the Court finds much reason to doubt the sincerity of the ZBA's professed willingness reasonably to consider another application addressing WDS's needs in an acceptably efficient and practical manner.[42]

## VIII.   The May 13, 2003 Resolution

138.    The May 13 Resolution denied the Application on the following stated grounds:

---

[42] In May 2005, pursuant to a Court-ordered Stipulation, WDS submitted a Modified Application for Special Permit Modification ("2005 Application") in which WDS proposed a building approximately 28,000 square feet, substantially smaller than the originally-designed Gordon Hall.  (Tr. 1073, 1293; Pl. Ex. 120.)  The building was also smaller than the 35,000 square foot building that defendants argued, and Fish testified, at trial would meet WDS's needs.  (Tr. 711-12, 783-84.)  The building proposed in the 2005 Application was presented as a compromise in a good-faith effort to resolve this litigation and move towards the construction of desperately-needed facilities; it did not adequately address all of WDS's needs.  (Tr. 1073.)  Nevertheless, after orally voting to "approve" the 2005 Application, the ZBA issued a written resolution containing several unreasonable conditions that actually would have precluded construction of the building purportedly approved.  Those conditions included, for example, a limitation on noise on the property at all times (including during construction) to a maximum of 50 decibels—a level often exceeded by normal conversation.  (Pl. Ex. 122).  Moreover, WDS was able to submit its modified plan only as a result of the parties' efforts at settlement; such a submission would not otherwise have been possible without beginning the application process anew.

62

(1) traffic; (2) parking; and (3) intensity of use, including "[t]he overall physical size of the structure, its location on campus and the effect it would have on the surrounding neighbors." (Pl. Ex. 4 at F-6 to F-10.)  The May 13 Resolution did not identify any of these, or any other purported justifications, as compelling governmental interests nor state that they pose any threat to public health, safety or welfare.  The May 13 Resolution did not discuss any less restrictive means of addressing any of the ZBA's concerns.  Nor did it express the conclusion that the Project would, as a whole, actually detract from public health, safety or welfare.  It also did not indicate that the ZBA gave any special consideration to WDS's proposed religious and educational use or its need for the proposed facilities or evidence a balancing of these needs against any potential environmental impact.  (Tr. 881.)

139.    The May 13 Resolution was drafted primarily by Gabriele; he did not get input from the other ZBA members.[43]  (Pl. Ex. 101; Tr. 859, 927, 1304; Jackson Dep. at 36-37, 54-55; Neuringer Dep. at 72; Weprin Dep. at 59, 60, 64; Gabriele Dep. at 76-79.)  The May 13 Resolution was also drafted without specific suggestions from the ZBA's consultants and traffic experts at BFJ or from SOUND's traffic expert, Dr. Horodniceanu, upon whom the ZBA heavily relied.  (Tr. 680-81, 1127-28; *see infra* ¶¶ 145, 152, 157, 161.)

140.    Many of the grounds identified in the May 13 Resolution were conceived after the ZBA closed the hearing process, affording WDS no opportunity to respond.  (Tr. 840.)  Gabriele testified: "[W]e realized the deficiencies . . . pretty much after we had closed the application. . . . [A]ll the issues were not found until after we had closed deliberations."  (*Id.*)

---

[43] Malavet actually typed the draft resolution and Joseph Messina, the Village's counsel, provided the chronological history.  (Gabriele Dep. at 76-79.)  However, Gabriele drafted the findings of fact upon which the denial is based.  (*Id.* at 79; Pl. Ex. 101; Tr. 927.)  All ZBA members were free to draft proposed findings of fact or language for a proposed resolution either approving or denying the Application; only Gabriele exercised this right.  (Tr. 858-60; Pl. Ex. 81 at 2-4, 48-50.)

141.    Moreover, Jackson and Gabriele testified at trial that they lacked enough information on the Application to make an informed decision.  (Tr. 832, 842, 876, 884, 1307.)  Jackson testified that he "still had questions about all the information that was being provided."  (Tr. 1307.)  Gabriele contended at trial that "it was difficult for me to actually achieve a point where I felt I fully understand what this application is about.  I never achieved this point . . . . Even until today."  (Tr. 884.)  In fact, as of May 13, 2003, Gabriele had not reviewed all the transcripts of the ZBA hearings relating to the Application, even though he did not assume his position as ZBA Chairman until December 2002, over a year after the Application was filed.  (Tr. 994.)  Nor had he reviewed the most recent renewal of WDS's special permit (November 2, 2000).  (Tr. 901-03.)  And neither he nor Jackson had ever seen the Negative Declaration issued by the ZBA and reinstated by this Court's December 2002 Order.  (Tr. 901-02.)

142.    Despite the fact that the ZBA discovered issues after closing the hearing process and apparently still had questions regarding the Application, none of the ZBA members moved to re-open the hearing to request additional information.  (Tr. 921.)  In fact, it was Chairman Gabriele who had suggested three months earlier that the ZBA hold a special meeting to "wrap . . . up" the Application:

> I conferred with my fellow board members during the break and I think it would be very productive for all of us, given the calendar, given the amount of time it takes to get through our agenda, I would like to propose if the applicant is amenable, that we make every effort to have a special meeting to see if we can't wrap this up.[44]

---

[44] Gabriele and Jackson testified at trial that they understood the Application to be on a "fast track" following the conference before this Court in January 2003, and that Staudt constantly pressured them to close the hearing process.  (Tr. 825-26, 834, 836, 1289-90, 1378.)  However, neither of them were aware of any Court order requiring that the hearing process be closed; and, in fact, no such order was issued by this Court or any other court.  (Tr. 900-01, 1319.)  The Court also finds it difficult to credit Gabriele's testimony that he felt compelled to close the hearing in response

(Pl. Ex. 78 at 90.)

A.   **Traffic**

143.   The May 13 Resolution states that "[t]he single most important element in considering this application is the intensity of use and the traffic which it will generate."  (Pl. Ex. 4 at F-6.)

144.   In concluding that the Project would adversely impact traffic, the ZBA disregarded the WDS Traffic Assessment (and Supplemental Traffic Assessment), the opinions of Divney, the opinions of its own traffic experts at BFJ and its own findings in the Negative Declaration.  The ZBA disregarded these conclusions and opinions despite the lack of any contradictory traffic study, or any inconsistent empirical data in the public record.[45]

145.   Instead, the May 13 Resolution relies heavily on comments made by Dr. Horodniceanu and upon Gabriele's own critique of the WDS Traffic Assessment.  The Traffic section states:

> With respect to the applicant's traffic study, specific questions were presented by other professionals which called into question the validity of the traffic study. Specifically, the testimony of Dr. Michael Horodniceanu, a distinguished traffic

---

to Staudt's repeated requests to render a decision given Gabriele's testimony that "[p]eople know better than to impose their opinions on me so they don't do it."  (Gabriele Dep. at 36.)

[45] As set forth below, Dr. Horodniceanu did not produce a contrary traffic study.  The unauthenticated summary of the traffic count purportedly created by "EIS International" for the Liberty Montessori School in 1997 also is not inconsistent with the WDS Traffic Assessment.  (Pl. Ex. 51.)  Nor does a comparison of the EIS International traffic count to the counts performed by DTS in June 2001 undermine the validity of the background growth rate applied in the WDS Traffic Assessment.  As already noted, and as reiterated below, DTS obtained the background growth rate from the NYDOT; Divney, Dr. Horodniceanu, Fish and Jacquemart all agreed that this was an appropriate source.  (Tr. 301, 569-70, 606-07, 669, 1145-46.)

engineer who is a former New York City DOT Commissioner and has completed dozens of traffic studies throughout the metropolitan area.

(*Id.* at F-7.)  Dr. Horodniceanu was in fact the sole professional who raised any issues with respect to the WDS Traffic Assessment.  (Tr. 899-900.)  Dr. Horodniceanu was retained by Neufeld and SOUND in or about the spring of 2002, and paid $3,500 to review the WDS Traffic Assessment and provide a "letter report."  (Tr. 547-48, 552-54.)  Dr. Horodniceanu did not himself, nor did anyone under his supervision, actually perform a traffic study or conduct any traffic counts.  (Tr. 552-54.)  Gabriele acknowledged at trial that Dr. Horodniceanu "didn't, you know, render an opinion per se." (Tr. 832-33.)  Rather, Dr. Horodniceanu simply identified purported "technical flaws" or "holes" in the WDS Traffic Assessment.  (Tr. 563, 587.)

146.    Even in that limited capacity, however, Dr. Horodniceanu never personally reviewed the Capacity Analysis Worksheets that set forth the analysis underlying the WDS Traffic Assessment, and which are attached thereto.  (Tr. 555.)  Dr. Horodniceanu never personally visited the Orienta Point area during the peak hours as identified in the WDS Traffic Assessment.  (Tr. 548-49, 558.)  Nor did Dr. Horodniceanu have any discussions with any ZBA members outside of the two ZBA hearings at which he spoke.  (Tr. 582-83.)

147.    Dr. Horodniceanu also did not review any drafts of the May 13 Resolution and did not know that the ZBA was relying on his comments in denying the Application.  (*Id.*)  The ZBA members did not even know how Dr. Horodniceanu's credentials compared to those of Divney. (Mgrditchian Dep. at 86-88; Gabriele Dep. at 90-93.)  The public record before the ZBA does not (nor does any evidence adduced at trial) reveal any reasonable basis for the ZBA to credit the

opinions of SOUND's expert over those expressed by WDS's expert or the ZBA's own expert.[46]

148.    The Resolution further notes that many of the inconsistencies were discovered by the "new board members": "This Board also recognizes that the Board's own consultant [BFJ] did not discover many of the detailed inconsistencies of the traffic report, which were only uncovered after a thorough reading of the traffic study by the new Board members."[47]  (Pl. Ex. 4 at F-9.)  Gabriele confirmed that the "new Board members" referred to in this statement were himself and Jackson. (Tr. 1359.) Neither Jackson nor Gabriele (nor any other ZBA member) is a traffic expert.[48] (Tr. 861, 863, 892, 1338; Pl. Ex. 81 at 12, 13.)  As between the two of them, Jackson testified that he does not

───────────────

[46] Jacquemart produced an expert report that included his own traffic count and analysis.  At trial, Jacquemart, for the first time, questioned DTS's analysis.  (Tr. 1101 *et seq.*)  Specifically, he questioned, among other things, the use of Highway Capacity Software ("HCS") to analyze the raw traffic count data.  (*E.g.*, Tr. 1128, 1147; *see supra* n.32).  He recommended using Synchro software because it integrates the analyses of intersections that are in close proximity to one another.  (Defs. Ex. MMM at 2; Tr. 1115-16.)  According to Jacquemart, the Synchro analysis revealed far greater delays than those shown by the HCS analysis.  (*Compare* Defs. Ex. MMM at 3, 6, 12, *with* Pl. Ex. 3(8) at 13-16, tbls. 2-3.)

The Court notes that Jacquemart's traffic counts, conducted on March 10, 2005 and updated on June 28, 2005: (1) took place at different times than the DTS count (Defs. Ex. MMM at 3); (2) took place at only Boston Post Road/Delancey Avenue and Boston Post Road/Orienta Avenue, thus not taking into account the "key" intersection of Boston Post Road/Rockland Avenue (*id.* at 3, 12; *infra* ¶ 152); and (3) used higher percentages of heavy vehicles for certain movements "coming out of Orienta Avenue" based on concerns raised by Dr. Horodniceanu.  (Defs. Ex. MMM at 11.)

The Court questions Jacquemart's findings based on these differences, as well as concerns raised during his testimony.  For example, Jacquemart expressed confusion over whether Synchro was in fact used; Jacquemart's March report attaches no Capacity Analysis Worksheets, and his July update attaches HCS worksheets.  (Tr. 1139, 1157.)  Regardless, the ZBA never had this information before them when they denied WDS's special permit based predominately on traffic concerns.

[47] Significantly, despite BFJ's purported failure to discover numerous "inconsistencies" identified by Gabriele (an admitted layman): (1) the Village has continued to work with BFJ (Tr. 653, 892-94); (2) the ZBA has continued to work with BFJ (Tr. 894); and (3) defendants retained BFJ's own partners—Fish and Jacquemart—as expert witnesses in this very action.  (Defs. Exs. LLL, MMM.)

[48] This fact is undisputed, and is one of the principal reasons the ZBA retained BFJ.

have "the same details or understanding [as] Mr. Gabriele," who "came up with the specifics" as to the traffic issues identified in the Resolution.  (Tr. 1360.)

149.    Gabriele, however, does not know how a traffic study is performed (Tr. 892); had never before reviewed a single traffic study (Tr. 991); and did not understand the Capacity Analysis Worksheets underlying the WDS Traffic Assessment.  (Tr. 945-46)  Gabriele offered the following testimony:

> Q.    . . . Now we've just established you don't know how a traffic study is done, do you?
>
> A.    That's correct.
>
> Q.    You don't know how to perform one.  Hence, you don't know what counts are taken and how that gets converted into peak hour data and passenger car equivalent, or anything like that; right?
>
> A.    Correct.[49]

(Tr. 991.)   In fact, at the final ZBA hearing before the vote to deny the Application, Gabriele reiterated that he was "not . . . an expert in traffic study" and reviewed the WDS Traffic Assessment "purely as a layman."  (Pl. Ex. 81 at 14; *see also id.* at 12 ("I am not an expert when it comes to traffic.").)

150.    Gabriele nevertheless concluded that there were "inconsistencies" in the WDS Traffic Assessment without consulting with the ZBA's own traffic experts or seeking clarification from WDS.  (Tr. 840-41, 992-93; Gabriele Dep. at 94-95.)  However, as discussed below, these purported "inconsistencies" catalogued in the Resolution were largely errors made by Gabriele (and the ZBA)

---

[49] Gabriele's attempts at trial to explain the purported deficiencies in the WDS Traffic Assessment served only to confirm his fundamental lack of understanding.  (Tr. 885, 908-10, 930, 947-48, 989.)

in interpreting the WDS Traffic Assessment, and not errors or inconsistencies in the WDS Traffic Assessment itself.

151.     Based on these facts and the remainder of the extensive record, the Court finds that the ZBA's decision to: (1) disregard the WDS Traffic Assessment and Supplemental Traffic Assessment; (2) disregard the opinions of the WDS traffic consultant and its own traffic experts; and (3) rely on Dr. Horodniceanu's comments and Gabriele's own analysis was unreasonable and arbitrary and evidences a lack of fairness in the hearing process afforded WDS.  As set forth more fully below, one of the consequences of that decision, and the failure to re-open the hearing to address the so-called "inconsistencies" in the WDS Traffic Assessment, is that the ZBA's key traffic findings are clearly wrong.  Those that are not demonstrably false are conclusory, and do not in any material respect detract from the conclusions of the WDS Traffic Assessment and Supplemental Traffic Assessment.

### 1.     The Purported Failure to Study "Key Intersections"

152.     The May 13 Resolution asserts that "Dr. Horodniceanu noted that key intersections were not included in the original traffic study . . . ."  (Pl. Ex. 4 at F-7.)  The "key intersections" referenced are the Boston Post Road/Delancey Avenue and Boston Post Road/Rockland Avenue intersections.[50]  (Pl. Ex. 72 at 84-85; Tr. 874.)

153.     Gabriele acknowledged at trial that those very intersections were studied and addressed in the Supplemental Traffic Assessment provided by WDS to the ZBA on January 30,

---

[50]  Neither Gabriele nor Jackson were aware that the intersections included in the WDS Traffic Assessment were reviewed by the ZBA's own traffic experts and included intersections added at their suggestion.   (Tr. 907-08, 1333.)

2003—more than three months before the May 13 Resolution was issued, and prior to Dr. Horodniceanu's February 7, 2003 appearance before the ZBA. (Pl. Ex. 55 at 9; Tr. 350-51, 904-05.) The Supplemental Traffic Assessment concluded that the intersections had "sufficient reserve capacity to accommodate the modest increase in peak hour traffic from the WDS project and acceptable traffic operations will continue to be provided under projected Build conditions." (Pl. Ex. 55 at 9.) The ZBA never questioned this conclusion. (Tr. 351-52, 907, 1334.) The ZBA also did not inform WDS that the Supplemental Traffic Assessment was inadequate or request that WDS perform additional traffic analyses. (Tr. 352.)

154.    It is not clear whether at the time he drafted the May 13 Resolution, Gabriele had even reviewed the Supplemental Traffic Assessment. (Tr. 909.) It is clear that the Supplemental Traffic Assessment was never shown by the ZBA to its own traffic experts at BFJ. (Tr. 1123, 1144.) The ZBA also never disclosed the Supplemental Traffic Assessment to Dr. Horodniceanu, despite his request that he be provided an opportunity to review it. (Pl. Ex. 78 at 62-63; Tr. 564.) In fact, when shown the Supplemental Traffic Assessment for the first time at trial and asked whether it addressed his concerns that the intersections had not been studied, Dr. Horodniceanu responded: "Definitely. It appears that way." (Tr. 566.)

155.    At trial, Gabriele and Jackson suggested—in retrospect—that the real problem was that the results of the Supplemental Traffic Assessment were not integrated into the original WDS Traffic Assessment. (Tr. 841, 906-07 ("So for me to look at it . . . in a microcosm quite frankly doesn't tell me what the level of service impact is on Orienta Avenue and things of that sort.").) The May 13 Resolution, however, does not state that WDS failed to integrate the results into the original study. (Pl. Ex. 4 at F-7.) Nor did the ZBA ever ask WDS to integrate the results before closing the

70

hearing and denying the Application.[51]  (Tr. 911.)

156.    In fact, in response to a suggestion by Steven Kass, counsel to SOUND, at the

February 6, 2003 ZBA hearing, Gabriele specifically refused to require WDS to undertake any such

additional traffic analysis:

> Mr. [K]ASS:        . . . May I simply suggest that in addition to the items on Jim
> [Staudt]'s lists, that he be requested or the applicant be requested to take a look at
> a systematic way, probably do a simulation of that three-part intersection.  I know
> they have given you some material.  We don't know what it is.  We have asked for
> a copy of it.  But there is no reason why they can't run a proper traffic model during
> this time with all the volumes moving through back and forth through those three-
> part intersections and have that available to look at.
>
> MR. GABRIELE:      Mr. [K]ass, I understand where you are coming from.  But
> I think that your request may be bordering on unreasonable.
>
> . . . .
>
> MR. GABRIELE:      . . . Mr. [K]ass, I understand the nature of your request.  I
> think it is onerous to the applicant to have them go back and create a model and so
> on and so forth.  While I was intrigued by [D]r. Horodniceanu's approach of three
> intersections of one study, again, I think it is excessively burdensome to the
> applicant and perhaps you may want to take it upon yourself to analyze the numbers
> and see if there is something that—
>
> MR. [K]ASS:      We'll be happy to try and do that.

(Pl. Ex. 78 at 102-05; *see also* Tr. 912-13, 1329-30.)  However, neither Kass, Dr. Horodniceanu nor

any representative of SOUND, ever presented the ZBA with any such traffic analysis.[52]  (Tr. 913.)

---

[51] At trial, defendants suggested that Item 19 of the Outstanding Issues List was "inartfully drafted" and that the ZBA "meant" for WDS to study the additional intersections and integrate the results into the original WDS Traffic Assessment.  (Tr. 959-60.)  The language actually used in Item 19, however, cannot reasonably be so construed.  (Tr. 959.)

[52] At trial, Gabriele suggested that he only intended to communicate that requiring WDS to perform an entirely "new [traffic] study" would be onerous and excessively burdensome.  (Tr. 960-61.)  However, his remarks as set forth in the ZBA transcript speak for themselves.  Kass was not requesting a new traffic count and study, but rather that WDS use its data to perform a "simulation of that three-part intersection" or "run a proper traffic model."  (Pl. Ex. 78 at 102-05.)  Gabriele

## 2.    The Allegedly Erroneous Background Growth Percentage

157.    Despite the fact that the ZBA's own traffic consultants had verified the background growth rate used in the WDS Traffic Assessment almost one-and-a-half years earlier (Tr. 1106, 1145-46), the May 13 Resolution took issue with DTS's use of a 2% annual background growth rate:

> The WDS traffic study indicates a projected growth of two percent. Dr. Horodniceanu indicated that he performed a traffic analysis in 1997 on the Liberty Montessori School (located at Orienta Avenue and Boston Post Road) application. Comparing his traffic count at the same intersection in 1997 with the traffic count in the WDS traffic study indicates a growth rate at the intersection in the last three years which is in excess of 3% per annum.

(Pl. Ex. 4 at F-7.)

158.    As both Gabriele and Jackson acknowledged at trial, this statement is wrong—Dr. Horodniceanu did not perform a traffic count in 1997 in relation to the Liberty Montessori School. (Tr. 568, 930-31, 1339-40.)  Rather, a summary of a traffic count purportedly performed by "EIS International" was provided to Dr. Horodniceanu by Neufeld.  (Pl. Ex. 51; Tr. 555-56.)  Dr. Horodniceanu did not even review the summary of the traffic count purportedly performed by "EIS International," let alone the underlying traffic counts themselves.[53]  (Tr. 556-57, 573.)  In fact, Dr. Horodniceanu had never heard of "EIS International."  (Tr. 568-69.)  The ZBA also never asked BFJ, who had confirmed the background growth rate used by WDS (*see supra* ¶ 101), whether they

---

himself stated that it would be onerous to require WDS to create a "model."  (*Id.* at 102-05.)  In any event, at no time after the Supplemental Traffic Assessment was submitted by WDS to the ZBA on January 30, 2003 did Gabriele, or any ZBA member, ever request that WDS perform any additional traffic studies or analysis.  (Tr. 352.)

[53] Although the summary of the Liberty Montessori School traffic counts does not specify when the underlying traffic counts were actually taken, it does indicate that the analysis of those traffic volumes was performed more than three years before WDS submitted the Application to the ZBA.  (Pl. Ex. 51 at 5-8.)

72

were familiar with "EIS International" or the Liberty Montessori School traffic study. (Tr. 931-32.)

In fact, Fish and Jacquemart, who have over 20 years of experience working for the Village, had

never heard of "EIS International" and were unfamiliar with the Liberty Montessori School traffic

study. (Tr. 719, 931-32, 1153, 1185.)

159.    The background growth rate used in the WDS Traffic Assessment was provided by

the NYDOT, which recommended a rate between 1.5-2% for the Boston Post Road/Orienta Avenue

intersection. (Tr. 301, 352-53, 606-07; *see supra* ¶ 86.) To be conservative, DTS used the higher

2% background growth rate. (Tr. 291-92, 294-95; *see supra* ¶ 86.) The source of the background

growth rate is clearly set forth in the WDS Traffic Assessment:

> [A] background growth rate of 2.0 percent per year as accepted by the New York
> State Department of Transportation has been applied to all existing volumes at
> the seventeen study intersections between 2001 and the end of 2003 reflecting
> the anticipated construction schedule of the proposed project.

(Pl. Ex. 3(8) at 7.)

160.    Dr. Horodniceanu confirmed that the NYDOT is a generally accepted source for

background growth information. (Tr. 569-70.) Likewise Fish testified that BFJ "usually consult[s]

with the state on background growth." (Tr. 669.) Significantly, defendants' own traffic expert in

this action, Jacquemart, had personally verified the methodology used in the WDS Traffic

Assessment, did not have any disagreement with the numbers and confirmed at trial that WDS's use

of a 2% background growth was reasonable. (Pl. Ex. 67 at 28; Tr. 1145-46; *see supra* ¶ 101.)

Gabriele testified that his doubts regarding the 2% figure arose from his own observations of traffic

outside the Orienta Point neighborhood:

> I do know that having lived the better part of my life in the Village, traffic patterns
> have gotten much more intense. I've seen traffic on certain streets that I had never
> seen before. In fact, I would honestly say that over the last three or four years, there

has been—there is traffic on my street, which was virtually unheard of.  So I tended
to put a little bit more stock in the higher estimate of growth.

(Tr. 930.)  Gabriele conceded that he would be comfortable with WDS using a background growth

rate of 2% if, as was actually the case, the range provided by the NYDOT was 1.5–2%.  (Tr. 993-94.)

### 3.    The Alleged Failure to Use Passenger Car Equivalents

161.    The May 13 Resolution states that the WDS Traffic Assessment failed to account for

"heavy vehicles," *i.e.*, use appropriate "passenger-car-equivalents."  The Resolution reads:

> According to Dr. Horodniceanu's review of the traffic study, as per the
> February 6, 2003 letter from Carter, Ledyard & Milburn LLP, the "WDS failed to
> use appropriate passenger-car-equivalents (PCEs) for the buses that will be
> traveling through this intersection.  Had WDS used the appropriate PCEs, its
> analysis would demonstrate an even greater impact at this intersection, one that
> would probably push the intersection into a level of service F . . . ."

(Pl. Ex. 4 at F-7 to F-8.)

162.    This statement likewise is wrong.  The WDS Traffic Assessment *does* specifically

account for the impact of "passenger-car-equivalents" or "heavy vehicles."  (Tr. 358.)  The Capacity

Analysis Worksheets, attached to the WDS Traffic Assessment, clearly disclose that the analysis

took into account that 5% of the vehicles would be "heavy vehicles."  (Pl. Ex. 3(8), Capacity

Analysis Worksheets at 1-3; Tr. 358-60.)  The 5% "heavy vehicle" factor was based directly upon

DTS's actual traffic counts.  (Tr. 359-60, 613-14.)  At trial, Dr. Horodniceanu had no reason to

disagree with this figure because he had never reviewed the Capacity Analysis Worksheets.  (Tr.

555; 574-75.)  Gabriele did not know why there was a line item for "heavy vehicles" in the Capacity

Analysis Worksheets (Tr. 945-46) because he did not understand them.  (*See supra* ¶ 149.)

163.    Neither Gabriele nor any other ZBA member raised their concerns with their retained

74

consultants, BFJ, who had never suggested that the WDS Traffic Assessment failed to take this into

account.  (Tr. 947; *see supra* ¶ 101.)  The ZBA also never raised this issue with DTS or WDS before

denying the Application on May 13, 2003.  (Tr. 947.)

### 4.    The Failure to Disclose the Level of Service Decline

164.    The May 13 Resolution discusses WDS's purported failure to distinguish between

LOS "E" and "F":

> The traffic study failed to illustrate the fine distinction which exists between an
> intersection classified as E as opposed to F as it relates to the intersection of Orienta
> Avenue and Boston Post Road.  This intersection at present, during the morning
> sampling, is currently at 74.8 seconds of delay and is projected to go to 79.5
> seconds delay, which is significant because an F rating is equal to an 80 second
> delay or is one-half of one second more than the projected delay.  Even a
> classification of E is recognized as unacceptable as per the SEQRA Technical
> Manual.

(Pl. Ex. 4 at F-7.)

165.    This statement is also wrong.  The WDS Traffic Assessment explicitly sets forth

the various LOS classifications and the delays respectively corresponding to each.  (Pl. Ex. 3(8),

unnumbered page prior to Capacity Analysis Worksheets; Tr. 353-54.)  In fact, Gabriele

acknowledged at trial that the WDS Traffic Assessment "clearly outlines" the distinction

between LOS "E" and "F."  (Tr. 976.)  Gabriele testified as follows:

> Q.    Now, Mr. Gabriele, do you know the difference between what's classified
> as an E intersection and what's classified as an F intersection?
>
> A.    Yes.  There is a chart in the [WDS] traffic study which clearly outlines that.

(*Id.*)

166.    Moreover, although the May 13 Resolution states that "[e]ven a classification of E

75

is recognized as unacceptable as per the SEQRA Technical Manual," more than a year earlier the

ZBA had unanimously issued a Negative Declaration under SEQRA, which found the current and

projected LOS levels "acceptable":

> The results of the [WDS Traffic A]ssessment demonstrated that the seventeen study intersections currently operate at acceptable overall peak hour levels of service and will continue to operate as such under projected conditions . . . .

> As a result, the traffic volumes . . . will not have a significant adverse effect on the environment.

(Pl. Ex. 97 at 2.)

167.    Further, the Boston Post Road/Orienta Avenue intersection was not, as the Resolution

states, "currently at 74.8 seconds of delay and . . . projected to go to 79.5 seconds delay."  (Pl. Ex.

4 at F-7.)  Only one movement—the westbound movement—through the Boston Post Road/Orienta

Avenue intersection (during the AM Peak Hour) was projected to go to a delay of 79.5 seconds.  (Pl.

Ex. 3(8) at 13, tbl. 2.)  The intersection as a whole (during the AM Peak Hour) was projected to

remain at an LOS of "D" (with a 45.6 second delay).  (*Id.*)  In fact, the Project is predicted to increase

traffic at the intersection during the AM Peak Hour by at most a mere 1.7% (approximately 42

vehicles); and during the PM Peak Hour by only 1.2% (approximately 30 vehicles).  (*Id.* at 5, tbl. 1.)

168.    Finally, even with respect to the westbound approach (during the AM Peak Hour) the

ZBA's conclusion is unfounded.  The Resolution states:

> Therefore, if this intersection [*i.e.*, movement] were to deteriorate to a grade F (since it finds itself at the threshold of level F through projections), it is clear that the current utilization of this intersection is at best dangerous and any potential increase of even one vehicle per hour would represent an unacceptable and potentially dangerous increase in traffic flow . . . .

(Pl. Ex. 4 at F-7.)  It cannot logically be deduced that "current utilization of this intersection is at best

dangerous" based on the fact that the intersection "finds itself at the threshold of F through

projections" of the worst-case scenario assuming (1) that the Project is built and (2) a maximum

enrollment of 591 students.  In fact, the conjecture that one additional vehicle per hour would result

in a dangerous increase in traffic was contradicted by defendants' own traffic expert at trial.

Jacquemart counted a total of 2,694 cars traveling through the Boston Post Road/Orienta Avenue

intersection during the PM Peak Hour—150 more vehicles than had been counted by DTS in the

WDS Traffic Assessment (2,544 vehicles).  (Pl. Ex. 3(8) at 5; Defs. Ex. MMM at Short Report,

Orienta Avenue & Boston Post Road, Existing PM Peak; *see supra* n.46 (noting Jacquemart's count

took place four years after the WDS Traffic Assessment).)  Nevertheless, Jacquemart testified that

his review of the accident reports for the intersection revealed "nothing unusual"; they were "like

any major intersection of Boston Post Road."  (Tr. 1188-89.)


### 5.   Concerns Over Baseball-Related Weekday Traffic

169.    The May 13 Resolution also alludes to WDS's purported failure to account for certain

baseball-related traffic:

> It is interesting to note that the traffic study indicated that, on the particular day that
> the study was taken, there was in fact a "baseball-related activity with participants
> arriving at the site at approximately 6:00 p.m. and departing at some time after 7:00
> p.m." (Traffic study, page 5, Section 2).  If the traffic count ceased at 6:30 p.m., it
> is conceivable that a number of the attendees of the sporting event were not counted
> in the traffic count whose latest sampling took place at 6:30 p.m.

(Pl. Ex. 4 at F-8.)

170.    Again, this statement is wrong.  (Tr. 1355.)  The latest sampling for the WDS Traffic

Assessment did not take place at 6:30 p.m.; rather traffic was counted through 7 p.m., a fact that is

explicitly noted in the text of the WDS Traffic Assessment:  "The counts were conducted between

the hours of 7:00 AM and 9:30 AM and 2:30 PM and 7:00 PM."  (Pl. Ex. 3(8) at 5; Tr. 364.)

171.    Moreover, that the WDS Traffic Assessment did not count all of the traffic departing the baseball games after 7 p.m. did not impact the conclusion drawn in the WDS Traffic Assessment because the PM Peak Hour for all of the studied intersections (clearly set forth in the Application) would have long since passed and the roads would have greater reserve capacity to accommodate vehicles.  (Tr. 364.)

172.    Again, to the extent that this was an issue for the ZBA, the ZBA never asked for traffic count information for the 6:30 p.m. to 7 p.m. time period.  (Tr. 992.)  Nor did the ZBA ever ask WDS to calculate the impact on traffic of cars that may have departed the Property after 7 p.m. (Tr. 365.)

### 6.    Use of Property for Sunday Sports League[54]

173.    The May 13 Resolution also references use of the Property for Sunday Sports League during the spring months:

> Significant traffic is also generated on Sundays as a result of sporting events. However, this fact was never disclosed in the traffic study, but is germane in that, while students are not present at [the Boston Post Road/Orienta Avenue] intersection on Sundays, there are certainly numerous residents who walk to Harbor Island Park and traverse this intersection during periods when the Sunday sporting events generate significant unquantified traffic.

(Pl. Ex. 4 at F-7.)

174.    As Divney explained at trial, the WDS Traffic Assessment did not address weekend traffic because the purpose of the Assessment was to evaluate the impact of potential increased enrollment from the Project on the study intersections during the peak hours—*i.e.*, the worst-case

---

[54] (*See supra* ¶ 10 (describing Sunday Sports League).)

scenario.  (Tr. 365-66.)  The potential increased enrollment created by the Project would directly affect traffic to and from WDS during the week—increased school enrollment would have a negligible effect on weekend traffic during the 10-week league season.  (*Id.*)  However, even if participation in Sunday Sports League increased as a result of the potential increase in WDS enrollment (and there is no evidence that it will), the surrounding roadway would have greater reserve capacity to accommodate traffic on the weekend than during weekday peak hours.  (*See* Tr. 362.)

175.    Moreover, even if there were evidence of congestion at the Boston Post Road/Orienta Avenue intersection on the weekend, the record is devoid of evidence that the Sunday Sports League is responsible for a significant portion of that traffic.  Indeed, this is unlikely given the multiple other area recreational facilities that would themselves attract weekend traffic, *e.g.*, the Hampshire Country Club, the Beach Point Club, the Orienta Beach Club and the boat yards along Rushmore Avenue. (Tr. 891, 926, 1332.)  Although Tilley testified that cars "were always going in and out" of the Property on weekends, including groundskeeping and facilities cleaning-related traffic (Tr. 1246-47), this traffic is negligible relative to weekday traffic.[55]

176.    Finally, the ZBA was aware that these baseball games had been going on for years. (Tr. 918.)  Special Permit 1SP-1987, granting WDS permission to construct an athletic field, explicitly contemplates use of the athletic field on Sundays, and Jackson confirmed that Sunday baseball was allowed under WDS's special permit.  (Pl. Ex. 90 at WDS 37-40, WDS 62-64; Tr. 1323.)  Nevertheless, the ZBA never requested that WDS perform any traffic studies analyzing the

---

[55] Moreover, while roughly 10-25 congregants attend Shaarei Tikva on the weekends, none of them drive, thus further diminishing weekend traffic concerns arising from use of the Property. (*See supra* ¶ 6.)

impact of these Sunday baseball games on traffic.  (Tr. 365-66.)

177.   Nor have any complaints ever been lodged with the Village against WDS or WRI, whether related to the Sunday Sports League or otherwise.[56]  (Tr. 918; Pl. Ex. 86 at 1-2; Pl. Ex. 97.) Despite living six blocks from WDS for 30 years, Neuringer never made any complaint against, or to, the school with respect to the Sunday Sports League, or anything else.  (Neuringer Dep. at 12-13, 66-67.)  Likewise, Mgrditchian has lived approximately half a mile to a mile from WDS for 23 years, but has never filed a complaint with or about WDS.  (Mgrditchian Dep. at 20-21.)

### 7.   WHHS Effects on Traffic

178.   The May 13 Resolution also comments on the fact that certain high school students depart the Property at 3 p.m.:

> Members of the Zoning Board of Appeals, on frequent visits to the day school, noted that high school students were seen leaving the campus in their cars at approximately 3:00 pm.  In the traffic study (page 5, paragraph 2) it is clearly stated that the high school dismissal peak hour was between 3:45 and 4:45 pm, indicating a significant gap in the traffic analysis, specifically as it relates to the portion of the student population on campus that drives.[57]

(Pl. Ex. 4 at F-8.)

179.   This statement, too, is wrong.  If the PM Peak Hour for the Property—determined

---

[56] Goldman testified that in her six years with WDS, she has received no complaints from Village officials, but has received three informal telephone complaints from neighbors regarding: (1) removal of an overhanging tree; (2) ballfield sand blowing into another property; and (3) vehicles speeding down Orienta Avenue.  (Tr. 110-11.)

[57] This paragraph continues:  "Furthermore, many of these students park illegally along Walton Avenue, and the presence of these vehicles calls into question the validity of the parking study and the adequacy of the proposed parking plan."  (Pl. Ex. 4 at F-8).  Parking is discussed *infra* at Section VIII.B.

based on counts taken from 2:30 p.m. to 7 p.m., and which necessarily includes traffic generated by WHHS—is "between 3:45 and 4:45 PM" (Pl. Ex. 3(8) at 5; Tr. 361), the fact that some WHHS students depart the Property before its dismissal peak hour—and long before the PM Peak Hour of any of the studied intersections—does not constitute a "significant gap" in the traffic analysis. Rather, the roadway network would have more reserve capacity when these students were using the roads, and their early departure would relieve, not aggravate, congestion during heavier travel periods. (Tr. 362.) At trial, Jacquemart agreed that the departure of some high school students at 3 p.m. would not adversely impact traffic during the PM Peak Hour. (Tr. 1192.)

## 8.   Failure to Account for Full Complement of High School Traffic

180.   The May 13 Resolution also states that the WHHS seniors had graduated by the time the WDS traffic count was taken on June 5, 2001:

> Upon a more in-depth investigation of the validity of the traffic study, it was ascertained that the high school graduation took place at the end of May in the year 2001 and on page 5, Section 2, of the WDS traffic study, it states that "manual traffic counts were conducted at the 17 study intersections listed below on Tuesday June 5, 2001, when the day school and the high school were in regular session." Research has found that while grades 9, 10 and 11 attend regular classes until the latter part of June, the high school seniors are effectively done with school, but for an occasional exam. High school students, especially seniors, represent a notable number of potential drivers and were likely not counted in the traffic sampling.

(Pl. Ex. 4 at F-8.)

181.   The WDS Traffic Assessment does erroneously indicate that the high school was in "regular session" as of June 5, 2001 (Pl. Ex. 3(8) at 5); DTS learned that high school graduation already had taken place subsequent to performing its traffic study. (Tr. 363.) However, DTS rectified this error by performing a limited recount in March 2002. (Tr. 373-74.) This recount was

81

performed at the Property driveways during a time when seniors were in regular session, and when high school senior enrollment was actually higher; the results indicated no significant change in the traffic volumes.  (Tr. 373-74, 614-15; Defs. Ex. YYY (comparing original count to March 2002 recount).)  In any event, to the extent that this was an issue for the ZBA, it was not included on the Outstanding Issues List or otherwise brought to the attention of WDS before the ZBA denied the Application on May 13, 2003.  (Tr. 1359.)

182.    As evidence adduced at trial confirmed, even assuming (1) all 33 of the high school seniors were in attendance, and (2) if in attendance had each driven their own vehicle, it is unlikely that the additional vehicles would have a significant impact on the PM Peak Hour for the Property or any of the study intersections.  (Tr. 363.)  The WDS Traffic Assessment indicates that the PM Peak Hour for the Property was 3:45 p.m. to 4:45 p.m., and the May 13 Resolution itself—in the preceding paragraph—notes the ZBA members' concern that high school students actually departed the Property earlier.[58]  (Pl. Ex. 4 at F-8; *see supra* ¶¶ 178-79.)  WHHS President Kalman confirmed that no more than 25% of the high school students stay past 3 p.m. for advanced placement classes. (Tr. 1386.)  As defendants' own traffic expert acknowledged, the departure of high school students earlier in the afternoon would not impact the PM Peak Hour.  (Tr. 1192.)

### 9.    Concern Regarding a Lack of Sidewalks

183.    The May 13 Resolution also comments on the purported lack of sidewalks and "inadequate" state of certain roads:

---

[58] The background traffic at the Boston Post Road/Orienta Avenue intersection during the PM Peak Hour is 2,544 vehicles (Pl. Ex. 3(8) at 5), so the additional WHHS-related vehicles would represent at most roughly a 1% increase in traffic.  (Tr. 363.)

> The applicant made no mention of the fact in the Traffic Study that neither Orienta Avenue or [sic] Rushmore Avenue have sidewalks. The study did mention that the roads were 20 feet wide, which is about the width of a standard two-car garage, clearly inadequate for large buses on a two-lane two-way street.[59]

(Pl. Ex. 4 at F-8; *see also id.* at F-6 ("It must be noted that none of these roads has sidewalks[,] resulting in a dangerous environment for pedestrians and joggers.").)

184.    This statement is also wrong. Both Orienta Avenue and Rushmore Avenue do have sidewalks along substantial portions of their length. (Pl. Ex. 116; Tr. 360.) Although the sidewalk along Orienta Avenue ends as it approaches Sylvan Lane, at that point Orienta Avenue splits into two parts, the main road and a service road, separated by a 15-foot wide grassy median. (Pl. Ex. 116; Tr. 493, 1245-46, 1331.)

185.    Moreover, as the May 13 Resolution acknowledges, the width of Orienta Avenue and Rushmore Avenue is specifically disclosed in the WDS Traffic Assessment:

> Orienta Avenue is a two-way, two-lane road (average width of 20 ± feet), which extends from US Route 1 on the west to the vicinity of Orienta Point on the east . . . . Rushmore Avenue is a two-way, two-lane road (average width 20 ± feet), which extends from Orienta Avenue on the west to the Sound on the east.

(Pl. Ex. 3(8) at 2; SAF ¶ 7.)

186.    Nevertheless, to the extent that this was an issue for the ZBA, nobody from the ZBA requested that the impact of the partial lack of sidewalks or width of the roads be studied by WDS before the Application was denied.[60] (Tr. 360.) Significantly, the WDS buses, which enter the

---

[59] These same concerns are expressed under "Intensity of Use" earlier in the Resolution. (*See infra* Section VIII.C.)

[60] The WDS Traffic Assessment and Supplemental Traffic Assessment counted any pedestrian traffic (and bicycle traffic) that passed through the studied intersections. (Tr. 494; Pl. Ex. 3(8), Capacity Analysis Worksheets; Pl. Ex. 55, Capacity Analysis Worksheets.)

Property via Orienta Avenue and exit via Rushmore Avenue, traverse entirely different routes.[61]  (Tr. 238-39; Pl. Ex. 116; Pl. Ex. 3(8) at figs. 3, 4.)  Moreover, the buses traveling to and from WDS are not currently full, and there is no evidence that the Project will necessarily result in any increase in bus traffic to or from WDS.[62]  (Pl. Ex. 73 at 28; Pl. Ex. 81 at 34; Defs. Ex. TT at 4.)

### 10.   Pedestrian Traffic Concerns[63]

187.   The May 13 Resolution also alludes to pedestrian traffic at the west end of Orienta Point, about eight-tenths of a mile from WDS:

> This intersection [Boston Post Road/Orienta Avenue] is heavily used by pedestrians in the afternoon, particularly high school students walking to the playing fields at

---

[61] Some WDS students are driven to school and a few students walk to school from the surrounding neighborhood. (Tr. 104.)  However, the majority of WDS students arrive by bus.  (*Id.*)  Approximately 15-20 buses (including approximately six minivans) arrive and depart the Property each weekday.  (Tr. 104-05.)  In the morning, the buses do not all arrive at the Property at the same time; however, they generally all arrive between 7:45 a.m. and 8:45 a.m.  (Tr. 105-06.)  In the afternoon, due in large part to the design of the existing traffic circle on the Property, buses often depart at the same time.  (Tr. 107-08; *see supra* ¶ 76 (discussing enlargement of internal driveway in order to eliminate caravanning).)

[62] Because different school districts in which WDS students reside use different buses, the buses traveling to and from the School each day are not filled to capacity.  (Tr. 1215; Pl. Ex. 69 at 83; Pl. Ex. 73 at 28; Pl. Ex. 81 at 34; Defs. Ex. TT at 4.)  DTS "looked at actually every bus[—]where it came from, what community it came from[—]trying to get a sense how big each bus was, did the bus have more capacity, would there be another bus" in order to properly assess current and projected bus-related traffic.  (Pl. Ex. 66 at 42.)
In addition, school buses transporting Orienta neighborhood children to other schools (including Rye Country Day School, Horace Mann and Eagle Hill School) also travel into and out of Orienta Point each morning and afternoon.  (Tr. 1242-43; Pl. Ex. 69 at 62, 83.)  There are no limits on the number of school buses that are permitted to travel into and out of Orienta Point to transport children to other schools.  (Tr. 926.)

[63] The concerns in this section relate to pedestrian traffic going to Harbor Island Park, and are separate and apart from the discussion *supra* Section VIII.A.9.  However, the Court again notes, (*see supra* n.60), that DTS counted any pedestrian traffic that passed through the studied intersections.

Harbor Island Park from Mamaroneck High School.

(Pl. Ex. 4 at F-7.)

188.    There is no evidence in the public record (and none was adduced at trial) as to how often the games at Harbor Island Park take place or how many people attend these games.  (*Compare* Tr. 1346 (Jackson speculated 30 to 40 student athletes traveled to the park from Mamaroneck High School), *with* Pl. Ex. 81 at 48 (Gabriele noting fellow ZBA member's concern "that you got hundreds of students that walk through that main intersection going to sports fields in Harbor Island on a daily basis right at prime traffic").)  There also is no evidence that traffic resulting from the Project will in any way affect these games or the students who participate in or attend them.  In fact, the record is to the contrary.

189.    The games at Harbor Island Park commence between 3 p.m. and 3:30 p.m. and students make their way through the Boston Post Road/Orienta Avenue intersection between approximately 2:45 p.m. and 3:30 p.m.  (Tr. 1344-45.)  However, WDS students are not dismissed until 4 p.m., and there is no overlap between the game-related pedestrian traffic traveling to Harbor Island Park and the PM Peak Hour for the Property, which is 3:45 p.m. to 4:45 p.m.[64]  (Tr. 106, 1344-45.)   Nor is there any evidence that these games conclude before the PM Peak Hour for the Property has ended.

190.    Moreover, the PM Peak Hour for the Boston Post Road/Orienta Avenue intersection does not commence until 5:15 p.m.  (Pl. Ex. 3(8) at 5.)  Any traffic leaving the Property, or pedestrian traffic traveling to/from Harbor Island Park, before the PM Peak Hour would be passing through the intersection when the intersection had more reserve capacity to absorb it.  (Tr. 362.)

---

[64] The ZBA was aware of this fact when it denied the Application.  (Pl. Ex. 81 at 20.)

85

**11.    WDS's Purportedly Willful Attempt to Mislead the ZBA**

191.    The ZBA accuses WDS of attempting to willfully mislead it by including a "very clear misstatement of the facts" in the WDS Traffic Assessment:

> Lastly, with respect to the traffic study, it appears that there may have been a willful attempt to provide inaccurate information to the Zoning Board of Appeals.  A very clear misstatement of the facts appears on page 6 of the Traffic Study where, in the first paragraph of the text, it indicates "that the highest AM peak hour activity for the subject site occurs between 7:45 to 8:45 AM (131 entering and 77 exiting vehicles). . .", when in fact sampling 17, which appears on the same page of the traffic study immediately above this quote, indicates that 384 vehicles enter the subject site during this hour.

(Pl. Ex. 4 at F-8.)

192.    This also is wrong.  There was no inaccurate information, much less a "willful attempt to provide inaccurate information" to the ZBA; rather, the ZBA's accusation was based on its own mistake of fact.  The Table at pages 5-6 of the WDS Traffic Assessment indicates that at Intersection No. 17 (the WDS Entrance), a total of 384 vehicles *pass through the intersection*.  (Pl. Ex. 3(8) at 5-6; Tr. 367.)  Of these 384 vehicles that pass through the intersection, only 131 vehicles enter the Property.  (Pl. Ex. 3(8) at 6; Tr. 367.)  Indeed, the paragraph containing the alleged "clear misstatement" begins by stating that the traffic volumes in the summary table represent "[t]he total existing traffic volumes recorded at the seventeen study intersections during peak hours."   (Pl. Ex. 3(8) at 5.)  That paragraph also refers to Figure No. 1 of the Traffic Assessment Appendix (Existing Traffic Volumes (2001) AM Peak Hour), a diagram that clearly illustrates 384 vehicles passing through the intersection but only 131 entering the Property.  (Pl. Ex. 3(8) at fig. 1.)

193.    Defendants acknowledged at trial that this finding was based on the ZBA's own misreading of the WDS Traffic Assessment.  (Tr. 950, 952, 1355-57.)  Jackson, for example, testified as follows:

> Q.      [S]o what was a—in the resolution indicated to be a willful attempt to provide inaccurate information and a very clear misstatement by Westchester Day School turned out to be, in fact, a mistake in the resolution, correct?
>
> A.      Yes.  Partially.
>
> . . . .
>
> Q.      . . . [D]id the Westchester Day School represent to you that only 131 vehicles entered the property when, in fact, 384 vehicles were entering the property?
>
> A.      To my knowledge, no.
>
> Q.      That was a mistake in the resolution, correct?
>
> A.      Okay.

(Tr. 1356-57.)  The court finds wholly unconvincing Gabriele's and Jackson's attempts at trial to downplay their mistake by attributing their confusion to WDS's alleged failure to provide the ZBA with requested information.  This Court has already determined that WDS never refused a ZBA request to provide it with more traffic information.  (*See supra* ¶¶ 104, 121, 153, 156.)

194.      Significantly, at no time before including this serious charge in the Resolution did the ZBA ever raise it with its own traffic experts, let alone WDS.  (Tr. 949.)  Gabriele acknowledged so much at trial:

> Q.      Did you ever discuss the information that you claimed was inaccurate or a misstatement with your consultant, Mr. Fish?
>
> A.      No.
>
> Q.      Did you ever discuss it with Mr. Divney at the hearing?
>
> A.      No.

(*Id.*)

87

### 12.    "As-of-Right" Traffic

195.    The May 13 Resolution also purports to compare the vehicular traffic associated with

WDS's and WHHS's use of the Property to that resulting from an "as-of-right" development:

> If this property were to be developed in an as-of-right fashion, it is likely that the
> 27 acre parcel would yield approximately 50 residential lots with each home having
> an average of three vehicles.  These homes would generate approximately 150
> vehicles coming and going on a particular day (assuming all of them traveled within
> the same time frame) which is in stark contrast to the 384 vehicles which pass
> through the Westchester Day School entrance between the hours of 7:45 and 8:45
> a.m. as per WDS traffic study, page 6, line item 17.

(Pl. Ex. 4 at F-7.)

196.    This also is wrong.  As set forth above, and as defendants now acknowledge, the

statement that "384 vehicles pass through the Westchester Day School entrance between the hours

of 7:45 and 8:45 a.m." is based upon the ZBA's own misreading of the WDS Traffic Assessment.

(*See supra* ¶¶ 192-93.)  In fact, 131 vehicles enter the Property during the AM Peak Hour, less than

the Resolution estimates would be generated if the property were developed "as-of-right" for

residential use.  (Pl. Ex. 3(8) at 6, Traffic Assessment Appendix Figure No. 1 (Existing  Traffic

Volumes (2001) AM Peak Hour).)

197.    There is no evidence that the ZBA discussed this calculation with its traffic experts

at BFJ.  (Tr. 949.)


### 13.    Additional Requested Traffic Studies

198.    The May 13 Resolution finds "[m]ost disturbing" WDS's supposed refusal to provide

the ZBA with enhanced traffic studies:

> Most disturbing, however, is the fact that most questions posed with respect to

expansion or clarification of traffic study results were met with a total unwillingness of the applicant to provide enhanced studies when concerns were raised.

(Pl. Ex. 4 at F-9.)

199.    Defendants, however, conceded at trial that WDS did not in fact refuse to conduct any traffic studies requested by the ZBA. (*E.g.*, Tr. 908-09.)  In fact, in January 2003, WDS had provided the ZBA with a Supplemental Traffic Assessment addressing two intersections not previously requested to be studied by the ZBA's own consultants. (Pl. Ex. 55 at 9.)  As discussed above, Gabriele—who personally drafted this finding of fact—declined to require WDS to perform any further traffic analysis on the ground that it would be "onerous" and "excessively burdensome." (Pl. Ex. 78 at 105; *see supra* ¶ 156.)

### 14.    Public Safety and the Mitigation of Potential Traffic Impacts

200.    Defendants asserted at trial that its traffic concerns represented a threat to public health, safety and welfare, even though the Resolution contains no express statement to that effect. In any event, the evidence does not support such an assertion, and no rational decisionmaker could conclude otherwise.  SOUND's own expert, Dr. Horodniceanu, testified at trial that traffic in and of itself does not pose a threat to the safety of residents of Orienta Point:  "Traffic is not normally a threat.  It's just, it's just a phenomenon." (Tr. 563.)  Likewise, Divney testified that congestion does not in and of itself pose a threat to safety:

> I don't believe that traffic volume in and of itself represents a threat to safety.
>
> The safety of an intersection has more to do with its design rather than the volume, and the presence of proper traffic signals and devices that can control the traffic. So volume in and of itself is not a matter of safety.

(Tr. 354-55.)  Finally, Jacquemart's review of accident reports for the allegedly problematic Boston Post Road/Orienta Avenue intersection revealed "nothing unusual."  (Tr. 1188-89.)

201.    Nevertheless, the record before the ZBA as of May 13, 2003, and evidence adduced at trial, plainly demonstrate that there are ways to mitigate existing or projected increases in traffic congestion.  Dr. Horodniceanu, Jacquemart and Divney all acknowledged that difficult traffic conditions can be mitigated by, for example, retiming traffic lights; widening the approaches; adding turning lanes; re-routing traffic; a more aggressive busing program; or an enrollment cap.  (Tr. 319, 583-84, 1174-75.)

202.    The ZBA was aware that potential traffic impacts could be mitigated when it denied the Application.  Dr. Horodniceanu clearly informed the ZBA that potential traffic impacts could be mitigated when he presented to the ZBA on February 6, 2003.  (*E.g.*, Pl. Ex. 78 at 69-70.) Dr. Horodniceanu made, among others, the following statements:

> MR. NEURINGER:    . . . .  Are there potential mitigating things that can be done?
>
> MR. HORODNICEANU:    I think in theory I can give you a laundry list of stuff.
>
> MR. NEURINGER:    No, I don't want to know what.  I just want to know if.
>
> MR. HORODNICEANU:    Yeah.  The answer is yes.  The question is . . . how many, the question is, you know, the trade off that exists, is there enough land to do anything, can you change the traffic signal timing.  I mean these are all things that can be looked at and ought to be looked at. . . .
>
> I believe that there are ways to tweak the system, to look at that and potentially they require additional—one example is you may want to put on Rockland another traffic signal and then coordinate it with the other two so they work in conjunction with each other.  So there are many ways to skin a cat here.[65]

---

[65] It is not persuasive that partial mitigation of the intersections of Boston Post Road require NYDOT approval before implementation.  Defendants produced no evidence that they or any of their representatives ever contacted the State to gauge its willingness to allow any mitigating measures.

(*Id.*)

203.    In the months leading up to the May 13 Resolution, the ZBA's own traffic experts also had repeatedly suggested that any potential impact of the Project on traffic could be reasonably mitigated through an enrollment cap and a traffic management plan.  (Pl. Exs. 53, 58, 102.)

### B.    Parking

204.    The May 13 Resolution states that the Project did not provide adequate parking and that WDS failed to seek a variance for the number of parking spaces proposed in the Application:

> The proposed construction calls for an additional 81 spaces resulting in a total of 177 spaces.  However, the proposed building will have an additional 25 classrooms which will require an additional 200 spaces plus 22 employees (as reported in section 6, page 4, of the submission) thus requiring a total of 222 new spaces.  The proposed site plan indicates the existence of a total of 169 spaces once the project is completed.  Therefore, the project as proposed would have a total deficiency of at least 228 (perhaps as many as 307) parking spaces which in effect would require a variance for the project as proposed.  No variance was ever requested or mentioned by the applicant.

(Pl. Ex. 4 at F-10.)

205.    The implication that the proposed building will result in 25 additional classrooms at WDS is patently false.  The Application provides for the decommissioning of 13 existing classrooms in the Castle, so that the net increase in classrooms is only 12.  (SAF ¶ 17; Pl. Ex. 3(4) at 2.)

206.    At no time before the May 13 Resolution was issued did the ZBA inform WDS that

_____

 (Tr. 496, 1344.)

   The Court notes that despite community complaints about existing traffic made at the ZBA hearings (*e.g.*, Pl. 67 at 42; Pl. Ex. 68 at 32-33), as well as the ZBA's concern over the existence of even a minuscule increase in traffic at the relevant intersections (*see supra* ¶ 168), there is no evidence that the Town has sought to mitigate this concern.  Nor is there any evidence that SOUND has carried the banner on this issue.

the Project provided for insufficient parking or required any parking variance.  (Tr. 727-28, 737, 743-44, 789-90, 934-35.)  Gabriele acknowledged that the ZBA never told WDS that the proposed parking was noncompliant.  (Tr. 934.)

207.    In fact, the finding in the May 13 Resolution was inconsistent with several earlier determinations (including by the ZBA itself) that the proposed parking complied with zoning, as well as repeated requests that WDS reduce the number of parking spaces.

208.    First, the Village Building Inspector specifically approved of WDS's methodology for calculating parking under the Village Code.  (Tr. 727-28, 738, 789, 1362; *see supra* ¶ 74.)

209.    Second, BFJ confirmed that the parking provided for by the Project was zoning compliant.  (Pl. Ex. 41 at 3.)  In fact, BFJ recommended a reduction in the number of parking spaces:

> The expansion requires a total of 70 spaces to meet the Village Zoning Code and the applicant is providing 81 spaces.  There are several issues raised by the parking:
>
> . . . .
>
> 2.    The excess spaces might be shown on the plans but not paved with asphalt. A porous pavement material might be used for the excess spaces.

(*Id.* at 3.)

210.    Third, the WCPB also determined that the proposed parking was zoning compliant and recommended a reduction in the number of spaces:

> Parking.  The site plan shows that the existing parking lot containing 96 spaces will be expanded by 81 spaces to hold accommodations for 177 automobiles. According to § 342-56 of the Code of the Village of Mamaroneck, 4 spaces per classroom must be provided plus 1 additional space for each teacher and employee. In this case, although 25 new classrooms are being provided by the construction of this new building, 13 existing classrooms are being decommissioned to be used for other purposes.  Because of this, there is only a net gain of 12 classrooms. According to page 5 of the Memorandum in Support of Application for Special Permit Modification, "It is estimated that if all new classrooms were filled, there

92

would be an increase of 22 new teachers and staff." Taking this into account, along with the net gain of 12 classrooms, 70 new parking spaces would be required.

. . . .

. . . [W]hether the school enrollment grows or not, it is apparent that the number of cars entering the school property to park there will not likely increase by 70. Nor will it likely increase by 81, which is the number of spaces proposed by the applicant. Because this new parking lot makes up a significant portion of the 1.40 acres of new impervious surface that is proposed for the site, the Village should consider a reduction in the amount of parking spaces required and encourage the applicant to reduce the number of spaces proposed.

(Pl. Ex. 39 at 1-2.)

211.    Fourth, in the Negative Declaration—still in effect as of May 13, 2003—the ZBA

itself confirmed that the parking was zoning compliant:

The environmental concern regarding parking is to be sure there are an adequate number of parking spaces for the existing and proposed uses, while at the same time preserving the existing mature trees on site and eliminating excess impervious surfaces. The Village Code requires 70 parking spaces to be added for the proposed project. The applicant has proposed 79 spaces. Applicant proposes to create a grass area for temporary overflow parking and to "bank" an unpaved area for 26 of the parking spaces in the event a demand for such spaces occurs.

As a result, the . . . proposed parking will not have a significant adverse effect on the environment.

(Pl. Ex. 97 at 2.)

212.    Fifth, in the Outstanding Issues List, the ZBA requested that WDS confirm that the

excess parking spaces to be held in reserve could be relocated. (Pl. Ex. 54 at 3, Item No. 6; *see supra*

¶ 120.) There was no mention of the need for additional parking or any variance.

213.    In fact, only after the ZBA hearing process closed did Gabriele question whether the

Application failed to meet the Village zoning requirements. (Tr. 934.) At trial, Jackson testified that

while he thought a parking variance might be needed, he admitted having never conveyed that

thought to either the ZBA or WDS.  (Tr. 1303-04.)

214.    Nevertheless, and despite the ZBA's contradictory finding in the Negative Declaration, none of the ZBA members moved to re-open the hearing to address the parking issue. (Tr. 921.)  Nor did the ZBA inquire into how the Village Building Inspector, the WCPB or BFJ calculated that the Project provided sufficient parking under the Village Code. (Tr. 939.)  Although the Resolution calculates parking based on the total number of classrooms, rather than the net increase in classrooms, Gabriele acknowledged that the Village Code's parking requirements do not apply to structures approved before April 1, 1968, a date he knew WDS's building approvals pre-dated.  (Tr. 940-41.)

215.    To the extent that additional parking spaces were required, the Property has more than ample reserve space on its 25.75-acre campus to accommodate those spaces.  (*E.g.*, Tr. 369; Pl. Exs. 1, 2.)

### C.    Intensity of Use and the Alleged "Master Plan"

216.    Defendants also assert that the intensity of use of the Property, including the size and location of Gordon Hall, poses a threat to public health, safety or welfare.  We find that the evidence fails to support such a conclusion, and that no rational decisionmaker could conclude that it did.  The May 13 Resolution identifies, in pertinent part, the following concern under "Intensity of Use":

> During the public hearing process, as well as in the applicant's presentation, several individuals requested clear statements by the applicant which would provide an indication of the anticipated future growth of the student population.  While the applicant was prepared to consider caps on the day school student population at this time, at no time did the applicant offer a cap on the high school population.  The usual response from the applicant was that the high school facility could only accommodate a maximum of 200.  However, when the applicant was asked whether the high school could expand into other portions of the campus, a clear response

was not forthcoming, leaving a significant gap in the disclosure of future growth. Furthermore, the applicant went on to say on numerous occasions that they could not govern the high school because it is a separate entity.

(Pl. Ex. 4 at F-6.)

217.    During the Application process, however, WDS clearly and repeatedly responded to

the ZBA's alleged concern that there was a "master plan," and that WHHS intended to "expand into

other portions of the campus."  For example, at the February 6, 2002 ZBA hearing, Kass, counsel

for SOUND, raised this alleged "master plan":

> MR. NEURINGER:   Mr. [K]ass, just a question, you have referred to something intriguing in a reference that you made on a couple of occasions to a master plan. Is there a document or some plan for the entire site that you're aware of?
>
> MR. [K]ASS:  We have never seen it.  We have heard it referred to in formal discussions and we could only surmise that it exists because of the way in which they have sought to cram this facility into a corner and leave open the balance of the site presumably for future use.  And I cannot imagine why, if this facility is so important to them, they don't explore some of the alternative locations particularly to the west of the driveway, the exit driveway, that Mr. Shapiro looked at.
>
> MR: NEURINGER:    So reference to a master plan is conjecture at this point?
>
> MR. [K]ASS:   It is surmise, not conjecture.  We think that it undoubtedly exists or they would not be pursuing this.

(Pl. Ex. 78 at 77-78.)

218.    In response to Kass's surmise that a "master plan" was being concealed from the

ZBA, Staudt, WDS's counsel, responded as follows:

> I have to speak to this issue of the secret master plan.  I have been to all the meetings.  Mr. [K]ass has not been to all the meetings, with all due respect.  You asked us to answer you on the question about a master plan for this property.  And in our June 17th memo we answered that question.
>
> We told you what we're looking at is the master plan.  There is nothing else.  And that's what we have always told the neighbors we have met with.  We have never

95

said that there is some other master plan.  I have been involved with the school since the days when they renovated the [C]arriage [H]ouse.  I give you my personal word that I have never heard of or seen any other master plan.

And when I asked the school is there a master plan, they say yes, that is the master plan.  This is what we have been creating over the course of the last several years.  There is no other plan for the property.

(*Id.* at 86; *see also* Pl. Ex. 50 at 4.)

219.    Gabriele and Jackson acknowledged that WDS repeatedly informed the ZBA that the Application before them was the "master plan" for the Property.  (Tr. 838-39, 1294-95.)  Jackson testified as follows:

Q.    Did you ever ask the applicant for a master plan for the entire campus?

A.    A number of people had asked that.  I believe the chairman had asked it on a couple of occasions.  A number of residents had come in and asked regarding the master plan for the property, and we were always told each and every time that this is the only master plan and that there's nothing else they plan to do.

Q.    This was with regard to the entire parcel, not just Westchester Day School?

A.    With regard to the entire parcel.

(Tr. 1294-95; *see also* Tr. 1231-32.)

220.    Consistent with WDS's representations to the ZBA, the evidence adduced at trial establishes the veracity of WDS's assertions, and, therefore the unreasonableness of the ZBA's speculations to the contrary.  Sometime prior to May 22, 2000, WHHS indeed had formed an expansion exploration committee ("Exploration Committee") to consider the possibility of improvements to and expansion of WHHS's existing facilities.  (Tr. 1387.)  The Exploration Committee held a few informal meetings in early 2000.  (*Id.*)  However, by the fall of 2000, WHHS had decided that it was not going to proceed with any expansion (*see supra* ¶ 83), and there is no

evidence of further Exploration Committee meetings.  (Tr. 1390-91, 1394-95, 1397.)

221.    Defendants point to several documents from a member of the Exploration Committee showing possible expansion ideas, beginning with the construction of a larger gymnasium, as evidence that a "master plan" did exist.[66] (Defs. Ex. WWW.)  However, there is no evidence that these ideas proceeded beyond the rough brainstorming stage, and at trial WHHS President Kalman stated that he had never seen these emails and that they in no way represented actual expansion plans for the high school.  (Tr. 1391-95, 1403.)  Moreover, these documents pre-date the Application: WDS contacted WHHS after those dates and was informed by Kalman that WHHS had no expansion plans.  Also, there is no evidence that the ZBA was aware of these "working drafts" when it denied the Application; defendants' suggestion of a master plan cover-up was based wholly on conjecture. (Tr. 1334.)

222.    Any future expansion plans of WRI, WDS or WHHS would require its own special permit application and a ZBA ruling thereon.  (Tr. 733-34.)  Additionally, as already noted, the special permit is subject to renewal every three years, and, as part of the renewal process, the ZBA has the right to impose conditions necessary to address concerns relating to public health, safety and welfare.[67]  (Id.)

---

[66] Defendants received these documents shortly before trial in response to a subpoena served on WHHS; they include a letter from Joseph Rafolowicz to Caren Hammerman and two documents entitled "WHHS Additional Facility Requirements (January, 2001 First Working Draft)" and "WHHS Additional Facility Requirements (April, 2001 Second Working Draft)."  (Defs. Ex. WWW.)  These otherwise unauthenticated documents are the centerpiece of defendants' argument. However, there is no evidence that either of these "working drafts" was attached to the letter to Hammerman or ever came to her attention, or the attention of anyone at WDS.

[67] As Staudt explained at trial, "New York State Village Law, . . . the enabling legislation for boards to conduct a special permit application process, specifically provides that the board conducting the process may impose reasonable conditions related to the impacts of the application."

223.    With respect to the number of students (and faculty) using the Property, WDS agreed to cap enrollment at the day school at 591 students and to cap Westchester Summer Day at 500 students. (*E.g.*, Pl. Ex. 50 at 4.)  Although the May 13 Resolution criticizes WDS for failing to cap enrollment at the high school, WDS and the ZBA discussed a campus-wide enrollment cap, which would include WDS and WHHS.  (*E.g.*, Pl. Ex. 53 at 4; Pl. Ex. 58 at 3, 7.)

224.    In any event, as both Jackson and Gabriele acknowledged at trial, the ZBA could have approved the Application subject to an enrollment cap on the entire campus—including WHHS—with or without the consent of WDS or WHHS.  (Tr. 922, 1336-37.)  They also acknowledged the ZBA's right to impose such conditions during the renewal process.  (Tr. 1325.)

225.    Neither WDS nor WHHS currently is subject to any enrollment cap.  (*E.g.*, Pl. Exs. 83-96.)

226.    The May 13 Resolution concludes with reference to "[t]he overall physical size of the structure, its location on the campus and the effect it would have on the surrounding neighbors." (Pl. Ex. 4 at F-10.)  There is no evidence in the public record to suggest that the size of the building, in and of itself, poses any threat to public health, safety or welfare.  Rather, Gabriele testified that the size of the building troubled him in that he did not understand why a building that size was necessary:

> [I]t was of concern to me only in the spirit of understanding why such a large building was required by the school in terms of why 44,000 square feet, why not 10,000 square feet, why not 60,000 square feet.  Trying to understand why a building of this type was designed.

(Tr. 846.)  The size of Gordon Hall, however, is based on a comprehensive analysis of WDS's needs

---

(Tr. 733-34.)

with regard to its dual curriculum.  (Tr. 1009-10, 1017; *see supra* ¶¶ 58-67.)

227.    There is no evidence that WDS does not need the facilities contemplated in the Application properly to fulfill its dual curriculum educational mission.[68]  Indeed, Jackson did not dispute that WDS's facilities were in need of modernization and expansion:

> Q.      Do you have any reason to disbelieve that Westchester Day School needed more facilities to service the children that were enrolled in it at the time it filed the application?
>
> A.      I don't believe—I mean, I don't have a—I agreed that they needed something.  I didn't know—I did believe they needed something.

(Tr. 1292, 1313.)  Gabriele agreed.  (Tr. 836-37.)

228.    Christopher Tilley, a neighbor and vocal opponent of the Project, testified at trial that he supported the modernization of the WDS's facilities through expansion and construction on the Property, but objected to that construction taking place on the side of the Property closest to and "within sight line of" his house.  (Tr. 1210, 1228-29, 1234, 1258-59.)  As discussed above, however, the only suitable location for Gordon Hall is between the Castle and the Carriage House, and WDS had taken reasonable steps to minimize the impact of the size of the building on the surrounding neighbors.[69]  (*E.g.*, Pl. Exs. 27, 42; Pl. Ex. 50 at 1-2; Pl. Ex. 55 at 4-6; *see supra* ¶¶ 69-71.)

229.    Based on these facts and the extensive record, the Court finds that the stated reasons for denying the Application set forth in the Resolution are not substantiated by evidence in the public record before the ZBA, and are, to a substantial extent, based on serious factual errors.  The

---

[68] The Court does not find convincing Jacquemart's trial testimony that WDS could make do with a 35,000 square foot building. (Tr. 711-12, 783-84; *see supra* n.42.)

[69] The record is clear that changing the location of a building on the Property would not impact traffic in and around Orienta Point—the purported "most important element" in denying the Application.  (Tr. 589-90.)

Application apparently was denied not because it failed to comply with the Village Code or otherwise would have an adverse impact on public health, safety or welfare, but rather upon undue deference to the opposition of a small but politically well-connected group of neighbors.[70]

## IX.    Post-May 13, 2003 Events

230.    In June 2003, a fire destroyed portions of the Castle.  (SAF ¶ 36; Tr. 101.)  The Village advised WDS that it could not re-occupy the Castle unless and until this century-old building was made fully compliant with all current codes.  (Tr. 101.)  WDS subsequently applied for a building permit to renovate and received it as-of-right.  (SAF ¶ 36.)  Limited by that permit, the Castle is being restored to its prior uses, albeit with the addition of a formal *shul*[71] and a designated *beit midrash*.  (Tr. 101-03, 202-04.)

231.    Notwithstanding the renovations to the Castle, WDS's facilities remain inadequate, and this significantly hinders WDS's ability to provide an adequate and effective dual curriculum Judaic and general studies education to its students consistent with its mission and the tenets of modern Orthodox Judaism.  (Tr. 102-03, 202-04.)  Specifically, WDS is left without much-needed classroom space, a learning center, small-group instructional rooms, a multi-purpose room or music

---

[70] For example, Tilley declared that by "standing up" to WDS when it informed the ZBA of its rights under federal law, Vozza earned his vote "forever":  "And Tony Vozza stood up and said I refused to be intimidated by someone of your sort and I refuse to have my Village intimidated, as well, he has my vote forever.  And when he became trustee, he had our vote forever and the rest of the board that acted in defense of your litigation."  (Tr. 1269-70.)  SOUND, of which Tilley is a member, sued, among others, the ZBA in an Article 78 proceeding prior to WDS's statement concerning its rights.  (*See supra* ¶ 110.)

[71] The construction of a *shul* was, because of space constraints, not contained in the Application, but was added after the fire because the entire Castle had to be gutted.  (Tr. 173-74, 186-87, 203-04.)

or art rooms (*e.g.*, Pl. Ex. 110), which, as discussed above, are necessary for WDS to effectively fulfill its religious mission. The renovation of the Castle also does not adequately resolve WDS's need for the age appropriate grouping of students. The Castle itself will still need to be reconfigured in connection with the Project to address WDS's needs. (Tr. 102-03, 202-04, 1034; Pl. Exs. 110, 111.)

## CONCLUSIONS OF LAW[72]

### I.    Religious Land Use and Institutionalized Persons Act

Section 2(a)(1) of RLUIPA provides that "[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden" is the least restrictive means of advancing a compelling governmental interest.[73]   42 U.S.C. § 2000cc(a)(1); *see also Westchester Day Sch.*, 386 F.3d at 185.  Under the statute, plaintiff carries the initial burden of proving that defendants' conduct satisfies at least one of RLUIPA's jurisdictional prerequisites, and that the conduct imposes a "substantial burden" on plaintiff's

---

[72] As an initial matter, we are mindful of the general proscription that federal courts should not become super zoning boards of appeal to review land use determinations.  *See Zahra v. Town of Southold*, 48 F.3d 674, 679-80 (2d Cir. 1995) (quoting *Sullivan v. Town of Salem*, 805 F.2d 81, 82 (2d Cir. 1986)).  However, "federal courts may exercise jurisdiction in zoning matters when local zoning decisions infringe national interests protected by statute or the constitution."  *Innovative Health Sys., Inc. v. City of White Plains*, 931 F. Supp. 222, 234 (S.D.N.Y. 1996).

[73] This Court previously has reviewed the history of RLUIPA, and will not repeat it here.  *See Westchester II*, 280 F. Supp. 2d at 233-34.

"religious exercise."[74]  *See* 42 U.S.C. § 2000cc(a)(1); 42 U.S.C. § 2000cc-1(b); *Westchester II*, 280 F. Supp. 2d at 239.  If WDS carries its burden, the burden shifts to defendants to prove that imposition of a substantial burden on WDS's religious exercise is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.  *See* 42 U.S.C. § 2000cc(a)(1); 42 U.S.C. § 2000cc-2(b); *Westchester Day Sch.*, 386 F.3d at 190; *Murphy v. Zoning Comm'n of the Town of New Milford*, 148 F. Supp. 2d 173, 187 (D. Conn. 2001), *vacated on other grounds*, 402 F.3d 342 (2d. Cir. 2005).

WDS asserts that the facts recited in the foregoing findings establish that defendants substantially burdened the School's religious exercise in violation of RLUIPA by interfering with its ability to provide effective religious education and by chilling its ability to attract students and recruit teachers as well as maintain its current enrollment.  WDS also argues that defendants have failed to demonstrate that the denial of the special permit was in furtherance of a compelling governmental interest or that it was the least restrictive means of furthering that interest.

Defendants, on the other hand, contend that the Second Circuit Opinion establishes that the construction of a classroom building is not a protected religious exercise, and that, given the as-of-right construction of a *shul* and *beit midrash* in the renovated Castle building, there is no substantial burden on religious exercise.  Defendants also argue that, even if any religious exercise was substantially burdened by the denial of the special permit, that denial was made in furtherance of a compelling governmental interest and is the least restrictive means available.

_____

[74] There is no question that WDS constitutes a "person, assembly, or institution" under 42 U.S.C. § 2000cc(a)(1).

102

## A.    The Jurisdictional Prerequisite

The protections of Section 2(a)(1) of RLUIPA apply in any case in which:

(A) the substantial burden is imposed in a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability;

(B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes, even if the burden results from a rule of general applicability; or

(C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

42 U.S.C. § 2000cc(a)(2).  Defendants argue that WDS fails to satisfy these jurisdictional prerequisites because no evidence adduced at trial demonstrates that interstate commerce would be affected, and the ZBA's denial of the special permit does not constitute an "individualized assessment."  (Defs. Post-Trial Reply Br. at 53-54.)  We disagree.

The evidence establishes that WDS satisfies the interstate commerce criterion of 42 U.S.C. § 2000cc(a)(2)(B).  Not only does WDS employ at least one out-of-state teacher, but it also educates out-of-state children, all of whom must necessarily travel into and out of New York State each school day.  (*See supra* ¶ 36 & n.13.)  Such travel clearly affects interstate commerce.  *See Camps Newfound/Owatonna v. Town of Harrison*, 520 U.S. 564, 573 (1997) ("The attendance of these [out-of-state] campers necessarily generates the transportation of persons across state lines that has long been recognized as a form of 'commerce.'" (citation omitted)); *Reich v. Mashantucket Sand & Gravel*, 95 F.3d 174, 181 (2d Cir. 1996) (finding "bingo hall and casino . . . designed to attract tourists from surrounding states undeniably affects interstate commerce." (quotation omitted)); *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1221-22 (C.D.

Cal. 2002) ("Churches . . . are major participants in interstate markets for goods and services, use of interstate communications and transportation, raising and distributing revenues (including voluntary revenues) interstate, and so on." (internal quotations omitted)).

The construction of Gordon Hall will also affect interstate commerce. *See*, *e.g.*, *Cottonwood*, 218 F. Supp. 2d at 1221-22 ("[C]onstruction of the church will affect a large quantity of construction workers, construction materials, transportation vehicles and commercial financial transactions, all of which affect commerce."); *Reich*, 95 F.3d at 181 ("[C]onstruction efforts . . . have a direct effect on interstate commerce."); *see also* 146 CONG. REC. S7774-01, S7775 (July 27, 2000) (impact on interstate commerce "will most commonly be proved by showing that the burden prevents a specific transaction in commerce, such as a construction project.").

Additionally, the "individualized assessment" criterion of 42 U.S.C. § 2000cc(a)(2)(C) is satisfied.  "The general rule that emerges from the case law is that the determination of whether the governmental action is an 'individualized assessment' depends on whether the decision was subjective in nature:

> Thus, even assuming that a governmental entity's enactments are neutral laws of general applicablity, their application to particular facts nevertheless can constitute an individualized assessment—particularly where, as here, the application does not involve a mere numerical or mechanistic assessment, but one involving criteria that are at least partially subjective in nature."

*Living Water Church of God v. Charter Twp. of Meridian*, 384 F. Supp. 2d 1123, 1130 (W.D. Mich. 2005) (internal quotations omitted).  The standard by which the ZBA reviewed the Application constitutes an "individualized assessment" in the implementation of a land use regulation.  *See* VILL. CODE § 342-71; (*supra* ¶ 23 & Findings of Fact Section VIII).  This conclusion comports with existing RLUIPA case law.  *See*, *e.g.*, *Living Water*, 384 F. Supp. 2d at 1130-31 (denial of special

104

use permit where determination based on criteria that were, in part, subjective considered an "individualized assessment"); *Castle Hills First Baptist Church v. City of Castle Hills*, No. SA-01-CA-1149-RF, 2004 WL 546792, at *15 (W.D. Tex. Mar. 17, 2004) ("Zoning, and the special use permit application process specifically, inherently depend upon a system of individualized assessment."); *Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter*, 326 F. Supp. 2d 1140, 1160 n.10 (E.D. Cal. 2003) ("It is . . . beyond cavil that zoning decisions such as the [conditional use permit application] at issue in this case are properly described as 'individualized assessments.'"); *Cottonwood*, 218 F. Supp. 2d at 1222 (denial of conditional use permit constitutes "individualized assessment").

### B.    Religious Exercise

Defendants' primary argument that no RLUIPA violation exists is predicated upon their reading the Second Circuit Opinion to hold that "activities and instruction in classrooms in religious schools such as WDS are *not* per se religious exercise under RLUIPA." (Defs. Post-Trial Br. at 50 n.8.) Defendants argue, therefore, that plaintiff's so-called "religious mission" argument (*i.e.*, that plaintiff's entire facilities are in furtherance of their religious mission and therefore protected by RLUIPA) must fail. (*Id.* at 50-51.) Defendants assert that, given the addition of the *shul* and *beit midrash* to the Castle building in its recent renovation, only construction of secular facilities remains. (*Id.*) Because the Second Circuit Opinion, according to defendants, protects only those facilities "devoted" to religious exercise, the ZBA could not have violated RLUIPA in denying a permit for the construction of classrooms, which, regardless of what is taught within them, are secular in nature. (*Id.* at 51.)

Plaintiff argues in favor of a broader interpretation of "religious exercise," especially where educational facilities cannot be neatly segmented into those for religious education and those for secular education.

Section 2000cc-3(g) makes clear that RLUIPA is to be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of th[e] Act and the Constitution." 42 U.S.C. § 2000cc-3(g).  To that end, RLUIPA broadly defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," including "[t]he use, building, or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc-5(7)(A).  Accordingly, "under RLUIPA, courts no longer need to analyze whether a claimed religious activity is an integral part of one's faith."  *Living Water*, 384 F. Supp. 2d at 1129 (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1225 (11th Cir. 2004), *cert. denied*, 125 S. Ct. 1295 (2005)).

This Court recognizes, of course, that "not every activity carried out by a religious entity or individual constitutes 'religious exercise.'" 146 CONG. REC. at S7776; *see also Westchester Day Sch.*, 386 F.3d at 190 n.4.  Although "Congress's decision to enact RLUIPA necessarily recognizes the fact that religious assembly buildings are needed to facilitate religious practice, and the possibility that local governments may use zoning regulations to prevent religious groups from using land for such purposes," *Guru Nanak*, 326 F. Supp. 2d at 1151; *see also Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005) (Posner, J.) (noting "vulnerability of religious institutions—especially those that are not affiliated with the mainstream Protestant sects or the Roman Catholic Church—to subtle forms of discrimination when . . . a state delegates essentially standardless discretion to nonprofessionals operating without

procedural safeguards"), *reh'g*, *en banc*, *denied*, No. 04-2326, 2005 U.S. App. LEXIS 3991 (7th Cir.

Mar. 7, 2005), Congress nevertheless recognized that

> [i]n many cases, real property is used by religious institutions for purposes that are comparable to those carried out by other institutions.  While recognizing that these activities or facilities may be owned, sponsored or operated by a religious institution, or may permit a religious institution to obtain additional funds to further its religious activities, this alone does not automatically bring these activities or facilities within [RLUIPA's] definition or [sic] "religious exercise."

146 CONG. REC. at S7776; *see also Westchester Day Sch.*, 386 F.3d at 190 n.4.

We are mindful of the Second Circuit's caution that RLUIPA cannot be so broad as to protect

any construction plan merely because an institution pursues a religious mission.  Under such an

overly broad interpretation, "any improvement or enlargement proposed by a religious school to its

secular educational and accessory facilities would be immune from regulation or rejection by a

zoning board so long as the proposed improvement would enhance the overall experience of the

students." *Westchester Day Sch.*, 386 F.3d at 189.  RLUIPA, after all, does not protect buildings or

structures per se, but rather protects "the use, building or conversion of real property *for the purpose

of religious exercise.*"[75]  42 U.S.C. § 2000cc-5(7)(B) (emphasis added); *see also Guru Nanak*, 326

---

[75] Defendants contend that the Second Circuit held, as a matter of law, that neither classrooms nor religious education or prayer therein are capable of protection under RLUIPA. (Defs. Post-Trial Br. at 50 n.8.)  Defendants' position appears to arise from the following statement in the Second Circuit Opinion:  "The submitted plan proposed to create rooms for both religious and secular purposes, the latter consisting primarily of classrooms and auxiliary facilities."  *Westchester Day Sch.*, 386 F.3d at 189.  Defendants, however, have incorrectly characterized the Second Circuit's holding.  The Second Circuit did not hold that classrooms cannot, under any circumstances, be used for "religious exercise" and, therefore, be protected under RLUIPA.  Rather, the Second Circuit held that this Court improperly granted summary judgment where material issues of genuine fact existed as to "the complete, definitive nature of the [ZBA's] ruling" as well as the ZBA's reasons for denying the special permit. *Id.* at 188-89, 190-92.  The Second Circuit, in dicta "express[ing] doubt" over our prior interpretation of "religious exercise" and "substantial burden," intended only to guide our decisionmaking process "in the [C]ourt's future consideration of the case." *Id.* at 189; *see id.* at 190 ("We have no need to decide the question at this time because the judgment must in any event

F. Supp. 2d at 1151.  Thus, as the Second Circuit noted, RLUIPA requires an examination into

"whether the facilities to be constructed [are] to be devoted to a religious purpose." *Westchester Day*

*Sch.*, 386 F.3d at 189.

    While the Second Circuit did not clarify the meaning of "devoted," its admonition concerning

the "treacherous zone between the Free Exercise Clause . . . and the Establishment Clause" suggests

a careful, fact-sensitive balancing of secular purposes and religious purposes in relation to the spaces

being constructed, as opposed to a strict requirement of exclusive use for religious purposes, which

would be inconsistent with the text and legislative history of RLUIPA.  *See id.* at 189-90; *see also*

*Guru Nanak*, 326 F. Supp. 2d at 1151; 146 Cong. Rec. at S7776.  Certainly, as the Second Circuit

noted, the construction of rooms used exclusively for secular purposes cannot constitute religious

exercise.  Otherwise,

> if two identically situated schools submitted functionally identical applications to
> a zoning board to rebuild and enlarge their gymnasium facilities, one being a
> religious school, the other a secular school, . . . the zoning board would be free to
> reject the application of the secular school but not that of the religious school,
> assuming the gymnasium would improve the experience of the students in the
> religious school.

*Westchester Day Sch.*, 386 F.3d at 189.  This would be a clear violation of the Establishment Clause.

*See id.* at 190 ("While government unquestionably may take positive steps to protect the free

exercise of religion, it must avoid going so far in this goal as to adopt a preference for one religion

or for religion generally.").  But plaintiff's proposed construction project is not for a gymnasium, or

any other spaces used solely for recreation or other secular purposes.  It is for, among other things,

classrooms and special instruction rooms dedicated to the teaching of Hebrew, Talmud and other

---

be vacated for the reasons set forth in Parts 1 and 3 of this opinion.  We nevertheless commend these
considerations to the court's attention on remand.").

strictly Judaic topics, as well as a multi-purpose room designed to enable group prayer and events devoted to expressions central to Judaism.

We do not read the Second Circuit's expressed concerns to bar a finding of religious exercise where facilities are used for both religious and secular purposes.[76] *See id.* at 189. Rather, courts must ensure that the facts warrant protection under RLUIPA, rather than simply granting blanket immunity from zoning laws.[77] Where a building is to be used for the purpose of "religious exercise," the building is not denied protection under RLUIPA merely because it includes certain facilities that are not at all times themselves devoted to, but are inextricably integrated with and reasonably necessary to facilitate, such "religious exercise." *See*, *e.g.*, *Living Water*, 384 F. Supp. 2d at 1133 (denial of special use permit to construct facility including classrooms, sanctuary, gymnasium, offices and meeting rooms constitutes RLUIPA violation where locating church and school in separate locations found not feasible); *Cottonwood*, 218 F. Supp. 2d at 1213, 1224, 1232 (finding "unquestionable religious" application for 300,000 square foot complex including worship center, multiple classrooms, study rooms, multi-purpose room, youth activity center, gymnasium, child daycare facility and space for community service programs). Consistent with RLUIPA's broad definition of "religious exercise," "[t]he use of the land does not have to be a 'core religious practice.'" *Guru Nanak*, 326 F. Supp. 2d at 1151.

---

[76] Requiring WDS to segregate its rooms into those designated exclusively to Judaic studies and those designated exclusively to secular studies would not only create the need for an even larger construction project, but also would be impracticable given how extensively Judaic concepts and examples are used in teaching secular subjects.

[77] Significantly, even where proposed renovations and construction are reasonably necessary for a religious school to provide a dual curriculum education to its students, as here, applicants are still subject to reasonable conditions imposed by zoning boards aimed at addressing potential adverse impacts of the project.

Numerous courts analyzing RLUIPA claims have found facilities used for religious education to fall under RLUIPA's protection. *See Living Water*, 384 F. Supp. 2d at 1129-30 (holding, after bench trial, that "Plaintiff's use of the proposed facility for a religious oriented school and for other ministries of the church constitutes religious exercise"); *Castle Hills*, 2004 WL 546792, at *8 (denial of special use permit application "to allow the use of existing fourth floor space for classrooms" for private Christian school constituted RLUIPA violation); *Cottonwood*, 218 F. Supp. 2d at 1213, 1224, 1232 (granting preliminary injunction on RLUIPA claim challenging denial of conditional use permit to construct 300,000 square foot worship center including, *inter alia*, "multiple classrooms and a multi-purpose room" for youth activities); *Shepherd Montessori Ctr. Milan v. Ann Arbor Charter Twp.*, 259 Mich. App. 315, 329, 675 N.W.2d 271, 280-81 (Mich. Ct. App. 2003) (reversing grant of summary judgment on RLUIPA claim in favor of defendants; "plaintiff has sufficiently shown that the contemplated use for the subject property—a faith-based primary school—falls within this broad definition of religious exercise"); *Alpine Christian Fellowship v. Cty. Comm'rs of Pitkin Cty.*, 870 F. Supp. 991, 994 (D. Colo. 1994) (finding religious education constituted protected religious exercise under Free Exercise Clause of First Amendment: "Given the importance of religious education to members of the Church, the importance of conducting the school within the church building is self evident.").

Here, the evidence shows that a significant portion of the proposed construction will be devoted to religious exercise. Although a particular religious practice need not be central to one's faith to be protected under RLUIPA, this Court already has found that the religious education of children is in fact central to modern Orthodox Judaism: the religious education of children is a key religious obligation mandated by the Torah, and for most modern Orthodox Jews, the enrollment of

their children in a dual curriculum Jewish school, such as WDS, is virtually mandatory.  (*See supra* ¶¶ 51-54); *see Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 716 (1981) ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or [another adherent] more correctly perceived the commands of their common faith," because "[c]ourts are not arbiters of scriptural interpretation.").  The Court has found that a number of classrooms in the proposed building were to be devoted exclusively to Judaic studies instruction.  In addition, the dual curriculum nature of WDS requires extra small rooms for tutoring and "challenge" instruction in Judaic studies.  The Court also has carefully considered that certain classrooms, the multi-purpose room and other facilities will not be devoted exclusively to religious education and practice.  Nevertheless, based on the facts and circumstances before it, the Court finds that a major portion of the proposed facilities will be used for religious education and practice or are inextricably integrated with, and necessary for WDS's ability to provide, religious education and practice—*i.e.*, engage in "religious exercise."  *See*, *e.g.*, *Living Water*, 384 F. Supp. 2d at 1129 (rejecting argument that "operation of a [religious] school with topics similar to and consistent with topics taught in a secular school and other related recreational and other activities normally associated with a secular school or institution does not constitute the exercise of religion"); *Cottonwood*, 218 F. Supp. 2d at 1213, 1227 (finding that where "providing numerous ministries" was central to applicant's faith, applicant had demonstrated religious need to "have a large, multi-faceted church," including daycare facility, youth activity center, gymnasium, and study rooms for after-school youth programs).

### C.   Substantial Burden

Given the Court's determination that WDS's use of the existing and proposed facilities

constitutes religious exercise, defendants essentially have conceded that WDS's religious exercise

is being burdened to some degree—their witnesses were in agreement that WDS's existing facilities

for providing students a religious education were in need of modernization and expansion.  (*See*

*supra* ¶¶ 227-28.)  The question remains, however, whether the burden imposed on WDS's religious

exercise constitutes a *substantial* burden under RLUIPA.

RLUIPA purposely does not define "substantial burden."  Congress "intended that the term

'be interpreted by reference to Supreme Court jurisprudence,' and that it 'not . . . be given any

broader interpretation than the Supreme Court's articulation of the concept of substantial burden [on]

religious exercise.'" *Cambodian Buddhist Soc'y of Ct., Inc. v. Newtown Planning & Zoning

Comm'n*, No. CV 030350572S, 2005 WL 3370834, at *6 (Conn. Nov. 18, 2005) (quoting 146 CONG.

REC. at S7776); *see also Westchester IV*, 379 F. Supp. 2d at 557.  As this Court stated in its July

2005 Order, the Supreme Court has articulated the substantial burden test differently over the years.

*See*, *e.g.*, *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988) (no substantial

burden unless regulation has "tendency to coerce individuals into acting contrary to their religious

beliefs"); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987) (substantial

burden where government put "substantial pressure on an adherent to modify his behavior and to

violate his beliefs"); *Bowen v. Roy*, 476 U.S. 693, 707-08 (1986) (no substantial burden where

government action only interfered with, but did not coerce, individual's religious beliefs); *Thomas*,

450 U.S. at 717-18 (substantial burden where government put "substantial pressure on an adherent

to modify his behavior and to violate his beliefs"); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)

(substantial burden when individual must "choose between following the precepts of her religion and

forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the

other").

Circuit courts have articulated different definitions of substantial burden as applied to Section 2(a)(1) RLUIPA cases. *Compare Civil Liberties for Urban Believers (C.L.U.B.) v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) ("[A] substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable."), *and Lighthouse Inst. for Evangelism Inc. v. City of Long Branch*, 100 Fed. Appx. 70 (3d Cir. 2004) (same), *with Sts. Constantine*, 396 F.3d at 900-01 (substantial burden "must . . . mean something different from 'greater burden than imposed on secular institutions,'" but noting "[t]hat the burden would not be insuperable would not make it insubstantial"). *See also Midrash Sephardi*, 366 F.3d at 1227 (declining to adopt *C.L.U.B.* definition despite agreeing that "'substantial burden' requires more than an incidental effect on religious exercise" and finding it "akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.").

Courts in the Second Circuit have concluded that the regulations must have a "chilling effect" on the exercise of religion to substantially burden religious exercise.[78]  *See Murphy*, 148 F. Supp. 2d at 188-89; *see also Guru Nanak*, 326 F. Supp. 2d at 1154 (understanding "chilling effect" to mean "actually inhibit[ing] religious activity in a concrete way, and caus[ing] more than a mere inconvenience"); *Grace United Methodist Church v. City of Cheyenne*, 235 F. Supp. 2d 1186, 1194

---

[78] In the context of Section 3 RLUIPA cases, the Second Circuit has followed the "substantial pressure" standard articulated in *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, *see Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996), and found that a "substantial burden" may exist where governmental action "significantly interfere[s] with" or "significantly impede[s]" religious exercise, *McEachin v. McGuinnis*, 357 F.3d 197, 201, 203 (2d Cir. 2004).

113

(D. Wyo. 2002); *Shepard Montessori*, 675 N.W.2d at 281.  Of course, mere "inconvenience" does

not rise to the level of a "substantial burden."  *See*, *e.g.*, *Westchester IV*, 379 F. Supp. 2d at 557.

Accordingly, for purposes of Section 2(a)(1) of RLUIPA, a "substantial burden" exists when a

governmental action seriously impedes religious exercise.  In this case the evidence clearly shows

that defendants' actions have imposed such a burden on WDS's religious exercise.

By precluding the construction of much needed facilities, defendants significantly interfered

with WDS's ability to provide an adequate and effective dual curriculum of Judaic and general

studies education, and so limited its ability to retain and attract students and faculty as to imperil its

continued existence.[79]  *See Living Water*, 384 F. Supp. 2d at 1128-29, 1133 (finding substantial

burden where "Plaintiff is severely limited in its ability to recruit for the school because of the

uncertainty about the future space and the current lack of programming" caused by inadequate

facilities); *Castle Hills*, 2004 WL 546792, at *9-10 (denial of special use application to expand

facility used for religious education may violate RLUIPA if it significantly limits "the number of

children who can be educated and the quality of the educational programs offered"); *Cottonwood*,

218 F. Supp. 2d at 1212 (substantial burden may exist where, *inter alia*, the "physical constraints of

---

[79] The Court has duly considered but is not persuaded by Fish's opinion regarding the adequacy of WDS's current facilities. (Defs. Ex. LLL; Tr. 708-11.)  As an initial matter, although the Court qualified Fish as an expert in "community planning and environmental concerns" (Tr. 705), the Court refused to qualify him as an expert in the "determination of needs of school populations for size." (Tr. 700-01.)  Second, Fish's opinion was based entirely on gross square feet per student figures applicable to secular schools and solely to new construction, which is more efficient in terms of space.  (Tr. 715-16; Pl. Ex. 64 at 29; *see supra* ¶¶ 62-64.)  Nevertheless, Fish applied these figures to WDS's existing buildings (used for dual curriculum education)—two of which were constructed in the 19th Century, and are significantly less efficient in terms of space. (Tr. 716, 1018; Pl. Ex. 64 at 29; Defs. Ex. LLL.)  Lastly, Fish acknowledged that he lacked any understanding as to the specific facilities that WDS requires to fulfill its dual curriculum educational mission.  (Tr. 717; *see also* Tr. 702-03, 713.)

114

its current facility also limit [plaintiff's] ability to conduct many of its different programs" and "to conduct outreach to potential new members"); *Murphy*, 148 F. Supp. 2d at 189 (restriction on attendance at weekly prayer sessions constituted "substantial burden" because, *inter alia*, "[t]his limitation could have a significant impact on the purpose of the prayer sessions"). Indeed, despite the increasing Orthodox Jewish population in the surrounding area (*see supra* ¶ 36), WDS's enrollment has declined by 17.5% since 1999/2000, in part due to defendants' actions. (*See supra* ¶¶ 37-38.)

The mere fact that a *beit midrash* and *shul* have been added as a result of the nearly completed Castle renovations following the fire in June 2003 (after the ZBA denied the Application) does not obviate the fact that WDS's religious exercise is substantially burdened by denial of the Application. The construction of those particular facilities does not resolve the myriad inadequacies in WDS's existing facilities detailed above (*see supra* Findings of Fact Section III.)—wholly unrelated to the existence of a *beit midrash* or *shul*—that hinder and significantly interfere with the religious education and practice of current students (and retention of students) and have a depressing effect on the enrollment of students and recruitment of qualified teachers.

In holding that WDS's religious exercise has been substantially burdened, the Court is cognizant of the Second Circuit's counsel that "rejection of a submitted plan, while leaving open the possibility of approval of a resubmission with modifications designed to address the cited problems, is *less likely* to constitute a 'substantial burden' than definitive rejection of the same plan, ruling out the possibility of approval of a modified proposal." *Westchester Day Sch.*, 386 F.3d at 188 (emphasis added). However, in remanding the case for development of facts to support our original conclusion that the ZBA's denial was "complete," the Second Circuit acknowledged that our

"assessment of the complete, definitive nature of the Board's ruling may well be correct." *Id.*

Indeed, the facts adduced at trial prove it so.

The Court cannot view WDS's Application "in isolation"; WDS has a long special permit

history with the Village, and the Application "must be viewed in the context of this history." *Living*

*Water*, 384 F. Supp. 2d at 1134. The Village was aware in 1999 that WDS's renovation of the

Carriage House was only the first phase of a larger project. *See id.*; (*see supra* ¶ 28). WDS worked

for over one-and-a-half years to address the ZBA's concerns and offered to make changes to, *inter*

*alia*, parking, the size of Gordon Hall and landscaping. (*See supra* ¶¶ 104, 109, 113, 120-23.) WDS

also agreed to an enrollment cap as well as a bus departure management plan to mitigate the traffic

impact of WDS's 15-20 minivans/buses. (*See supra* ¶¶ 125-27.) Several of the concessions made

by WDS are explicitly noted in the May 13 Resolution:

- "The parking layout was revised to relocate the 31 spaces closest to Skibo Lane, increasing the distance between the parking lot and the neighbors' property line, from 63 feet to 80 feet. The size for all parking spaces was increased to 9 feet wide" (Pl. Ex. 4 at F-2.)

- WDS "offered to cap its Pre-K to 8th grade enrollment at 591 students and cap the summer program at its current level of 500 students" (*Id.*)

- WDS "agreed to a revised and reconfigured building addition that would be shifted slightly further away from the property line. This change alters the design program and eliminates two full-sized classrooms . . . ." (*Id.* at F-5.)

Despite these and other significant concessions by WDS, the ZBA nevertheless denied the

Application in its entirety. That denial was final, definitive and "complete"—*i.e.*, ripe for judicial

review. (*See supra* ¶¶ 135-36); *compare Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342,

353 (2d Cir. 2005) (RLUIPA claim not ripe where plaintiff could have appealed cease and desist

order to zoning board). Indeed, the ZBA's own members testified that WDS's application process

116

had closed, prompting each of the members to discard all documents relating to the Application. (*See supra* ¶¶ 133-34.)  The ZBA members themselves acknowledged that any future application would require WDS to start the special permit process from the beginning, including a new SEQRA review, notwithstanding this Court's reinstatement of the ZBA's Negative Declaration.  (*See supra* ¶ 134.)

The Court has duly reconsidered the statement in the May 13 Resolution that "[t]his denial exclusively addresses the future expansion of the school and its accessory uses, both from a physical and operational standpoint *as they relate to this application*" (*see supra* ¶ 135) in light of the Second Circuit's statement that these words "seem expressly intended to imply that the Board does not foreclose the possibility of approving a modified application designed to cure the problems and deficiencies cited by the Board." *Westchester Day Sch.*, 386 F.3d at 188-89.  However, to the extent that this language, or the Resolution's specified reasons for the denial, could be understood to invite the filing of another application—a possibility that would exist anyway—it does not preclude a finding that the ZBA's denial was final and determinative.[80]  The mere opportunity to continue filing applications does not preclude the finding of a substantial burden.  *See Sts. Constantine*, 396 F.3d at 901 (Posner, J.) (noting that plaintiff's ability to resubmit its application with a different "planned unit development" did not mean defendant's denial of its original application did not amount to a substantial burden).

─────────────

[80] Indeed, it would make little sense if an applicant's ability to prove a claim under RLUIPA, targeted at the discriminatory acts of zoning boards, were limited only to those instances in which a zoning board was so careless as to omit such language in the denial of an application.  *See Sts. Constantine*, 396 F.3d at 900 (noting potential for discrimination against non-mainstream religions where the state "delegates essentially standardless discretion to non-professionals operating without procedural safeguards").

In fact, WDS proposed modifying its Application with a building reduced by 1,000 gross square feet and moved further away from Skibo Lane (*see supra* ¶ 123); the ZBA did not respond to that proposal or at any point indicate that in rejecting the original Application it would permit WDS to merely modify its Application without restarting the process.  (*See supra* ¶ 135.)  Even without the ZBA members' own indications of the finality of the denial, defendants can point to no testimony suggesting that a modified plan would have been entertained.

At a minimum, if WDS were to file another application with the ZBA, it would face substantial "delay, uncertainty and expense" on top of that to which it already has been subjected. (*See supra* ¶ 136); *Sts. Constantine*, 396 F.3d at 901 (Posner, J.) (finding burden of "delay, uncertainty, and expense" associated with continued application filing substantial because that "the burden would not be insuperable would not make it insubstantial"); *see also Living Water*, 384 F. Supp. 2d at 1134 (noting that where applicant "will incur delay, expense and uncertainty if it is required to reapply or search for another site" in conjunction with its special permit application, burden goes beyond mere inconvenience and becomes substantial).

In any event, based on the extensive record before the Court, it is clear that any purported willingness on the part of the ZBA even to consider fairly, much less approve, another application actually filling WDS's needs is, at the least, highly suspect.  (*See supra* ¶¶ 137, 151; *see supra* n.42); *see Westchester Day Sch.*, 386 F.3d at 188 n.3 ("[I]n some circumstances denial of the precise proposal submitted may be found to be a 'substantial burden,' . . . for example, where the board's stated willingness is disingenuous . . . ."); *see also Living Water*, 384 F. Supp. 2d at 1134 (finding RLUIPA violation where special use permit for religious school was denied on arbitrary grounds despite long history between plaintiff and Township during which plaintiff worked in good faith to

118

address concerns relating to project).

### D.    Compelling Governmental Interest and Least Restrictive Means

"If a land use decision . . . imposes a substantial burden on religious exercise . . . and the decisionmaker cannot justify it, the inference arises that hostility to religion, or more likely to a particular sect, influenced the decision." *Sts. Constantine*, 396 F.3d at 901.  Because this Court finds that the denial of the Application imposes a substantial burden on WDS's religious exercise, the burden shifts to defendants to prove that imposition of this substantial burden on WDS's religious exercise is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest.  *See* 42 U.S.C. § 2000cc(a)(1); 42 U.S.C. § 2000cc-2(b); *Westchester Day Sch.*, 386 F.3d at 190; *Murphy*, 148 F. Supp. 2d at 187.

Compelling governmental interests are those that protect public health, safety or welfare. *See Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) ("[O]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion."); *Sherbert*, 374 U.S. at 406 ("[I]n this highly sensitive constitutional area, 'only the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'" (quoting *Thomas v. Collins*, 323 U.S. 516, 530 (1945))).  "The compelling interest standard . . . is not 'water[ed] . . . down' but 'really means what it says.'"  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (quoting *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 888 (1990)).

Least restrictive means requires establishing that "[there are] no alternative forms of regulation" that would further the alleged governmental interest.  *Sherbert*, 374 U.S. at 407.  "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must

use it." *U.S. v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 815 (2000).  Moreover, it cannot be

assumed that a "plausible, less restrictive alternative would be ineffective." *Id.* at 823.  Rather, "it

is the Government's obligation to prove that the alternative will be ineffective to achieve its goals."

*Id.* at 816.

Accordingly, the governmental action "must advance 'interests of the highest order' and must

be narrowly tailored in pursuit of those interests." *Church of the Lukumi*, 508 U.S. at 546 (quoting

*McDaniel v. Paty*, 435 U.S. 618, 628 (1978), in turn quoting *Yoder*, 406 U.S. at 215).

"[D]emonstrat[ing] a compelling interest and show[ing] that it has adopted the least restrictive means

of achieving that interest is the most demanding test known to constitutional law." *City of Boerne*

*v. Flores*, 521 U.S. 507, 534 (1997).

### 1.    Traffic

The May 13 Resolution identifies traffic as "[t]he single most important element" in denying

the Application.  (Pl. Ex. 4 at F-6; Pl. Ex. 82 at 5 ("[T]he proposed resolution . . . is essentially

predicated upon traffic.")  Whether traffic concerns can amount to a compelling interest is an open

question:  "[T]here are very few rulings discussing the question, and none that we know arising

under RLUIPA." *Westchester Day Sch.*, 386 F.3d at 191.  The Second Circuit noted:

> We know of no controlling authority, either in the Supreme Court or any circuit[,]
> holding that traffic problems are incapable of being deemed compelling.  It is true
> that one circuit opinion in the Eighth Circuit recited that "interests in traffic safety
> and aesthetics . . . have never been *held to be* compelling." *Whitton v. City of*
> *Gladstone*, 54 F.3d 1400, 1408 (8th Cir. 1995) (emphasis added).  However, the
> fact that the case reports do not reveal any case in which a court has found traffic
> concerns compelling does not support the proposition that traffic concerns by nature
> cannot be compelling.

*Id.* The Second Circuit cautioned previously against espousing a "far-reaching constitutional rule" on this issue where other bases existed upon which the case could be decided. *Id.* (citing principle of judicial restraint). Assuming, without determining, that traffic constitutes a compelling interest in this instance, *see Murphy v. Zoning Comm'n of Town of New Milford*, 289 F. Supp. 2d 87, 103 (D. Conn. 2003), *vacated on other grounds*, 402 F.3d 342 (2d Cir. 2005), the Court finds, based on the evidence in the record, that defendants' outright denial of the special permit was not the least restrictive means of addressing that interest because measures existed to mitigate any potential increase in traffic caused by the Project. As noted above, defendants bear the burden of demonstrating that no alternatives, other than outright denial, could further their interests relating to traffic. 42 U.S.C. § 2000cc(a)(1)(A). They have failed to carry that burden. *See*, *e.g.*, *Murphy*, 148 F. Supp. 2d at 190.

Substantial evidence in the record establishes that potential impacts resulting from Project-related traffic could have been mitigated. At trial, the three traffic experts, Divney, Jacquemart and Dr. Horodniceanu testified regarding various mitigation possibilities. (*See supra* ¶¶ 126, 201.) All three acknowledged that difficult traffic conditions can be mitigated by, for example, retiming traffic lights; widening approaches; adding turning lanes; re-routing traffic; a more aggressive busing program; or an enrollment cap. (*See supra* ¶ 201.)

The ZBA's own consultants—in the weeks leading up to the May 13, 2003 denial—had forwarded to the ZBA a draft resolution approving the Application subject to conditions including an enrollment cap and a traffic management plan. (*See supra* ¶¶ 126-28.) BFJ subsequently took "a close look at the relationship between the student cap and traffic impacts" and reported to the ZBA that an interim enrollment cap and bus schedule "should be able to reasonably control traffic

impacts." (*See supra* ¶ 128.) At the time Fish sent the memorandum to the ZBA, he did not believe that there were any issues concerning the Application that could not be mitigated by imposing conditions on the approval.  (*See supra* ¶ 126.)

Despite the fact that the ZBA felt it was "incumbent" on it to examine these issues in the context of a draft resolution provided by BFJ incorporating these mitigation measures, the ZBA members did not discuss approving the WDS Application subject to conditions—or even what conditions might address their concerns. (*See supra* ¶¶ 129-30.) This, despite the fact that even Dr. Horodniceanu, upon whom the ZBA substantially relied, informed it months before the Application was denied that there are several mitigation measures "that can be looked at and ought to be looked at." (*See supra* ¶ 202.)   The ZBA's awareness of these measures, their acknowledgment of their importance and their utter failure to assess their effectiveness prevents them from justifying such denial as the least restrictive means of addressing their traffic concerns.[81]

In addition, the Court notes that despite community complaints about existing traffic made at the ZBA hearings (*see supra* n.65), as well as the ZBA's acknowledgment of existing congestion during the AM Peak Hour (*see supra* ¶ 164), there is no evidence that the Town has sought to mitigate this concern at any time during the period of almost three years since the Application was denied. Jacquemart, defendants' trial traffic expert, testified that based on his traffic counts and accompanying analysis—conducted in March 2005, over four years after the WDS Traffic

---

[81] Given that neither the ZBA nor the Village contacted the NYDOT with respect to mitigating traffic at the Boston Post Road/Orienta Avenue intersection, it is irrelevant that certain mitigation measures would have required State approval. (*See supra* n.65.)  Defendants bear the burden of proving that alternatives would be ineffective, and can hardly justify outright denial of the Application based on their own failure even to inquire into possible alternatives.  *See Playboy Entm't,* 529 U.S. at  816, 824.

Assessment—his study intersections[82] experienced congestion during peak hours.  Yet, Jacquemart testified that a review of the accident reports for the study intersections revealed "nothing unusual." (*See supra* ¶ 168.)  Rather, Jacquemart characterized them as "like any major intersection of Boston Post Road."[83]  (*Id.*)

This is striking given that BFJ's memorandum to the ZBA explaining the effectiveness of its proposed mitigation measures stated that "the projected increase in traffic from the Day School is less than one year of background growth." (*See supra* ¶ 128.)  Over four years have elapsed between plaintiff's and defendants' traffic analyses; yet, despite four years of traffic growth, accident reports showed the study intersection was no more dangerous than any other major Boston Post Road intersection and the Village has put forth no evidence that it has attempted any mitigation of this supposedly dangerous intersection.[84]

In light of the evidence, it is clear that the incremental impact of the Project on traffic could

_____

[82] As noted above (*see supra* n.46), Jacquemart's study counted traffic at only two intersections—Boston Post Road/Delancey Avenue and Boston Post Road/Orienta Avenue—compared to DTS's initial 17 studied intersections, later supplemented to include two additional intersections, that also counted traffic at these intersections.

[83] The hearsay statements of an unidentified gas station attendant concerning "unsafe maneuvers" are plainly insufficient for defendants to carry their burden under "the most demanding test known to constitutional law." (Tr. 1188.)  In any event, these maneuvers are not tied particularly to the amount of traffic on the roads as much as driver behavior, appropriately controlled by local law enforcement.

[84] Significantly, there currently are no conditions on WDS's special permit relating to traffic management or an enrollment cap.  Finally, the Court again finds it significant that denial of the Application leaves any purported traffic issues caused by WDS wholly unaddressed.  *See Church of the Lukumi*, 508 U.S. at 546; *Fifth Ave. Presbyterian Church v. City of New York*, No. 01 Civ. 11493, 2004 WL 2471406, at *10-11 (S.D.N.Y. Oct. 29, 2004).  Here, a less restrictive means—*e.g.*, approving the Application subject to a traffic management plan and/or enrollment cap (which WDS already had agreed to accept)—would actually have addressed those purported concerns.

have been mitigated in a number of ways.   Defendants' have failed to carry their burden of
demonstrating that no alternatives other than an outright denial could protect their interests relating
to traffic.   *See* 42 U.S.C. § 2000cc(a)(1)(A); 42 U.S.C. § 2000cc-2(b); *Sherbert*, 374 U.S. at 407; *see
also Murphy*, 148 F. Supp. 2d at 190 (imposition of a cap on *participants* attending residential prayer
session was not the least restrictive means of addressing traffic concerns:   "Instead of taking action
which would directly regulate the increased volume of traffic on Sunday afternoons, defendants
issued an opinion which attempts to control the number of people present in plaintiffs' home.");
*Cottonwood*, 218 F. Supp. 2d at 1229 (even assuming a compelling governmental interest, City "has
not demonstrated that that there is no other way" to further that interest short of outright denial of
conditional use permit).

## 2.      Property Values, Aesthetics and Drainage

Defendants also assert denial was justified by the additional compelling government interests
of avoiding adverse visual impacts and adverse effects on property values.   As to property values,
defendants have not presented any credible evidence that the Project would negatively impact
property values.   (*See supra* ¶ 118.)   Even assuming there were evidence supporting defendants'
charge, there is reason to question whether the maintenance of property values constitutes a
compelling governmental interest.   *See*, *e.g.*, *Playboy Entm't*, 529 U.S. at 815 ("[T]he lesser scrutiny
afforded regulations targeting the secondary effects of crime or declining property values has no
application to content-based regulations targeting primary effects of protected speech."); *XXL of
Ohio, Inc. v. City of Broadview Heights*, 341 F. Supp. 2d 765, 789-90 (N.D. Ohio 2004) ("No court
has found [protection of property values] to be a compelling governmental interest sufficient to

124

withstand strict scrutiny."). Moreover, the evidence indicates that any adverse environmental impact of the size of the building and the set-back from Skibo Lane could have been mitigated by the ZBA through imposition of conditions (*see supra* ¶¶ 123, 126), thus establishing that there were less restrictive means available to address this concern.

Regarding defendants' interest in potentially adverse visual impacts, as discussed above, WDS presented a comprehensive landscaping plan, schematics illustrating the sight lines from Skibo Lane and artists' renderings of the Property as viewed from Skibo Lane. (*See supra* ¶¶ 71-72, 102-04, 113, 123.) There was no evidence that these studies were defective, and defendants are required to show that no alternatives were available. Both the parking area and Gordon Hall were to be substantially screened from Skibo Lane. WDS's architect testified that he believed, given the proposed landscaping, that the full building would not even be seen from Skibo Lane. (*See supra* ¶ 71.) Moreover, defendants' own consultants informed the ZBA that "there are only four homes or four households that are directly affected . . . by the massing of the new building. . . . I think particularly it is the center two homes here that could be affected. It is purely aesthetic." (*See supra* ¶ 103.d.) Clearly, defendants have not established that no alternatives other than denial were capable of protecting against detrimental visual impacts. In any event, the visual impact of the Project does not implicate a compelling government interest. *See Cottonwood*, 218 F. Supp. 2d at 1228 (aesthetic concerns may constitute "substantial" but not "compelling" governmental interest); *Castle Hills*, 2004 WL 546792, at *16 ("[I]nterest in window coverings or foliage is not a compelling one and can be addressed by the manner in which a permit is granted, not by an outright refusal to consider a permit's application when at . . . stake is a religious institution's ability to use the land for religious conduct."); *see also Solantic LLC v. City of Neptune Beach*, 410 F.3d 1250, 1267 (11th Cir. 2005)

(holding that City's asserted interest in aesthetics is not a compelling governmental interest); *Whitton*, 54 F.3d at 1408 ("[A] municipality's asserted interests in . . . aesthetics, while significant, [has] never been held to be compelling"); *XXL of Ohio*, 341 F. Supp. 2d at 789-90 (aesthetics and neighborhood preservation not sufficiently compelling to withstand strict scrutiny of content-based restriction on speech (citing, *inter alia*, *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994) and *Whitton*, 54 F.3d at 1408).

Further, issues regarding the Project's potentially negative impacts on drainage were raised at trial. With respect to stormwater management, the Village's own consultants determined that the Project actually would result in an "overall improvement." (*See supra* n.35.) Drainage clearly does not constitute a compelling governmental interest where the proposal actually alleviates existing problems.

### 3.    Parking

Defendants also argue that noncompliance with the Village's zoning code with respect to parking constitutes a compelling governmental interest. However, defendants cannot reasonably demand for one-and-a-half years that WDS reduce the number of parking spaces only to turn around and—without affording WDS any opportunity to respond—contend that the lack of parking somehow poses a threat to public safety. The evidence establishes that the Village Building Inspector, the WCPB and defendants' own consultants all expressed the opinion that WDS provided compliant parking. (*See supra* ¶¶ 74, 100; *see supra* n.22.) There is no such indication in the Resolution or the extensive public record before the ZBA that the lack of parking constituted a threat to public safety. In any event, the 25.75-acre Property obviously can accommodate as many, or as

126

few, parking spaces as reasonably are required by the Village Code to ensure public safety. The parking issue is obviously an afterthought effort to bolster a flimsily supported decision.

### 4.    Summary

Because WDS established that denial of the Application substantially burdened its religious exercise and defendants failed to demonstrate that the denial is the least restrictive means of furthering any compelling governmental interest, the ZBA's denial of the Application constitutes a violation of Section 2(a)(1) of RLUIPA. RLUIPA, 42 U.S.C. § 2000cc-2(a), allows the Court to fashion any appropriate remedy where a violation of RLUIPA has been proven. The Court, therefore, will annul and set aside the May 13 Resolution and order the ZBA to immediately and unconditionally issue WDS's special permit modification, as requested in the Application.[85]

## II.    As-Applied Establishment Clause Challenge

This Court is cognizant that the principle of constitutional avoidance requires us to resolve all statutory issues posed by RLUIPA before confronting issues concerning its constitutionality. *See*, *e.g.*, *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring). Here, however, the statutory claims have been resolved in plaintiff's favor, and we must address the constitutional challenge.

---

[85] During the course of the hearing process, WDS agreed to certain modifications to the Application to address concerns raised by the ZBA. Those modifications, which are all contained in the letter from Divney to the ZBA, dated June 17, 2002 (Pl. Ex. 50), and include, among other things, the enrollment cap of 591, were part of the Application as of May 13, 2003. This Court finds, however, that no additional conditions to the special permit modification sought by WDS are necessary to address any alleged impacts from the Project.

127

Defendants bring an as-applied challenge,[86] positing that a finding in favor of WDS on its RLUIPA claim violates the Establishment Clause of the First Amendment by impermissibly favoring religion over nonreligion and "provid[ing] WDS with a sword that no 'atheist or agnostic can obtain.'" (Defs. Post-Trial Br. at 64 (quoting *City of Boerne*, 521 U.S. at 537 (Stevens, J., concurring)).) Quoting from the Background section of the Second Circuit Opinion, which reviewed this Court's grant of summary judgment in favor of WDS, defendants argue that the Second Circuit "discerned that a portion of the facilities to be built or modified, such as the *beit midrash* and *shul* (although not part of the Application), were intended specifically for religious exercise, while the major part of the plan involved secular facilities, such as classrooms, rooms for computer and art, smaller rooms for tutoring, a cafeteria, and administrative offices." (*Id.* at 63 (quoting *Westchester Day Sch.*, 386 F.3d at 185).)

As the *beit midrash* and *shul* have been built as-of-right, defendants contend that only construction of secular facilities remains at issue. Therefore, according to defendants, "the Application is no different from one that might be presented to the ZBA by a secular school, non-profit organization or the like." (*Id.*) And as a consequence, "[g]ranting WDS'[s] special use permit will have the unintended consequence of granting WDS the unfettered ability to construct and build what they want, where they want and when they want, irrespective of Mamaroneck's zoning code, solely because of its status as a religious school, which runs afoul of the Establishment Clause." (*Id.*

_____

[86] Defendants' facial challenge to RLUIPA's constitutionality was fully considered and rejected by the Court in its September 2003 Order and July 2005 Order. *See Westchester II*, 280 F. Supp. 2d at 233-39; *Westchester IV*, 379 F. Supp. 2d at 554. Defendants have not raised any new arguments with respect to their facial challenge and consequently the Court will not revisit that issue herein.

at 64.)

According to plaintiff, defendants' position is predicated upon the "fundamentally flawed position that the Project involves the construction of facilities to be used for *secular* purposes."  (Pl. Post-Trial Reply Br. at 21 (emphasis in original).)   Plaintiff asserts that because the evidence demonstrates the contrary, *i.e.*, that the facilities are to be used for religious education and practice in conjunction with WDS's religious mission, finding a RLUIPA violation merely "alleviates a burden . . . without affording similar benefits to secular entities."[87]   (*Id.*)

The Establishment Clause of the First Amendment of United States Constitution provides that "Congress shall make no law respecting an establishment of religion . . . ."  U.S. CONST. AMEND. I.  The Establishment Clause requires equal treatment of religious and secular entities because favoring religion over nonreligion would amount to an impermissible establishment of religion.  *See*, *e.g.*, *Gillette v. United States*, 401 U.S. 437, 450 (1971) ("[T]he Establishment Clause prohibits government from abandoning secular purposes . . . to favor adherents of any sect or religious organization.").  "The Supreme Court has consistently disapproved of unequal treatment that elevates religion over secular interests." *Midrash Sephardi*, 366 F.3d at 1238 (collecting cases).  Of course, the Supreme Court "has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Hobbie*, 480 U.S. at 144-45; *see also Zorach v. Clauson*, 343 U.S. 306, 312 (1952) ("The First

---

[87] On February 10, 2006, this Court received an *amicus curiae* brief from the United States, arguing that RLUIPA is constitutional and presents no Establishment Clause problem.  In addition, the United States argues that defendants' as-applied challenge "presents nothing more than the typical balancing of interests RLUIPA contemplates" by its incorporation of the least restrictive means analysis under strict scrutiny.  (U.S. Amicus Br. at 18-19.)  The United States' brief has been considered by this Court in deciding the issues discussed in this section of this Opinion.

Amendment . . . does not say that in every and all respects there shall be a separation of Church and State."). "[I]n commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice." *Bd. of Educ. of Kiryas Joel Vill. Sch. Dist. v. Grumet*, 512 U.S. 687, 705 (1994); *see also Cutter v. Wilkinson*, 125 S. Ct. 2113, 2121 (2005). Rather, "'there is room for play in the joints between' the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Cutter*, 125 S. Ct. at 2117 (quoting *Locke v. Davey*, 540 U.S. 712, 718 (2004) in turn quoting *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 669 (1970)). Yet, "[a]t some point, accommodation may devolve into 'an unlawful fostering of religion.'" *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334-35 (1987) (quoting *Hobbie*, 480 U.S. at 145).

Recently, the Supreme Court, in *Cutter v. Wilkinson*, rejected an Establishment Clause challenge to the prisoners' rights provisions in Section 3 of RLUIPA, 42 U.S.C. § 2000cc-1. The reasoning of that case, although not addressed to the land-use provisions of Section 2 of RLUIPA, nevertheless is applicable here. This Court previously analyzed RLUIPA's constitutionality under the Establishment Clause in accordance with the three-prong test set forth in seminal case of *Lemon v. Kurtzman*, 403 U.S. 602 (1971).[88] However, the Supreme Court did not employ the *Lemon* test

---

[88] Assuming *Cutter* is not dispositive and the *Lemon* test is the more appropriate method of assessing Section 2 of RLUIPA, for the reasons set forth in the September 2003 Order and July 2005 Order as well as those that follow, RLUIPA's land-use provisions comply with *Lemon* both facially and as applied to the facts of this action. *See, e.g.*, *Midrash Sephardi*, 366 F.3d at 1235-43; *Castle Hills*, 2004 WL 546792, at *18-19; *United States v. Maui Cty.*, 298 F. Supp. 2d 1010, 1014-15 (D. Haw. 2003); *Murphy*, 289 F. Supp. 2d at 122-24; *Freedom Baptist Church of Del. Cty. v. Twp. of Middletown*, 204 F. Supp. 2d 857, 864-65 (E.D. Pa. 2002).

in assessing the constitutionality of Section 3 of RLUIPA. *Cutter*, 125 S. Ct. at 2125 n.1 (Thomas, J., concurring) (noting the Court "properly decline[d] to assess RLUIPA under the discredited test of *Lemon v. Kurtzman*"). Indeed, although the *Lemon* test has been referred to as a "central tool" in deciding Establishment Clause cases, *see Zelman v. Simmons-Harris*, 536 U.S. 639, 668 (2002) (O'Conner, J., concurring), it has fallen into noted disfavor, *see McCreary Cty. v. Am. Civil Liberties Union of Ky.*, 125 S. Ct. 2722, 2750-51 (2005) (Scalia, J., dissenting) ("[A] majority of the Justices on the current Court (including at least one Member of today's majority) have, in separate opinions, repudiated the brain-spun '*Lemon* test' that embodies the supposed principle of neutrality between religion and irreligion."); *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring) ("Like some ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried, *Lemon* stalks our Establishment Clause jurisprudence once again, frightening the little children . . . .").

Under the Supreme Court's *Cutter* reasoning, RLUIPA's institutionalized-persons provision was "compatible with the Establishment Clause because it alleviate[d] exceptional government-created burdens on private religious exercise" while taking "adequate account of the burdens a requested accommodation may impose on nonbeneficiaries" and ensuring neutral application "among different faiths." *Cutter*, 125 S. Ct. at 2121. The same holds true for RLUIPA's land-use provisions: Congress sought to protect religious land use in light of "massive evidence" that local governments "frequently discriminated against [such uses] on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation." 146 Cong. Rec. at S7774. Although, as noted above, it is possible for government to go so far in accommodating religion as to constitute "an unlawful fostering of religion," *see Amos*, 483 U.S. at 334-35, where

"government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities." *Id.* at 338.

Section 2 of RLUIPA "does not override other significant interests." *Cutter*, 125 S. Ct. at 2122. Rather, RLUIPA requires government to properly balance the needs of religious groups against community interests. RLUIPA applies only to land-use regulations imposing a *substantial* burden on religious exercise that lack a compelling governmental interest furthered in the least restrictive manner. *See* 42 U.S.C. § 2000cc(a)(1). Given that the substantial burden test is interpreted according to existing Supreme Court jurisprudence, no new standard prejudices government interests in community safety or welfare in violation of the Establishment Clause.

And while the compelling governmental interest standard is indeed a stringent one, "'[c]ontext matters' in the application of that standard." *Cutter*, 125 S. Ct. at 2123 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003)). Federal courts must be mindful that they are not to become super zoning boards of appeal reviewing land use determinations. *See Zahra*, 48 F.3d at 679-80 (quoting *Sullivan*, 805 F.2d at 82). As Congress expressly noted, RLUIPA "does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations . . . ." 146 CONG. REC. at S7776. RLUIPA requires governments to weigh credible threats to the community by a religious entity's proposed construction in order to eliminate discrimination. As this Court observed above (*supra* I.D.1.), had defendants been able to produce any evidence equating the background increases in traffic in the Orienta Point neighborhood in the more than three years between rejection of the Application and the bench trial with increased

132

danger to pedestrians or vehicles, defendants might well have established a compelling governmental interest warranting denial of the Application.  But there is no such evidence.

As a result, defendants require this Court to assume that the Project can be neatly cleaved into its secular and religious components, and that the Second Circuit mandated such a clean division in its remand decision.  (Defs. Amicus Reply Br. at 7.)  We do not read any such per se rule into the Second Circuit Opinion, nor do we consider such division possible. (*See supra* ¶¶ 42-50.)  That decision remanded the case for further factual development and, in doing so, stressed that the summary judgment context required drawing all factual inferences in favor of the ZBA.  On remand, during the bench trial, this Court heard convincing evidence that a substantial number of the so-called secular classrooms and small-group instructional rooms would be devoted exclusively to teaching purely Judaic studies.  In addition, other supposedly secular facilities such as the multi-purpose room will be frequently or even predominately used to accommodate WDS's religious needs.

Defendants' argument suggests that the Second Circuit implied that unless a room is used for purely religious purposes 100% of the time, it must be classified as "secular."  If the Second Circuit meant to require such strict, antiseptic classification of uses, it explained no basis for that conclusion.  Indeed, creating such a strict division would violate the Establishment Clause by hindering religious exercise by punishing the economical, multi-purpose utilization of spaces.  *See Boyajian v. Gatzunis*, 212 F.3d 1, 8 (1st Cir. 2000) ("[T]he state's decision to give religion an assist in the local land-use planning process is consistent with the Supreme Court's holding in *Amos* that legislation isolating religious groups for special treatment is permissible when done for the 'proper purpose' of alleviating a burden on the exercise of religion." (citation omitted)); *see also Amos*, 483

133

U.S. at 337 ("A law is not unconstitutional simply because it allows churches to advance religion, which is their very purpose.").  Moreover, after full development of the facts as mandated by the remand, this Court finds that the construction project proposed in the Application will provide much-needed additional space which will be used to a substantial extent for religious purposes.

Lastly, Section 2 of RLUIPA does not differentiate among bona fide faiths because it does not single out any one religion or any particular religious sect for either special protection or disadvantageous treatment.  *See Cutter*, 125 S. Ct. at 2123 (applying test under Section 3).  As already stated, RLUIPA does not provide any religious group or sect with immunity from zoning codes.  It merely requires a nondiscriminatory balancing of religious needs against community interests.  Consequently, we conclude that Section 2 of RLUIPA, as applied to WDS's Application, does not violate the Establishment Clause.

## III.   All Writs Act

The Court next addresses WDS's claim under the All Writs Act.[89]  The All Writs Act provides, in relevant part, that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651(a).

### A.      Jurisdictional Issues

This provision, while not conferring an independent basis of jurisdiction, authorizes a federal

---

[89] This claim is independent of WDS's RLUIPA claim, and the Conclusions of Law set forth below are not in any way dependent upon any of the Conclusions of Law set forth in Sections I. & II.

court "'to issue such commands . . . as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained.'" *Pa. Bureau of Corr. v. U.S. Marshals Serv.*, 474 U.S. 34, 40 (1985) (quoting *United States v. N.Y. Tel. Co.*, 434 U.S. 159, 172 (1977)); *see also Sprint Spectrum L.P. v. Mills*, 283 F.3d 404, 413 (2d Cir. 2002).

The All Writs Act provides an arsenal of judicial implements designed to achieve the "rational ends of law." *N.Y. Tel. Co.*, 434 U.S. at 172 (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)). A federal court may avail itself of the auxiliary writs as aids in the performance of its duties when necessary "in its sound judgment to achieve the ends of justice entrusted to it." *Id.* at 172-73 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 273 (1942)). The federal courts' authority under the All Writs Act should be exercised "'flexibly in conformity with these principles.'" *Sprint Spectrum*, 283 F.3d at 413 (quoting *N.Y. Tel. Co.*, 434 U.S. at 173).

In its December 2002 Order, this Court held that the Negative Declaration was not properly rescinded as a matter of State law and therefore remained in full force and effect. *See Westchester I*, 236 F. Supp. 2d 349. This required the ZBA to continue WDS's Application to the special permit hearing stage, where the ZBA was to evaluate the Application consistent with New York law and the authority vested in it under the Village Code. The ZBA should not be allowed to frustrate the December 2002 Order by providing less than a fair hearing and simply denying the Application in response to the same small but vocal public outcry that prompted it improperly to rescind the Negative Declaration under the guise of the same pretextual concerns.

The Court is mindful that the federal courts "should not become zoning boards of appeal." *See*, *e.g.*, *Sullivan*, 805 F.2d at 82. However, the Court cannot allow the ZBA to flout the intent of

the December 2002 Order. *See, e.g.*, *N.Y. Tel. Co.*, 434 U.S. at 188 (Stevens, J., dissenting). Thus, it is incumbent upon the Court to address the legality of the ZBA's denial of the Application in order to protect the integrity of the December 2002 Order and "to achieve the ends of justice entrusted to it." *See id.* at 173; *Achtman v. Kirby, McInerney & Squire, LLP*, No. 02 Civ. 9913, 2005 WL 3466586, at *3-4 (S.D.N.Y. Dec. 12, 2005) (injunction restraining law firm from contacting securities fraud class members regarding alleged malpractice by class counsel was proper exercise of jurisdiction under All Writs Act where injunction was necessary to protect integrity of existing orders concerning responsibilities of class counsel); *Sunrise Dev., Inc. v. Town of Huntington*, 98 CV 3336, 1999 U.S. Dist. LEXIS 21326, at *2, *4 (E.D.N.Y. Sept. 1, 1999) (vacating "positive declaration" issued by zoning board pursuant to authority under All Writs Act).

If the ZBA's denial of the Application is contrary to New York law, the All Writs Act vests the Court with the power to annul and set aside the Resolution. *See N.Y. Tel. Co.*, 434 U.S. at 173; *Sunrise Dev.*, 1999 U.S. Dist. LEXIS 21326, at *2. Moreover, this Court has independent authority to address WDS's claim that the ZBA's decision was arbitrary and capricious in its exercise of supplemental jurisdiction as governed by New York law and N.Y.C.P.L.R. § 7801 *et seq*., pursuant to 28 U.S.C. § 1367. Supplemental jurisdiction permits consideration of claims over which a federal court would not normally have jurisdiction so long as the complaint properly invokes a basis for federal jurisdiction and the claims "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367. It is beyond cavil that the claim that defendants' actions violate requirements of New York law is sufficiently related to the RLUIPA claim as to form part of the same case or controversy. *See id.*; *see also City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156,

167-69 (1997); *Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311, 316 (2d Cir. 2000) ("An appeal of an administrative ruling to a state court is removable to a federal district court so long as the complaint . . . presents a well-pleaded claim arising under federal law.").

Contrary to defendants' assertions, WDS was not required to specifically plead the supplemental jurisdiction statute, nor "specifically identify state law claims as such if the cause of action obviously exists under state law." *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 674 (6th Cir. 2005). Nor can defendants contend that the Amended Complaint failed to alert them to the state law component of WDS's action. The Amended Complaint expressly alleges that the "denial of WDS's application by the Board of Appeals was arbitrary and capricious and was not supported by evidence in the record." (Am. Complt. ¶ 93.) Although defendants make the post-trial contention that WDS's state law claim would more appropriately be brought as an Article 78 proceeding (Defs. Post-Trial Br. at 67), the language of the Amended Complaint incorporates the legal standard that would be applied in an Article 78 proceeding. *See*, *e.g.*, *Twin Cty. Recycling Corp. v. Yevoli*, 90 N.Y.2d 1000, 1002, 688 N.E.2d 501, 502, 665 N.Y.S.2d 627, 628 (1997); *see also* FED. R. CIV. P. 8(a).

Under either approach, the relevant facts, standard of review and result are the same. The parties understood that the Court was going to address whether the ZBA's actions complied with state law, had a full and fair opportunity to discover and develop the relevant facts at trial, and thus are not prejudiced by the Court's additional reliance on 28 U.S.C. § 1367. To the contrary, judicial economy, convenience, fairness and comity all weigh in favor of retaining jurisdiction over the state claims. *See Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 55-57 (2d Cir. 2004), *cert. denied,* 125 S. Ct. 2270 (2005). This Court has become intimately familiar with the merits of this case during the last four years. A full record has been developed after significant discovery that addresses all the

137

circumstances surrounding the denial of the special permit modification. Significantly, the availability of the state law basis for granting WDS injunctive relief may permit the Court of Appeals, if the judgment in this case is appealed, to avoid resolving defendants' constitutional challenges to RLUIPA and ancillary questions concerning what state interests are "compelling." *See Westchester Day Sch.*, 386 F.3d at 191 ("Prudence counsels against reaching out to establish a far-reaching constitutional rule when there are many other bases upon which this case may ultimately be decided.").

As set forth below, the Court holds that the ZBA's denial of the Application was arbitrary and capricious under New York law.

### B.    Standard of Review

#### 1.    General Standard of Review

Under New York law, a special use permit, unlike a variance, authorizes the use of property in a manner expressly permitted by the zoning ordinance under stated conditions. *See Twin Cty. Recycling*, 665 N.Y.S.2d at 628; *N. Shore Steak House, Inc. v. Bd. of Appeals of Thomaston*, 30 N.Y.2d 238, 243, 282 N.E.2d 606, 609, 331 N.Y.S.2d 645, 649 (1972). The significance of this distinction is that the "'inclusion of the permitted use in the ordinance is tantamount to a legislative finding that the permitted use is in harmony with the general zoning plan and will not adversely affect the neighborhood.'" *N. Shore Steak House*, 331 N.Y.S.2d at 649; *see also Twin Cty. Recycling*, 665 N.Y.S.2d at 628.

Thus, the burden of proof on an owner seeking a special use permit is lighter than on an owner seeking a variance. *See N. Shore Steak House*, 331 N.Y.S.2d at 649; *Twin Cty. Recycling*

*Corp. v. Yevoli*, 224 A.D.2d 628, 628, 639 N.Y.S.2d 392, 393 (2d Dep't 1996), *aff'd*, 665 N.Y.S.2d

627.  "[T]he issuance of a special permit is a duty which must be exercised whenever there is

compliance with the statutory conditions." *Peter Pan Games of Bayside, Ltd. v. Bd. of Estimate of*

*City of New York*, 67 A.D.2d 925, 926, 413 N.Y.S.2d 164, 166 (2d Dep't 1979); *see also Knight v.*

*Bodkin*, 41 A.D.2d 413, 417, 344 N.Y.S.2d 170, 175 (2d Dep't 1973).

      A zoning board, of course, retains broad discretion in evaluating applications for special use

permits and determining whether a special use permit should issue.  *See Twin Cty. Recycling*, 665

N.Y.S.2d at 628.  Although judicial review of such decisions is limited, a zoning board's denial of

a special use permit, must bear a substantial relation to public health, safety, morals, or general

welfare.  *See Pine Knolls Alliance Church v. Zoning Bd. of Appeals of Moreau*, 5 N.Y.3d 407, 412-

13, 838 N.E.2d 624, 627, 804 N.Y.S.2d 708, 711 (2005); *Cornell Univ. v. Bagnardi*, 68 N.Y.2d 583,

596, 503 N.E.2d 509, 515, 510 N.Y.S.2d 861, 867 (1986); *Westchester Reform Temple v. Brown*,

22 N.Y.2d 488, 493, 239 N.E.2d 891, 894, 293 N.Y.S.2d 297, 301 (1968).  A zoning board's

decision must also have a rational basis and be supported by substantial evidence.  *See, e.g.*, *Fuhst*

*v. Foley*, 45 N.Y.2d 441, 444, 382 N.E.2d 756, 757, 410 N.Y.S.2d 56, 57 (1978); *Twin Cty.*

*Recycling*, 665 N.Y.2d at 628; *Greenfield v. Bd. of Appeals of the Vill. of Massapequa Park*, 21

A.D.3d 556, 557, 800 N.Y.S.2d 728, 729 (2d Dep't 2005).  The denial of a special permit will be

annulled and set aside where it is arbitrary and capricious and not supported by substantial evidence.

*See Twin Cty. Recycling*, 665 N.Y.S.2d at 628; *N. Shore Steak House*, 331 N.Y.S.2d at 650;

*Greenfield*, 800 N.Y.S.2d at 729; *see also Pecoraro v. Bd. of Appeals of Town of Hempstead*, 2

N.Y.3d 608, 613, 814 N.E.2d 404, 407, 781 N.Y.S.2d 234, 237 (2004) ("Courts may set aside a

zoning board determination only where the record reveals that the board acted illegally or arbitrarily,

or abused its discretion, or that it merely succumbed to generalized community pressure.").

### 2.        Application to Educational and/or Religious Institutions

Under New York law, it is well established as a matter of public policy that educational or religious uses of land are "presumed to have a beneficial effect on the community."[90]  *Pine Knolls Alliance Church*, 804 N.Y.S.2d at 711 (church); *see also Cornell Univ.*, 510 N.Y.S.2d at 867 (university); *Westchester Reform Temple*, 293 N.Y.S.2d at 301 (synagogue); *Ass'n of Zone A & B Homeowners Subsidiary, Inc. v. Zoning Bd. of Appeals of Long Beach*, 298 A.D.2d 583, 584, 749 N.Y.S.2d 68, 70 (2d Dep't 2002) (religious high school and college); *Town of Islip v. Dowling Coll.*, 275 A.D.2d 366, 367, 712 N.Y.S.2d 160, 161 (2d Dep't 2000) (local college).  Accordingly, educational and religious institutions "have enjoyed special treatment with respect to residential zoning ordinances and have been permitted to expand into neighborhoods where other nonconforming uses would otherwise not have been allowed."  *Pine Knolls Alliance Church*, 804

---

[90] It also is well-settled under New York law that the special status afforded educational and religious uses also extends to necessary accessory uses such as, for example, a parking lot or administrative office.  *See, e.g.*, *Diocese of Rochester v. Planning Bd. of Town of Brighton*, 1 N.Y.2d 508, 525-26, 136 N.E.2d 827, 837, 154 N.Y.S.2d 849, 853, 861-63 (1956) ("A church is more than merely an edifice . . . . Strictly religious uses and activities are more than prayer and sacrifice." (quoting *Cmty. Synagogue v. Bates*, 1 N.Y.2d 445, 453, 136 N.E.2d 488, 493, 154 N.Y.S.2d 15, 21 (1956)); *Dowling Coll.*, 712 N.Y.S.2d at 161 ("Educational institutions are generally permitted to engage in activities and locate on their property facilities for such social, recreational, athletic, and other accessory uses as are reasonably associated with their educational purpose."); *N. Shore Hebrew Acad. v. Wegman*, 105 A.D.2d 702, 705, 481 N.Y.S.2d 142, 144-45 (2d Dep't 1984) (finding proposed center for performing arts "sufficiently related to [Jewish day school's] overall educational and religious purposes to entitle it to the constitutional protections generally accorded to educational and religious uses"); *High St. United Methodist Church v. City of Binghamton Planning Comm'n*, 186 Misc. 2d 159, 162-63, 715 N.Y.S.2d 279, 282 (Sup. Ct. Broome Cty. 2000) ("[R]eligious use . . . encompasses not only buildings designed for worship, but also ancillary and accessory uses such as schools, playgrounds, related housing, and parking lots . . . .").

N.Y.S.2d at 711 (quoting *Cornell Univ.*, 510 N.Y.S.2d at 865); *see also Westchester Reform Temple*, 293 N.Y.S.2d at 301; *Dowling Coll.*, 712 N.Y.S.2d at 161.  The special status applies to both the initial construction of such facilities and their subsequent renovation and/or expansion. *See Westchester Reform Temple*, 293 N.Y.S.2d at 301; *High St. United Methodist Church*, 715 N.Y.S.2d at 282.

Factors bearing on the public health, safety and welfare, such as traffic, that may suffice to deny a permit for commercial use generally will not suffice to deny an educational or religious use. *See Cornell Univ.*, 510 N.Y.S.2d at 867; *Westchester Reform Temple*, 293 N.Y.S.2d at 301; *Diocese of Rochester*, 154 N.Y.S.2d at 859; *see also McGann v. Inc. Vill. of Old Westbury*, 186 Misc. 2d 661, 662, 719 N.Y.S.2d 803, 804 (Sup. Ct. Nassau Cty. 2000) ("So strong is the presumption of public benefit that ordinarily such factors bearing on public health, safety and welfare as neighborhood appearances, adverse effect on property values, loss of tax revenue, decreased enjoyment of neighboring properties and traffic hazards are insufficient to rebut the presumption.").  Despite the presumed beneficial effect, the presumption can be rebutted "'with evidence of a significant impact on traffic congestion, property values, municipal services and the like.'" *Pine Knolls Alliance Church*, 804 N.Y.S.2d at 711 (quoting *Cornell Univ.*, 510 N.Y.S.2d at 867).  However, where the negative impacts are not so extreme as to justify the denial of an educational or religious use, it is incumbent on the zoning board to accommodate the educational or religious use while imposing conditions to mitigate any potential adverse effects.  *See id.*, 804 N.Y.S.2d at 711 ("This procedure 'affords zoning boards an opportunity to weigh the proposed use in relation to neighboring land uses and to cushion any adverse effects by the imposition of conditions designed to mitigate them.'" (quoting *Cornell Univ.*, 510 N.Y.S.2d at 868)); *Jewish Reconstructionist Synagogue of N. Shore, Inc.*

141

*v. Inc. Vill. of Roslyn Harbor*, 38 N.Y.2d 283, 289-90, 342 N.E.2d 534, 539, 379 N.Y.S.2d 747, 754

(1975) (denial of permit arbitrary and capricious where "no hard evidence" that "any effort was made

to find ways to mitigate . . . inconveniences short of outright denial"); *St. Thomas Malankara*

*Orthodox Church, Inc. v. Bd. of Appeals, Town of Hempstead*, 23 A.D.2d 666, 667, 804 N.Y.S.2d

801, 802 (2d Dep't 2005) ("A local zoning board is required to 'suggest measures to accommodate

the proposed religious use while mitigating the adverse effects on the surrounding community to the

greatest extent possible.'" (quoting *Genesis Assembly of God v. Davies*, 208 A.D.2d 627, 628, 617

N.Y.S.2d 202, 202 (2d Dep't 1994))); *Young Israel of N. Woodmere v. Town of Hempstead Bd. of*

*Zoning Appeals*, 221 A.D.2d 646, 647, 634 N.Y.S.2d 199, 201 (2d Dep't 1995) ("[E]very effort to

accommodate the religious use must be made." (quotation omitted)).[91]

Given the educational and religious use of Gordon Hall and the other facilities in the Project,

as well as WDS's existing buildings, the ZBA's denial of the Application is subject to heightened

scrutiny under New York law.  *See Pine Knolls Alliance Church*, 804 N.Y.S.2d at 711; *Cornell*

*Univ.*, 510 N.Y.S.2d at 867-68.  The ZBA's denial deserves especially careful scrutiny because

traffic concerns often are used by public officials as a pretext for the discrimination against religious

institutions.  *See, e.g.*, *Am. Friends of Soc'y of St. Pius, Inc. v. Schwab*, 68 A.D.2d 646, 649, 417

N.Y.S.2d 991, 993 (2d Dep't 1979) (where denial of a religious use is based on, *inter alia*, traffic

hazards, "it is necessary to most carefully scrutinize the reasons advanced for a denial to insure that

---

[91] *See also Apostolic Holiness Church v. Zoning Bd. of Appeals of Town of Babylon*, 220
A.D.2d 740, 743, 633 N.Y.S.2d 321, 323 (2d Dep't 1995) ("Whenever possible, a religious use
should be accommodated by the imposition of conditions."); *Islamic Soc'y of Westchester &*
*Rockland, Inc. v. Foley*, 96 A.D.2d 536, 537, 464 N.Y.S.2d 844, 845 (2d Dep't 1983) ("There is an
affirmative duty on the part of a local zoning board to suggest measures to accommodate the planned
religious use without causing the religious institution to incur excessive additional costs, while
mitigating the detrimental effects on the health, safety and welfare of the surrounding community.").

they are real and not merely pretexts used to preclude the exercise of constitutionally protected privileges").

**C.     No Substantial Relation to Health, Safety or Welfare and
        No Substantial Evidence Supports a Contrary Finding**

As discussed above, the ZBA provided a list of reasons for its denial, including traffic, parking, aesthetics, drainage and public concern, each of which will be discussed below in relation to New York law.  Based on the extensive record, the Court finds that the ZBA's denial of the Application was arbitrary and capricious under New York law because the purported justifications set forth in the Resolution do not bear the necessary substantial relation to public health, safety or welfare, and the ZBA's findings are not supported by substantial evidence.

**1.     Traffic**

Traffic represents the ZBA's purported "single most important concern," and the vast majority of the findings set forth in the Resolution relate to alleged deficiencies in the WDS Traffic Assessment.  These deficiencies, however, do not bear a substantial relation to public health, safety or welfare and cannot constitute substantial evidence supporting denial because in major part they are patently false.

In finding these supposed deficiencies, the ZBA relied heavily on a letter report from SOUND's traffic expert Dr. Horodniceanu criticizing the WDS Traffic Assessment, as well as on the Chairman's personal view of that Assessment.  (*See supra* ¶¶ 145, 148.)  We recognize that courts in the Second Circuit have refused "'to create by fiat a constitutional requirement that all

zoning boards in this Circuit use expert testimony or written studies to support their decisions.'" *Omnipoint Commc'n, Inc. v. City of White Plains*, 430 F.3d 529, 534 (2d Cir. 2005) (quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 501 n.3 (2d Cir. 2001)). Thus, zoning boards are not obligated to accept the results of a study conducted in a defective manner, even absent a contradictory study. *See id.* at 533. However, where, as here, the most reliable expert opinion strongly supports the granting of a permit, a zoning board should not disregard such opinion in favor of its own inexpert judgment, particularly when that judgment is based on clearly incorrect assumptions of fact. *Cf. Retail Prop. Trust v. Bd. of Zoning Appeals of Town of Hempstead*, 98 N.Y.2d 190, 192-96, 774 N.E.2d 727, 729-32, 746 N.Y.S.2d 662, 664-66 (2002) (discussing effect of contrary expert traffic studies). We have commented at length above on the ZBA's erroneous findings above (*see supra* Findings of Fact Section VIII.), and will review them only briefly here.

First, the Resolution asserts that "Dr. Horodniceanu noted that key intersections were not included in the original traffic study . . . ." (*See supra* ¶ 152.) However, these two intersections, unbeknownst to Dr. Horodniceanu, were in fact studied, and the supplemental analysis was forwarded to the ZBA more than three months before it issued the Resolution. (*See supra* ¶ 153.) The ZBA's post-Resolution attempts to discredit WDS's supplemental analysis are not only unconvincing but also are irrelevant to the ZBA's reasoning at the time of the denial. (*See supra* ¶¶ 155-56; *see supra* n.46.)

Second, the Resolution asserts that WDS's Traffic Assessment employed an incorrect background growth rate based on a 1997 study allegedly conducted by Dr. Horodniceanu for the Liberty Montessori School. (*See supra* ¶ 157.) Yet, WDS used a background growth rate of 2% based on a recommendation from NYDOT, a figure with which the ZBA's own consultants

144

concurred.  (*See supra* ¶¶ 86, 159.)  Moreover, Dr. Horodniceanu, who at trial agreed that NYDOT-supplied figures are a generally accepted standard of background growth, never conducted a study for the Liberty Montessori School.  (*See supra* ¶ 158.)

Third, the Resolution states that the WDS Traffic Assessment failed to factor in passenger-car equivalents, thus failing to properly account for bus-related traffic.  (*See supra* ¶ 161.)  This statement is wrong, as DTS factored into its analysis the assumption that 5% of the vehicles traveling in Orienta Point would be heavy vehicles, a figure based directly on DTS's actual traffic counts.  (*See supra* ¶ 162.)

Fourth, the Resolution charges that WDS failed to "illustrate the fine distinction" between the LOS ratings when assessing the Boston Post Road/Orienta Avenue intersection.  (*See supra* ¶ 164.) This also is wrong, as the WDS Traffic Assessment includes a chart listing the various ratings and the seconds of delay associated with each rating.  (*See supra* ¶ 165); *see also Lerner v. Town Bd. of Town of Oyster Bay*, 244 A.D.2d 336, 337, 663 N.Y.S.2d 661, 662 (2d Dep't 1997) (finding lack of substantial evidence where petitioner's expert demonstrated no LOS degradation at surrounding intersections and "appellants, while critiquing these findings, offered no independent data to the contrary").

Fifth, the Resolution confuses the LOS of one movement at that intersection with the overall LOS of the entire intersection.  Whereas only the westbound, or outbound, movement is projected to rise to an LOS of "E," the intersection as a whole remained unchanged at LOS "D."  (*See supra* ¶ 167.)

Sixth, the Resolution states, with respect to the Boston Post Road/Orienta Avenue intersection, that "it is clear that the current utilization of this intersection is at best dangerous and

any potential increase of even one vehicle per hour would represent an unacceptable and potentially dangerous increase in traffic flow." (*See supra* ¶ 168.)  This conclusory statement was proven false at trial by the testimony of defendants' own traffic expert.  (*Id.*)  Also, ZBA Chairman Gabriele acknowledged at trial that he discounted the empirical data in the WDS Traffic Assessment in favor of his own observations.  (*See supra* ¶ 160.)  However, casual personal impressions are an improper basis for disregarding scientifically designed traffic studies by qualified experts.  *Cf. Eddy v. Niefer*, 297 A.D.2d 410, 412-13, 745 N.Y.S.2d 631, 633-34 (3d Dep't 2002) (speculation of zoning board chair concerning impact of project on traffic insufficient to support denial of special use permit).

Seventh, the Resolution states that concerns over future growth stemmed from community concerns over traffic intensity and the danger posed to pedestrians and joggers due to the lack of sidewalks.  (*See supra* ¶ 183.)  Yet, both Orienta Avenue and Rushmore Avenue have sidewalks along their most heavily traveled portions (nearest Boston Post Road), and where the sidewalk on Orienta Avenue ends at Sylvan Lane, the road splits into the main road and a service road, the two separated by a 15-foot wide grassy median.  (*See supra* ¶ 184.)  Moreover, there is no evidence that the completed construction will cause an increase in bus traffic (*see supra* ¶ 186; *see supra* n.62), and there is no evidence beyond the speculation of one ZBA member and one local resident as to pedestrian traffic other than the pedestrians counted by DTS during its traffic study.  (*See supra* ¶ 188); *see also Oyster Bay Dev. Corp. v. Town Bd. of Town of Oyster Bay*, 88 A.D.2d 978, 979, 451 N.Y.S.2d 796, 798 (2d Dep't 1982) (finding "conclusory in form" and insufficient testimony of local residents and affidavit of one town board member as to existing conditions concerning traffic danger posed to children, congestion due to narrow streets and difficulty turning at certain intersections in the face of testimony of petitioner's traffic expert that roads could handle projected traffic increase

where opinion was based on traffic study).

The unsupported findings in the Resolution are insufficient to justify denial of the Application. *See Robert Lee Realty Co. v. Vill. of Spring Valley*, 61 N.Y.2d 892, 894, 462 N.E.2d 1193, 1194, 474 N.Y.S.2d 475, 475-76 (1984) (denial of special permit purportedly based on "traffic congestion" arbitrary and capricious where finding was "not supported by substantial evidence in the record"); *Triangle Inn, Inc. v. Lo Grande*, 124 A.D.2d 737, 738, 508 N.Y.S.2d 240, 242 (2d Dep't 1986) (conclusory statement that proposed motel expansion "would have adverse traffic impacts at an already overcongested location" insufficient to support denial of special use permit). This is especially true where the ZBA was presented with the WDS Traffic Assessment and Supplemental Traffic Assessment, which constituted thorough and comprehensive analyses of the potential impact of the Project on traffic at 19 different intersections in and around WDS and Orienta Point. (*See supra* ¶¶ 85-92, 121.) It should be emphasized that the ZBA's own consultants verified the methodology used by WDS and never criticized the reports. (*See supra* ¶¶ 101, 157, 160.) There was no empirical evidence contradicting WDS's findings before the ZBA when it made its decision to deny the Application, and the recitation of facts upon which the ZBA relied in rejecting those findings was pervasively erroneous.

Significantly, Gabriele conceded before the May 13, 2003 vote that the ZBA's rejection of WDS's traffic studies was, at least in part, based on "public outcry." (*See supra* ¶ 131.) Under New York law, however, the results of empirical traffic analyses cannot be disregarded based upon community objections. *See Retail Prop. Trust,* 746 N.Y.S.2d at 666 ("[E]xpert opinion regarding traffic patterns, when presented, may not be disregarded in favor of generalized community opposition."); *Burke v. Denison*, 203 A.D.2d 642, 644, 609 N.Y.S.2d 959, 960 (3d Dep't 1994)

147

("generalized community concerns" regarding traffic insufficient to counter empirical study by applicant's traffic engineer concluding that proposed use would not have significant effect upon traffic); *Pilato v. Zoning Bd. of Appeals of Town of Mendon*, 155 A.D.2d 864, 865, 548 N.Y.S.2d 950, 951 (4th Dep't 1989) ("[I]t is improper to disregard expert testimony proffered by the applicant in favor of generalized community objections.").

As there is no evidence—substantial or otherwise—supporting the ZBA's claims that WDS's traffic studies were defective, and there are no other analyses in the record, the ZBA's rejection of the WDS Traffic Assessment (and Supplemental Traffic Assessment) was improper under New York law. *See Greenfield*, 800 N.Y.S.2d at 730 (denial of variance arbitrary and capricious where board's findings "were uncorroborated by any empirical data or expert testimony, and therefore were insufficient to counter the expert testimony presented by [applicant]"); *Framike Realty Corp. v. Hinck*, 220 A.D.2d 501, 502, 632 N.Y.S.2d 177, 178 (2d Dep't 1995) (denial of special exception application found arbitrary and capricious because "generalized complaints about traffic from local residents describing existing conditions are insufficient to counter an expert opinion based on empirical studies that 'the existing street system could handle the projected increase in traffic'" (quoting *Oyster Bay Dev. Corp.*, 451 N.Y.S.2d at 797)).

Even if there were evidence that the Project would have a significant impact on traffic (and there is not), the denial would still be arbitrary and capricious under New York law due to the lack of evidence that the Project would have a greater impact on traffic than other unconditionally permitted uses of the Property. *See Robert Lee Realty*, 474 N.Y.S.2d at 475-76 (denial of special permit based on "traffic congestion" arbitrary and capricious where there was no evidence that proposed use would have any greater impact than unconditionally permitted uses); *7-Eleven, Inc. v.*

148

*Bd. of Trs. of Inc. Vill. of Mineola*, 289 A.D.2d 250, 250, 733 N.Y.S.2d 729, 729-30 (2d Dep't 2001)

("Where the denial of the special use permit is based on a claim of traffic congestion, there must be

evidence that the proposed use would cause greater traffic congestion than an as-of-right use.");

*Markowitz v. Town Bd. of Town of Oyster Bay*, 200 A.D.2d 673, 674, 606 N.Y.S.2d 705, 707 (2d

Dep't 1994) (denial of special use permit arbitrary and capricious where there was not substantial

evidence that proposed use "would have a greater impact on traffic than would other

unconditionally-permitted uses").  As discussed above, the sole comparison to as-of-right use set

forth in the Resolution is, as defendants conceded at trial, based on the ZBA's obvious misreading

of the WDS Traffic Assessment.  (*See supra* ¶¶ 195-97.)


### 2. <u>Parking</u>

The purported lack of parking on the Property does not bear a substantial relation to public

health, safety or welfare, and the Resolution does not suggest otherwise, either explicitly or

implicitly.  The Resolution states only that the proposed 81 parking spaces creates a parking

deficiency of some 228 parking spaces, and that WDS never applied for a variance to accommodate

that many spaces.  (*See supra* ¶ 204.)  Of course, this number was based on an incorrect calculation

performed by ZBA Chairman Gabriele and contradicted by calculations performed by the Village

Building Inspector, the WCPB and the ZBA's own consultants, not to mention a previous finding

by the ZBA in its Negative Declaration (reinstated by this Court) that the Project was parking

compliant.  (*See supra* ¶¶ 207-12.)

Based on these facts, the Court finds the ZBA's determination that the Project provided

insufficient parking to be arbitrary and capricious.  *See Syracuse Bros., Inc. v. Darcy*, 127 A.D.2d

588, 589, 511 N.Y.S.2d 389, 389 (2d Dep't 1987) (annulling denial of application for site plan approval on ground that, *inter alia*, planning board's determination that parking was inadequate found "no support in the record"); *N.Y. Tennis Assocs. v. Town of Vestal*, 97 A.D.2d 899, 900, 470 N.Y.S.2d 466, 468 (3d Dep't 1983) (annulling denial of special use permit based on, *inter alia*, lack of parking where "the record [was] entirely void of any proof of inadequacy of on-site parking"). In any event, as noted *supra* Section I.D.3., there was sufficient reserve space on the 25.75-acre Property to accommodate as many, or as few, spaces as would reasonably be required to protect the public health, safety or welfare.

### 3.    **Visual Impact**

Although aesthetics are not wholly irrelevant, the limited impact of the Project on the views of four neighbors is insufficient to deny the Application. *See Presnell v. Leslie*, 3 N.Y.2d 384, 389, 144 N.E.2d 381, 384, 165 N.Y.S.2d 488, 492 (1957) ("While we have never supported a zoning ordinance which restricts the use of property for a purely aesthetic reason alone, we have stated that such considerations are not wholly without weight."). The ZBA's own consultants dismissed the aesthetic concerns as affecting, at most, only four homes along Skibo Lane. (*See supra* ¶ 103.d.) Even with respect to these homes, Gordon Hall will be screened by existing trees and vegetation, as well as newly planted evergreen trees and a 5-foot high solid fence designed to shield light from car headlights. (*See supra* ¶¶ 71-72, 102-04, 113, 123.) Even the lights illuminating the parking lot were designed so as to minimize light spillage. (*See supra* ¶ 72.) The factual weight leans heavily against rejection. *See Presnell*, 165 N.Y.S.2d at 492; *cf. N. Shore Steak House*, 331 N.Y.S.2d at 650 (annulling denial of special permit where, *inter alia*, there was no reasonable basis for conclusion

that additional cars would negatively impact surrounding neighbors given applicant's agreement to

provide 10-foot screen of shrubs or trees to protect surrounding neighbors).

As already noted, it appears that the Application was denied not based on concerns bearing

a substantial relation to public health, safety or welfare, but rather because of limited, but vocal,

community pressure.  For that reason alone the ZBA's decision is arbitrary and capricious under New

York law.  *See Retail Prop. Trust,* 746 N.Y.S.2d at 666; *Twin Cty. Recycling*, 665 N.Y.S.2d at 628

(denial of special use permit arbitrary and capricious where "it is evident that the application was

denied not because it failed to meet the applicable criteria but because of generalized community

pressure"); *Pleasant Valley Home Constr., Ltd. v. Van Wagner*, 41 N.Y.2d 1028, 1029, 363 N.E.2d

1376, 1377, 395 N.Y.S.2d 631, 632 (1977) (denial of special permit application arbitrary and

capricious where it was based on "community pressure" directed against additional development in

the area).  *But see Harlen Assocs.*, 273 F.3d at 500-01 (upholding zoning board decision against

NIMBY community opposition in part because board's "position remained unchanged after the

public spoke against granting the application").


### 4.    **Impermissible Considerations**

The ZBA also denied the Application based, at least in part, on impermissible considerations.

The May 13 Resolution, for example, speculates about possible high school expansion, alluding to

WDS's supposed failure to provide the ZBA with sufficient evidence about the "master plan" for the

Property.  (*See supra* ¶ 216.)  We have already determined that WHHS had no expansion plans and

had communicated that position to WDS, which in turn had informed the ZBA.  (*See supra* ¶¶ 217-

21.)  Therefore, no substantial evidence exists to support a contrary finding.  It is well-settled that

151

the ZBA cannot deny a special use permit based on speculation as to a future expansion.  *See*, *e.g.*, *Young Israel of N. Woodmere*, 634 N.Y.S.2d at 201 ("The Board's speculative argument concerning future increase in attendance is insufficient to justify the burden thus placed on the petitioner's religious affairs."); *N. Shore Hebrew Acad.*, 481 N.Y.S.2d at 145 (denial of special use permit for performing arts center at Jewish day school arbitrary and capricious where it appeared that decision was motivated primarily by "speculation and fears concerning the noise and traffic that the program would generate if it expanded significantly, when there was no evidence that such an expansion in the student body was contemplated").

Finally, with respect to drainage concerns, there is no evidence that drainage constitutes a threat to the public health, safety or welfare where there is undisputed evidence that the Project actually would result in an "overall improvement."  (*See supra* n.35.)

Thus, defendants have not overcome the presumption that WDS's education and religious use will have a beneficial effect.  For that reason alone, the ZBA's outright denial of the Application was arbitrary and capricious under New York law.  *See Pine Knolls Alliance Church*, 804 N.Y.S.2d at 711; *Cornell Univ.*, 510 N.Y.S.2d at 863, 867; *Albany Prepatory Charter Sch. v. City of Albany*, 10 Misc. 3d 870, 876, 805 N.Y.S.2d 818, 822 (Sup. Ct. Albany Cty. 2005).

### D.    Failure to Consider Accommodation

Even if the presumption had been rebutted, we find that the ZBA failed to make any, let alone a reasonable effort to accommodate WDS's educational and religious use, as it must under New York law.  *See McGann*, 719 N.Y.S.2d at 804 (factors such as traffic, parking, aesthetics, "are germane only to the sculpting of reasonable restrictions in order to avoid or minimize negative

impact to the health, safety and welfare of the community"). The Court heard from both plaintiff's and defendants' experts that potential traffic increases caused by the Project could have been mitigated by implementing any number of different solutions. (*See supra* ¶¶ 126, 201.) In addition, after taking a "close look at the relationship between the student cap and traffic impact," the ZBA's own traffic experts advised them that the imposition of an interim cap and bus schedule "should be able to reasonably control traffic impacts." (*See supra* ¶¶ 126-28.) The record is devoid of evidence suggesting why the ZBA decided not to approve the Application subject to such conditions. Indeed, the draft resolution provided by the ZBA's consultants approving the Application subject to an enrollment cap and traffic management plan was never even circulated to the ZBA members despite Chairman Gabriele's public statement that it was "incumbent" upon the ZBA to review it before voting on the Application. (*See supra* ¶¶ 129-30.) The same holds true for the ZBA's concerns over parking (*supra* ¶¶ 74, 100; n.22); property values (*supra* ¶ 118); visual impacts (*supra* ¶¶ 71-72, 102-04, 113, 123, 126); and drainage (*supra* n.35).

Because the ZBA failed to make a reasonable effort to accommodate WDS's education and religious use through the imposition of conditions, its decision was arbitrary and capricious under New York law. *See, e.g.*, *Apostolic Holiness Church*, 633 N.Y.S.2d at 324 (affirming, subject to reasonable conditions to be imposed by zoning board, decision annulling denial of variance held to be arbitrary and capricious because, *inter alia*, "generally, problems of traffic and congestion can be adequately addressed with the imposition of conditions"); *Genesis Assembly of God*, 617 N.Y.S.2d at 203 (denial of building permit arbitrary and capricious where building department did not appear to consider possibility of approving application capping attendance); *Lawrence Sch. Corp. v. Lewis*, 174 A.D.2d 42, 47, 578 N.Y.S.2d 627, 630 (2d Dep't 1992) (denial of variance arbitrary and

153

capricious where "reasonable conditions" would have addressed board's concerns); *St. Thomas Malankara Orthodox Church*, 804 N.Y.S.2d at 802 (denial of variance arbitrary and capricious where board "made no effort to suggest . . . measures" mitigating impacts of requested parking waiver).

### E.    <u>Summary</u>

As explained above, the ZBA's denial of the WDS Application was arbitrary and capricious under New York law, and therefore must be annulled and set aside. This result is necessary in order to protect the integrity of the December 2002 Order and to achieve the ends of justice entrusted to us. Accordingly, pursuant to its authority under the All Writs Act, this Court annuls and sets aside the May 13 Resolution and orders the ZBA to immediately and unconditionally issue WDS's special permit modification requested in the Application.[92]

### SUMMARY

The Zoning Board of Appeals of the Village of Mamaroneck (the "ZBA"), under intense and unrelenting pressure from politically well-connected neighboring residents, including a recent ex-Chairman of the ZBA, voted 3-2 to deny the Application of Westchester Day School ("WDS" or the "School") for a special permit to construct a new classroom building interconnecting two existing buildings on its 25.75-acre property in Orienta Point (the "Property"). The ZBA based its denial on

---

[92] As noted *supra* n.85, modifications contained in a letter from Divney to the ZBA, dated June 17, 2002 (Pl. Ex. 50), such as, among other things, the enrollment cap of 591, were part of the Application as of May 13, 2003. This Court finds, however, that no additional conditions to the special permit modification sought by WDS are necessary to address any alleged impacts from the Project.

two principal objections.

First was the size and location of the new addition which, together with the two existing buildings to which it would be connected at its opposite ends, would create a composite structure some five hundred feet in length that, at its closest point, would be only 25 feet from the property line, presenting what the objectors envision as a massive and unattractive appearance when viewed from outside the Property. They urge that the new building should be reduced in size and moved to the opposite side of the heavily wooded and sparsely occupied Property. But separating the new classrooms from the other school facilities, such as assembly rooms and lunchrooms, would mean that young children would be required repeatedly to walk outside for long distances in cold and/or stormy weather and to cross several heavily traveled driveways where crossing guards would have to be provided. Clearly, the proposed location of the new building is the only one that is remotely comparable in terms of efficiency and practicality. Moreover, the adjoined buildings would not present a monolithic façade, but one relieved by numerous offsets so that the addition is not only attractive and architecturally consistent with the existing buildings but is only two stories in height—considerably lower than the three-story Castle at one end—and its apparent bulk has been further reduced by extending its sloped roof down to the first floor ceiling line and dormering the second floor windows. Furthermore, the adjacent property line borders the terminal portion of a dead-end street that is used to reach only four homes. The closest of these homes is on the opposite side of the street, some 117 feet from the proposed addition. The enlarged building would be visible from only four homes, even without the double row of evergreen trees that the Application requires to be planted between the building and the property line. When those trees mature within a few years, the building would scarcely be visible at all from outside the Property. For these reasons, any

155

objections based on the aesthetic appearance of the addition seem utterly trivial in comparison to WDS's pressing need for improved facilities.

One couple whose property adjoins the WDS premises in the area of the expanded parking lot complains of the glare of headlights and the noise of car doors closing.   But the parking lot had been in use for many years before this couple bought their property and, even if WDS's enrollment increases to full capacity, there will be only a minor fractional increase in the number of cars using the parking lot.   Moreover, even though most of the usage will be during daylight hours when headlights are not needed, the Application calls for a 5-foot high solid wooden fence to screen the parking lot from outside view.

The ZBA's second major objection was that the new building would increase WDS's enrollment capacity to 591 students, 18% more than its peak enrollment of 502 in 2000, and that such an increase in school population would cause intolerable traffic congestion on Orienta Point, a peninsula accessible by only one two-way street, Orienta Avenue, and one outbound-only street, Old Post Road.   But a traffic study conducted by WDS's expert, and confirmed by the ZBA's own expert, shows that, even on the worst-case assumption that WDS's enrollment increased to 100% of capacity, the greatest—but still tolerable—traffic delay would occur at Orienta Avenue's westbound (outbound) intersection with Boston Post Road in the morning peak hour, when many residents of Orienta Point are leaving their homes for work or other errands—and when the WDS students and staff are all going the opposite direction and adding little if any to the congestion.   The same is true, of course, during the afternoon peak hour when the residents are coming home and the students and staff are leaving or will already have left Orienta Point.   There is no convincing evidence to rebut the conclusion reached by WDS's traffic expert:  that the proposed addition will

not have a substantial adverse affect on traffic conditions in the area.

The ZBA's rejection of WDS's Application strongly relied on the serious charge that in the Application "there may have been a willful attempt to provide inaccurate information" respecting the number of cars entering the School premises during the morning peak hour. However, at trial, the ZBA Chairman conceded that this charge was clearly wrong, being based on his misreading of the traffic study conducted by WDS's traffic expert, about which he did not consult the ZBA's own expert. As discussed above, this is only one of many significant factual errors in the ZBA's Resolution denying the Application.

The pervasive theme of the ZBA's defense is that their denial of WDS's Application did not burden the exercise of religion because: (1) WDS is functioning adequately in its present buildings; (2) the *shul* and *beit midrash*, the only two portions of the proposed structure dedicated exclusively to religious uses, have already been incorporated in the Castle when it was reconstructed as-of-right following the fire in June 2003; and (3) all of the added classrooms would be used for instruction in secular subjects. But all of the classrooms would also be usable and frequently used for religious instruction. Moreover, it is not appropriate to bifurcate WDS's dual curriculum and consider the religious and secular components in isolation because WDS would not exist at all without its religious mission. Jewish parents, whose children are entitled to a free public education, are willing to pay annual tuition of up to $17,000 per child for attendance at WDS for only one reason: so that their children, while receiving a good general education, will also be inculcated in the tenets, traditions and rituals of the Orthodox Jewish faith. It is such religious nurture of the young that has passed the faith from generation to generation and maintained its vitality through the ages. In this worthy mission, WDS has been substantially hampered by a woefully inadequate physical plant,

157

which has contributed to a steady decline in enrollment in recent years and which threatens its very survival.  The argument that WDS's mission has not been impeded because it has thus far been able to endure adverse conditions reflects a callous indifference to the difficulties which those conditions have created for WDS in its efforts to attract, retain and educate students and the real danger that they will lead to its ultimate failure—difficulties and danger that clearly impose a substantial burden on the exercise of religion in violation of RLUIPA.

Like other religious schools, WDS performs an extremely valuable public service, not only educating many children who would otherwise have to be educated at public expense, but also instilling in them principles of morality and ethics that will make them better members of society.  For these reasons religious schools are favored property uses and zoning boards are adjured to weigh their needs heavily against environmental concerns.  In this case, it appears that the ZBA did just the opposite.

Any new building on the WDS premises, especially one that increases enrollment capacity, would necessarily have some adverse impact on the surrounding community.  But a weighing of WDS's pressing need against the relatively minor adverse environmental impacts in this case compels the only reasonable conclusion:  that the ZBA's denial of WDS's Application for a special permit was so contrary to the evidence and to the equities as to be arbitrary and capricious.

It is true that the denial of an application for a special permit is never final except in the highly unlikely event that the ZBA expressly says it is.  WDS can file a new application proposing a smaller building and/or a different location, but it would take many months for new plans to be drawn and new studies to be made and still more time for opposition studies, new public hearings and ZBA consideration.  And the evidence suggests that successive applications or proposed

158

modifications might be denied until the Project would, in effect, have been designed by the ZBA, a group influenced by clamorous neighbors and admittedly without training in architecture or knowledge of the special space needs of dual curriculum religious schools.  More than four years have already passed since the present Application was filed—an Application that, after duly considering all of the evidence, we are strongly convinced should have been granted.   The Court sees no reason to prolong the process for another lengthy period while enrollment continues to drop, construction costs rise still more and potential donors possibly lose interest.  Justice so long delayed is justice denied.

## CONCLUSION

Therefore, the Court will issue a mandatory injunction pursuant to its authority under the All Writs Act, 28 U.S.C. § 1651, ordering the Zoning Board of Appeals of the Village of Mamaroneck (the "ZBA") to approve forthwith the present amended Application of Westchester Day School ("WDS") for a special permit based on our conclusion that the ZBA's denial of the Application was so contrary to the evidence and to the equities as to be arbitrary and capricious, and our conclusion that defendants have substantially burdened WDS's religious exercise without a compelling governmental interest exercised in the least restrictive means, in violation of the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq.*

The Court reserves decision on plaintiff's prayer for damages and attorneys' fees pending

appellate review.  WDS may submit on notice to defendants a proposed Order for Partial Judgment and certification for immediate appeal pursuant to 28 U.S.C. § 1292(b).


SO ORDERED.

Dated:   White Plains, New York
         March 2, 2006



_William C. Conner_
Sr. United States District Judge

160